UNITED STATES of America, Plaintiff,

v.

CONSERVATION CHEMICAL COMPANY, Norman B. Hjersted, Conservation Chemical Co. of Illinois, Armco Steel Corporation, FMC Corporation, International Business Machines Corp., Western Electric Company, Inc., and Mobay Chemical Company, Defendants.

No. 82–0983–CV–W–5.

United States District Court,
W.D. Missouri, W.D.

July 2, 1985.

See also 106 F.R.D. 210.

170

Kenneth Josephson, Asst. U.S. Atty., Kansas City, Mo., John R. Barker, Environmental Enforcement Section, Land Natural Resource Div., U.S. Dept. of Justice, Washington, D.C., Ken Weinfurt, Asst. U.S. Atty., Kansas City, Mo., John Wittenborn, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Niewald, Waldeck, Norris & Brown, Michael E. Waldeck, John L. Hayob, Terry L. Karnaze, Kansas City, Mo., for Conservation Chemical, CCC of Ill. and Norman Hjersted.

Thos. F. Fisher, John M. Kilroy, Jr., Shughart, Thomson & Kilroy, Kansas City, Mo., Edmund B. Frost, John A. Zackrison, Kirkland & Ellis, Washington, D.C., Robert F. St. Aubin, FMC Corp., Philadelphia, Pa., for FMC Corp.

Neil D. Williams, Overland Park, Kan., James F. Duncan, Watson, Ess, Marshall & Enggas, Kansas City, Mo., Allan J. Topol, Patricia A. Barald, David F. Williams, Covington & Burling, Washington, D.C., for IBM Corp.

Richard F. Adams, Ben R. Swank, Jr., John J. Williams, III, Slagle & Bernard, Kansas City, Mo., for third party plaintiffs.

Linde Thomson Fairchild Langworthy Kohn & Van Dyke, P.C., John R. Cleary, Darwin Johnson, Wm. Session and Robert J. Bjerg, Kansas City, Mo., for Norman Hjersted.

J. Jeffrey McNealey, Porter, Wright, Morris & Arthur, Columbus, Ohio, Martin J. Purcell, Robert M. Kroenert, Stanley A. Reigel, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Daniel W. Kemp, Legal Dept., Armco, Inc., Middleton, Ohio, for Armco, Inc.

Jerome T. Wolf, Carl H. Helmstetter, Spencer, Fane, Britt & Browne, Kansas City, Mo., John A. McKinney, Morton I. Zeidman, Alan R. Chesler, New York City, for AT & T Tech. Inc.

Stephen Jacobson, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for Mobay.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

On May 17, 1985, the Special Master filed a report issuing recommendations concerning the appropriate disposition of eighty-two pending motions to dismiss or motions for summary judgment. By subsequent Court order, the Court directed that objections to the Special Master's report submitted pursuant to Fed.R.Civ.P. 53 shall be filed by July 1, 1985. As required, the Court has independently reviewed the record regarding the issues relating to the Master's report, including the relevant motions and responses thereto, and the objections filed to the report. *See United States v. Louisiana,* —— U.S. ——, 105 S.Ct.

1074, 1080, 84 L.Ed.2d 73 (1985). Accordingly, the Court enters the following rulings in summary form, and, with respect to those recommendations approved by the Court, the Court hereby adopts the reasoning stated in the Master's report in support of those recommendations. Recommendations of the Master not adopted by the Court will be so designated.

## COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT

1. The plaintiff's motion for partial summary judgment on liability issues under Sections 106(a) and 107(a) of CERCLA, 42 U.S.C. §§ 9606(a) and 9607(a), and Section 7003 of RCRA, 42 U.S.C. § 6973—

A. The plaintiff's motion will be granted with respect to the following issues:

(1) The plaintiff's claim for recovery of response costs under CERCLA § 107 from defendant C.C.C. and CCCI. Over the Master's recommendation, the Court will, however, allow C.C.C. and CCCI to contest the amount of those response costs at trial by attempting to meet their burden under 42 U.S.C. § 9607(a) of establishing that those costs claimed are inconsistent with the National Contingency Plan;

(2) The plaintiff's claim that an imminent and substantial endangerment to the public health or welfare or the environment exists at the C.C.C. site within the meaning of CERCLA § 106;

(3) The plaintiff's request for injunctive relief against C.C.C. and CCCI to abate the endangerment under CERCLA § 106;

(4) The plaintiff's claim that an imminent and substantial endangerment exists at the C.C.C. site within the meaning of RCRA § 7003;

(5) The plaintiff's request for injunctive relief against C.C.C. to abate the endangerment under RCRA § 7003; and

(6) The scope of liability under RCRA § 7003 is joint and several unless the harm is found to be divisible.

B. The plaintiff's motion for partial summary judgment is otherwise denied and the following issues, among others, are subject to continued litigation:

(1) The extent of the endangerment;

(2) Whether the plaintiff's response costs are consistent with the National Contingency Plan;

(3) Whether the original generator defendants are liable with respect to the Government's claims under CERCLA §§ 106 and 107, that is, whether the original generator defendants in fact shipped wastes to the C.C.C. site;

(4) With respect to the plaintiff's claim under RCRA § 7003, whether the original generator defendants actually shipped waste to the C.C.C. site and whether these defendants contributed to the endangerment in terms of a causal connection;

(5) Whether the defendants are liable for response costs pursuant to this Court's equitable discretion under RCRA § 7003;

(6) Whether the harm is indivisible; and

(7) The liability of Norman Hjersted.

2. The plaintiff's motions for partial summary judgment against the defendants regarding defenses—The Court concludes the following as a matter of law:

(1) Although strict liability is applicable under CERCLA §§ 106 and 107, over the Master's recommendation the Court concludes that CERCLA § 107(b) provides affirmative defenses to such liability;

(2) Equitable defenses are available under CERCLA;

(3) The plaintiff is not required to comply with the statutory prerequisites of CERCLA § 104 or CERCLA § 112(a) in order to obtain recovery under CERCLA §§ 106 and 107;

(4) The plaintiff's claim under RCRA § 7003 is not barred because the plaintiff did not comply with the notice provisions of RCA § 3008, 42 U.S.C. § 6928;

(5) The mere existence of an adequate remedy at law does not preclude injunctive relief under CERCLA;

(6) The statute of limitations found in CERCLA § 112 is not applicable in this case, although the equitable doctrine of laches may be considered by the Court;

(7) The provisions of RCRA and CERCLA are not facially unconstitutional; and

(8) The exception for mining wastes and fly ash found at CERCLA § 101(14)(C) applies only to subparagraph (C), and is not a general exception to the definition of "hazardous substances" under the remaining provisions of CERCLA § 101(14).

3. Motions for partial summary judgment regarding third-party plaintiff's right to contribution and third-party defendants' joint and several liability—

The Court concludes the following as a matter of law:

(1) Under CERCLA, if the harm caused by the defendants is determined to be indivisible under the theory of joint several liability, a right of contribution exists against third-party defendants for costs of injunctive relief and response costs imposed on or incurred by the defendants; and

(2) The third-party defendants' liability for contribution under CERCLA is several, but not joint and several, as liability for contribution does not extend beyond a tortfeasor's equitable share of the liability.

4. Motions concerning the right of third-party plaintiffs to seek injunctive relief against third-party defendant generators—

The Court declares as a matter of law, consistent with the Special Master's Report and Recommendation, that the right to seek injunctive relief under both RCRA and CERCLA is vested solely in the Government, therefore the Court has no jurisdiction to impose equitable remedies on third-party plaintiffs and counterclaim defendants.

5. The motions based on the theory of de minimis non curat lex—

Consistent with this Court's prior ruling and with the Special Master's Report and Recommendation, the Court declares that the application of the de minimis theory would be inconsistent with Congressional intent underlying RCRA and CERCLA, and therefore cannot be used as an absolute defense in this case.

6. Remaining issues presented in the pending motions: Consistent with the Master's Report, the Court declares as follows:

(1) A generator is not absolved of liability under CERCLA simply because it did not select the disposal site, because ownership of waste was transferred to a transporter, because, by selecting a site, the transporter would also be liable under § 107(a)(4), or because the waste was initially transported to another site before being transferred to the ultimate site;

(2) The motion for summary judgment by Schwinn Bicycle Company regarding the § 107(b)(3) defense must be denied as material facts are in dispute, but the defense may be raised with evidentiary support at the Phase I hearing.

(3) The conclusions and recommendations contained in the following sections of the Special Master's Report are adopted in their entirety:

(a) VIII. Miscellaneous generator liability issues—

(b) IX. Liability for hazardous substances sold to C.C.C. for treatment of other waste—

(c) X. In personam jurisdiction—

(d) XIII. Liability of KCP & L as past owner of C.C.C. site and as owner of facility.

7. Third-party generator defendant Wellman Dynamics Corporation's motion for summary judgment on the issue of continued corporate liability—a ruling on this motion is deferred pending further

consideration of Wellman Dynamics' objections to the Special Master's Report.

Accordingly, subject only to the expressed exceptions contained above, it is hereby

ORDERED that the Special Master's Report filed May 17, 1985 is adopted. It is further

ORDERED that, subject to the exceptions contained above, the pending motions to dismiss and motions for summary judgment are ruled in accordance with the Master's Report.

SPECIAL MASTER'S REPORT

ROBERT H. FREILICH, Special Master.

## TABLE OF CONTENTS

INTRODUCTION ............................................178

I. UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT OF LIABILITY PURSUANT TO SECTION 106(a) AND 107(a) OF CERCLA AND SECTION 7003 OF RCRA ................................................ 181

II. THE UNITED STATES' MOTIONS REGARDING DEFENSES ............................................ 202

III. THIRD–PARTY PLAINTIFFS' RIGHT TO CONTRIBUTION UNDER CERCLA ................................. 222

IV. THE ABILITY OF THE THIRD–PARTY PLAINTIFFS TO OBTAIN INJUNCTIVE RELIEF AGAINST THE THIRD–PARTY DEFENDANT GENERATORS .................... 230

V. ARGUMENTS BASED UPON THE PRINCIPLE OF DE MINIMIS NON CURAT LEX ........................... 232

VI. SELECTION OF THE DISPOSAL SITE BY A GENERATOR IS NOT A PREREQUISITE TO LIABILITY ......... 233

VII. THE THIRD–PARTY DEFENSE UNDER CERCLA SECTION 107(b)(3) ........................................ 234

VIII. MISCELLANEOUS GENERATOR LIABILITY ISSUES ... 235

IX. LIABILTY FOR HAZARDOUS SUBSTANCES SOLD TO CCC FOR TREATMENT OF OTHER WASTE ............. 237

X. IN PERSONAM JURISDICTION ........................ 241

XI. MOTION OF FORD MOTOR COMPANY .................. 250

XII. MOTION OF THE WELLMAN DYNAMICS CORPORATION ................................................. 251

XIII. LIABILITY OF KCP&L AS PAST OWNER OF CCC CITE AND AS AN OWNER OF A FACILITY .................. 253

APPENDIX A—SUMMARY OF DISPOSITION OF MOTIONS

APPENDIX B—SPECIAL MASTER'S RECOMMENDATION CONCERNING THIRD–PARTY GENERATORS' "DE MINIMIS" MOTIONS

## INTRODUCTION

Pending before the Court are eighty-two (82) motions to dismiss or motions for summary judgment concerning Phase One issues, other than insurance-related issues. Attached as Appendix A to this report is an alphabetical listing of parties who have filed motions, the Master's recommendation on the disposition of such motions and the location or locations within the report where such motions are addressed.

As the Court is aware, on April 15, 1985, the Special Master filed his Recommendation Regarding Summary Judgment Motions or Motions to Dismiss (for Non-Insurance Issues), which recommendation suggested deadlines for filing motions, or for renewing consideration of motions which had been filed previously in the litigation, in order that disposition of those motions would be part of the Master's Report to the Court. That recommendation was approved by Order of the Court on April 24, 1985, with the exception that the objection to the recommendation filed by the Kansas City Power & Light Company was sustained and the Kansas City Power & Light Company's motion for summary judgment which was not submitted within the deadlines established in the Recommendation was deemed timely filed by the Court. No other parties filed objections to the recommendation and no party other than Kansas City Power & Light Company has received permission of the Court to have its motion considered if it did not comply with the deadlines established in the Recommendation. Therefore, of the eighty motions that are pending, five are not being considered in this report due to the fact that their

filing or renewal did not comply with the deadlines established in that recommendation.[1]

In addition, a considerable number of the motions that were filed were not considered by the Special Master for the reason that the motions did not comply with the requirements of Federal Rules of Civil Procedure, Rule 56, relating to summary judgment motions [or motions to dismiss for failure to state a claim upon which relief can be granted filed pursuant to Fed. R.Civ.P. Rule 12(b)(6) which present matters outside the pleadings and are treated as motions for summary judgment].[2] A general discussion of the requirements of Rule 56 and the case law concerning summary judgment motions follows.

It should also be noted that application of the rules for summary judgment precludes approval of most of the motions that have been filed. Of the motions that should be denied on that basis, most present a straightforward question of fact or mixed fact and law (e.g., did XYZ Corporation ship its hazardous substances to the CCC site, or were XYZ Corporation's substances hazardous?). Time and space prevent a discussion of the facts of all the motions. Therefore, motions which cannot be granted because there are material facts in dispute are, for the most part, dealt with in a footnote unless an important or novel question of law is also raised. However, the fact that a particular party's motion is dealt with in a footnote does not mean that that motion was not given full and careful consideration. On the contrary, every motion which was considered (i.e., all except

1. The five motions consist of those filed by the following companies: Armco, Inc.; Kaw Transport Company; NL Industries, Inc.; Peterson Manufacturing Company, Inc.; and Trans World Airlines, Inc.

2. Motions not complying with the requirements of Rule 56 were filed by the following parties: Thorpe Manufacturing Company; Rockwell International Corporation; Georgetown Steel Corporation; Monroe Auto Equipment Company; Jones Chemicals, Inc.; McGraw Edison Company; Brookside Corporation; Charles O. Larson Company; Woodward Governor Company; Metal Plating Corporation; Frantz Manufacturing Company; Philip A. Hunt Chemical Corporation; Cessna Aircraft Company; F.L. Carswell Manufacturing Company/C.M.C. Production Galvanizers, Inc.; Elco Industries, Inc.; Pfizer, Inc.; Sundstrand Corporation; Owens-Corning Fiberglas Corporation; Atlantic Richfield Company; Continental Steel Corporation; Mueller Company; Metals Protection Plating Company, Inc.; Norman B. Hjersted; Zenith Electronics, Inc. (Motion No. 2); Rochester Corporation; Kiowa Corporation; and Zenith Electronics, Inc. (Motion No. 1).

those which were untimely or not properly presented) was reviewed very carefully. Moreover, the fact that a motion is dealt with in a footnote is not a reflection of its relative merit. The evidence against many of the third-party defendants appears to fall into the "scintilla" category and, while sufficient to avoid summary judgment, will hardly be sufficient to establish liability at trial unless additional evidence is forthcoming.

The standard to be applied by the trial court in ruling upon a motion for summary judgment pursuant to Fed.R.Civ.P., Rule 56(e) has been clearly stated by the United States Supreme Court:

> Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case "show that * * * there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(e), Fed.Rules Civ.Proc. This rule authorizes summary judgment "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, * * * [and where] no genuine issue remains for trial * * * [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Sartor v. Arkansas Nat. Gas. Corp.*, 321 U.S. 620, 627, 88 L.Ed. 967, 972, 64 S.Ct. 724 [728] (1944).

*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962).

To obtain summary judgment, the movant must demonstrate the absence of any genuine issue of material fact, *Snyder v. United States*, 717 F.2d 1193, 1195 (8th Cir.1983), and that he is entitled to judgment as a matter of law. In determining whether or not the movant has met the heavy burden of proving the absence of any material fact, it is the duty of the trial court to scrutinize the evidence, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), in the light most favorable to the non-moving party, *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir.1980), according the non-movant the benefit of every reasonable factual inference, *Adickes v. S.H. Kress, supra; Buller v. Buechler*, 706 F.2d 844 (8th Cir.1983), and resolving all doubts as to the facts or the existence of any material fact against the moving party. *Adickes v. S.H. Kress & Co., supra; United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Summary judgment should be denied if there is even the slightest doubt as to a factual dispute or any genuine issue of material fact. *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 395 F.2d 388, 389 (8th Cir.1968).

The burden is on the party seeking judgment to establish the right to a judgment with such clarity as to leave no room for any doubt or controversy, *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 693 F.2d 733, 737 (8th Cir.1982), *cert. denied sub nom. Drury v. Westborough Mall, Inc.*, 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983); *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir. 1982); *Snell v. United States*, 680 F.2d 545, 547 (8th Cir.), *cert. denied*, 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982), and to prove that the nonmoving party is not entitled to recover under any discernable circumstances. *McGee v. Hester*, 724 F.2d 89, 91 (8th Cir.1983); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363–64 (8th Cir.1983). If the evidence presented to support or oppose the motion is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper, *Snyder v. United States*, 717 F.2d 1193, 1195 (8th Cir.1983), and should likewise be denied where the affidavits or other sworn statements require an evaluative judgment between two rationally possible conclusions, *Minnis v. UAW*, 531 F.2d 850, 854 (8th Cir.1975); *Chenette v. Trustees of Iowa College, Grinnell, Ia.*, 431 F.2d 49, 53 (8th Cir.1970), even if the court is convinced that the evidence makes it unlikely that a party can prevail at trial. *Hughes v.*

*American Jawa, Ltd.*, 529 F.2d 21, 25 (8th Cir.1976).

The Eighth Circuit has repeatedly held that summary judgment is a drastic remedy. See, *e.g., Snell v. United States*, 680 F.2d 545, 547 (8th Cir.), *cert. denied*, 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982) ("This circuit has repeatedly emphasized the drastic nature of the summary judgment remedy"). It has also been labeled "extreme" and "treacherous" by the Eighth Circuit. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). The Court's latest pronouncement in this regard, *Buford v. Tremayne*, 747 F.2d 445 (8th Cir.1984), simply refers to the remedy as "drastic." (747 F.2d at 447).

■ A number of motions which have been filed rely upon statements of counsel (both sworn and unsworn) to establish uncontroverted facts. However, Rule 56(e), Fed.R.Civ.P., requires that in determining the propriety of a motion for summary judgment facts be established or controverted by sworn statement of a competent witness. Arguments of or statements by counsel should not be considered to establish a fact. Rule 56(e) Fed.R.Civ.P. provides:

> (3) Form of *Affidavits*; Further Testimony; Defense Required.
> Supporting and opposing *affidavits* shall be made on personal knowledge, *shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn* or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The Court may permit *affidavits* to be supplemented or opposed by *depositions, answers to interrogatories, or further affidavits.* When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but in his response, by *affidavit* or as otherwise provided in this rule, must set forth specific facts showing that

there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. (Emphasis added).

The Rule itself seems to clearly require sworn statements to support or oppose a motion for summary judgment. In *Adickes v. S.H. Kress & Co., supra*, both plaintiff and defendant relied upon unsworn statements to oppose and support a motion for summary judgment. The trial court granted summary judgment in favor of defendant, the Second Circuit affirmed and the Supreme Court granted *certiorari* and reversed. On the issue of the propriety of summary judgment, the Court noted that unsworn statements do not comply with the requirements of Rule 56(e), Fed.R. Civ.P. (398 U.S. at 158, n. 16, 17 & 19, 90 S.Ct. at 1608, n. 16, 17 & 19) and therefore should not be considered.

In *Jones v. Menard*, 559 F.2d 1282 (5th Cir.1977), a crewman who had sustained back injuries brought suit against the ship's owner and operator, who in turn filed third-party complaints against the ship's builder and designer seeking indemnity and contribution. The trial court entered summary judgment. In reversing the trial court, the appeals court found that the affidavit and report proffered by movants should not have been considered on the issue of whether the pipe was flawed because: (1) the report annexed to the affidavit was prepared by someone other than the affiant; (2) the author of the report was not qualified as an expert and, therefore, his report provided no proof of evidence that movant could have adduced at trial; and (3) the report satisfied none of the evidentiary requirements of Rule 56(e) in that it was not a sworn affidavit, an interrogatory, a deposition, or an admission, and thus should not have been considered. 559 F.2d at 1285, n. 5.

In *Gordon v. Watson*, 622 F.2d 120 (5th Cir.1980), a pretrial detainee sued the prosecutor and jailer alleging punitive confinement and denial of telephone privileges. The jailer and prosecutor moved for summary judgment asserting via affidavit that

they had legitimate non-punitive reasons for transfer from one detention facility to another; however, the jailer's affidavit failed to show a legitimate, non-punitive reason for confining the prisoner in a one-man cell except to the extent that it incorporated an earlier verified response to the motion for summary judgment. The Court found that the trial court impermissibly relied on the incorporated matters in granting summary judgment because such did not affirmatively show that the affiant was competent to testify to the matters or that the facts were based on his personal knowledge. The Court noted that the counter-pleadings filed by the prisoner in response to defendants' affidavits were not notarized; and, as an unsworn statement it may not be considered in determining the propriety of summary judgment. 622 F.2d at 123. *See also, Property Management & Investments, Inc. v. Lewis,* 752 F.2d 599, 604 (11th Cir.1985) (on motion for summary judgment court may only consider materials that would be admissible or usable at trial); *Meserole v. M/V Fina Belgique,* 736 F.2d 147, 149 (5th Cir.1984) (unsworn letter is not admissible on summary judgment motion); *Jacobson v. Maryland Cas. Co.,* 336 F.2d 72, 75 (8th Cir.1964) (assertions in motion are meaningless unless supported as provided for in Rule 56(e)).

Any question regarding the propriety of using assertions of counsel made at oral argument or in legal memoranda to establish the existence of any material fact has been laid to rest. Statements of counsel may *not* be used to establish facts. *See, Transurface Carriers, Inc. v. Ford Motor*

*Co.,* 738 F.2d 42, 46 (1st Cir.1984) (collecting authority); *Watts v. United States,* 703 F.2d 346, 353 (9th Cir.1983) ("Legal memorandum and argument are not evidence and cannot, by themselves, create a factual dispute sufficient to defeat summary judgment where no dispute otherwise exists."); *British Airways Board v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). *See also, Local 314, Nat. P.O. Mail Handlers v. National P.O. Mail Handlers,* 572 F.Supp. 133, 140 (E.D.Mo.1983); *Moats v. United States,* 564 F.Supp. 1330, 1343-4 (W.D.Mo.1983).

## I. UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT OF LIABILITY PURSUANT TO SECTIONS 106(a) AND 107(a) OF CERCLA AND SECTION 7003 OF RCRA

### A. Background

The first application to be considered is the United States' Motion for Partial Summary Judgment of Liability Pursuant to Sections 106(a) and 107(a) of CERCLA and Section 7003 of RCRA. Relief is requested against the original seven defendants, i.e., Conservation Chemical Company ("CCC"), Norman Hjersted, Conservation Chemical Company of Illinois ("CCCI"), Armco, Inc. ("Armco"), AT & T Technologies, Inc. ("AT & T"), FMC Corporation ("FMC") and International Business Machines Corporation ("IBM"). In its motion, the plaintiff has included a "Statement of Undisputed Facts," some of which have in fact been disputed by the defendants.[3] Particular-

---

**3.** The original generator defendants (Armco, AT &T, FMC and IBM) were explicit in announcing their intention not to controvert many of the undisputed facts stated by the plaintiff: "Original generator defendants have not sought herein to refute point-by-point many of the plaintiff's assertions of 'undisputed' fact. Reference to the citations set forth by plaintiff clearly show the areas of misstatement and disagreement among the various generator defendants and their various consultants with the assertions made by plaintiff. Rather, the original generator defendants have generally focused herein only on the two major areas of 'undisputed fact,' i.e., the alleged existence of 'an imminent and substantial endangerment' at or about the CCC site, and

the causal relationship of original generator defendants' activities with conditions at the CCC site. Briefly put, plaintiff has set forth no citation to any agreement or concurrence by the original generator defendants that 'an imminent and substantial endangerment' does or may exist or that the original generator defendants have any causal relationship to such a preceived condition. Specifically, and as set forth in the answers of the original generator defendants, the existence of any facts supporting such conclusions are specifically denied." Likewise, CCCI focused on the question of whether or not there was "an imminent and substantial endangerment," apparently believing that to be a threshold question which, if disputed, precludes

ized or disputed assertions of fact will be addressed in the substantive discussion of the issues. The following facts which provide background information are basically undisputed. These facts are taken from discovery responses or from the "Remedial Investigation Report" prepared earlier in the litigation by Armco, AT & T, FMC and IBM (sometimes referred to herein as the "original generator defendants").

From 1960 until the present, defendant CCC has owned and operated an industrial chemicals waste disposal facility located at 8900 Front Street, Kansas City, Missouri (the "site", the "CCC site" or the "KC site"). The approximately six (6) acre site is located on the Missouri River floodplain, between the East Bottoms Levee and the Missouri River, just upstream of the confluence of the Missouri and Blue Rivers.

CCC purchased the KC site in 1959. By early 1963, CCC had constructed a shop and office building, installed various storage tanks and reaction vessels, and constructed six basins at the site. Basins 1 through 5 were constructed by excavating soils. Basin 6 was constructed by excavating soil and constructing walls.

CCC stored, treated and disposed of various chemical wastes in Basins 1 through 6. In addition, CCC operated one or more incinerators at the site for the destruction of chemical wastes from the early 1960s until approximately 1971. CCC also buried various chemical wastes on the site.

Over 50 million gallons of waste materials were transported to the site during its period of operations. The type of wastes which CCC treated, stored or disposed of at the KC site included:

(1) liquid acidic metal finishing wastes, such as spent steel pickling solutions containing sulfuric acid or hydrochloric acid, spent electroplating solutions, and bright dipping solutions;

(2) liquid alkaline metal finishing wastes, including wastes containing cyanide;

(3) solid cyanide wastes;

(4) laboratory wastes;

(5) non-pourable organic chemicals;

(6) sludge containing arsenic sulfide and elemental phosphorous;

(7) filter cake containing arsenic sulfide; and

(8) solid cyanides.

As a consequence of CCC's activities, each of the waste disposal basins at the KC site contains at least the following hazardous substances: methylene chloride; tetrachloroethylene; trichloroethylene; toluene; 1,1,1-trichloroethane; phenol; 2,3,7,8-tetrachlorodibenzo-P-dioxin; arsenic; beryllium; cadmium; chromium; copper; lead; mercury; nickel; selenium; zinc; and cyanides.[4]

The surface soil at the CCC site contains at least the following hazardous substances: methylene chloride; tetrachloroethylene; tricholoroethylene; bis (2-ethylhexyl) phthalate; PCB–1254; arsenic; beryllium; cadmium; chromium; copper; lead; nickel; selenium; zinc; and cyanides.

addressing other questions. For his opposition, Norman Hjersted chose to rely upon the general factual contentions filed previously on his behalf and his motion for summary judgment, both of which were incorporated by reference in a pleading in opposition to the plaintiff's motion.

**4.** A substance is a "hazardous substance" for purposes of CERCLA if it is identified under, or has the characteristics identified under, certain provision of the Clean Air Act, the Clean Water Act, CERCLA, RCRA, or the Toxic Substances Control Act. CERCLA Section 101(14), 42 U.S.C. § 9601(14). Substances which are identified under Section 311(b)(2)(A) of the Clean Water Act, 33 U.S.C. § 1321(b)(2)(A), are listed in 40 C.F.R. § 116.4. Substances which are identified under Section 3001 of RCRA, 42 U.S.C. § 6921, are listed in 40 C.F.R. §§ 261.-31–.33. The characteristics which make a substance hazardous under Section 3001 of RCRA, 42 U.S.C. § 6921, identified in 40 C.F.R. §§ 261.-21–.24. Substances identified under Section 307(a) of the Clean Water Act, 33 U.S.C. § 1317(a), are listed in 40 C.F.R. § 401.15. Substances identified under Section 112 of the Clean Air Act, 42 U.S.C. § 7412, are listed in 40 C.F.R. Part 61. A number of the substances identified in this paragraph and succeeding paragraphs are identified as hazardous under more than one statute.

The groundwater beneath the CCC site contains at least the following hazardous substances: benzene; chloroform; ethylbenzene; methylene chloride; tetrachloroethylene; toluene; 1,1,1-trichloroethane; trichloroethylene; vinyl chloride; phenol; arsenic; cadmium; chromium; copper; nickel; selenium; zinc; and cyanides.

The subsurface soil at the CCC site contains at least the following hazardous substances: methylene chloride; tetrachloroethylene; toluene; trichloroethylene; phenol; bis (2-ethylhexyl) phthalate; arsenic; beryllium; cadmium; chromium; copper; lead; nickel; selenium; zinc; and cyanides.

At least some of these hazardous substances are being released into the environment, which the generator defendants define as areas likely to be directly encountered by humans or other living organisms.[5] The "Remedial Investigation Report" states that hazardous substances are being and may be released from the CCC site in several ways:

Waste materials from the site have the potential for migration via groundwater, surface water or air. Migration to groundwater can occur through leaching or by direct infiltration. These materials can also enter the atmosphere through volatilization or particulate transport while migration to surface water can occur by way of overland flow and flood inundation. Wastes which enter the aquifer beneath the site can be transported by groundwater flow to discharge points along the Blue River and Missouri River. The surface water flow can, in turn, transport these materials to receptors along the Missouri River.

By defendants' own estimates, more than 22,000 pounds of hazardous substances are being discharged into the Missouri River and Blue River each year. Such discharges include the following hazardous substances: benzene; carbon tetrachloride; chloroform; 1,1-dichloroethane; 1,2-dichloroethane; 1,1-dichloroethylene; ethylbenzene; methylene chloride; tetrachloroethylene; toluene; 1,2-trans-dichloroethylene; 1,1,1-trichloroethane; 1,1,2-tricholoroethane; tricholoroethylene; trichlorofluoromethane; vinyl chloride; 2,4-dichlorophenol; 2,4-dimethylphenol; phenol; 2,4,6-trichlorophenol; arsenic; cadmium; chromium; copper; nickel; selenium; thallium; zinc; and cyanides. These substances could continue to be discharged for many years.

Of the substances listed in the preceding paragraphs, at least the following are known or suspected carcinogens for which the recommended exposure level is zero: benzene; carbon tetrachloride; chloroform; 1,2-dichloroethane; 1,1-dichloroethylene; tetrachloroethylene; 1,1,2-trichloroethane; trichloroethylene; polychlorinated biphenyls (PCBs); vinyl chloride; trichlorophenol; arsenic; and beryllium. There is potential for exposure of humans to these substances. The site is surrounded by Kansas City, Missouri and its suburbs. A farmer cultivates soybeans on the land immediately adjacent to the site on the southeast side. Mobay Chemical Corporation ("Mobay") operates a manufacturing facility which is located one-quarter mile south of the site. A Kansas City Power & Light Company ("KCP & L") plant is located approximately one-quarter mile west-northwest of the site. Residential and other industrial areas are as close as 1.3 miles from the site.

Mobay operates several wells on its property that may draw groundwater from beneath the CCC site. The Missouri Water Company draws water for public water supplies from several wells located on the same side of the river as the site about five miles downstream of the site. Those wells

---

5. Defendants' definition is more restrictive than the definition of "environment" contained in Section 101(8) of CERCLA, 42 U.S.C. § 9601(8), which provides: "'Environment' means (A) the navagible waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson Fishery Conservation and Management Act, and (B) any other surface water, groundwater, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States."

are recharged, at least in part, by water from the river. The City of Lexington, located 40 miles downstream from the CCC site, draws water directly from the Missouri River for public use. In addition, other living organisms, including frogs, toads, turtles, lizards, snakes, birds, mammals and fish, are likely to inhabit the area of the CCC site.

### B. Liability Under CERCLA Section 107

#### 1. The Elements of Liability Under 107(a) of CERCLA

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), identifies both those persons who are liable for response costs incurred by the United States under Section 104 of CERCLA, 42 U.S.C. § 9604, and those persons who may be ordered under Section 106 of CERCLA, 42 U.S.C. § 9606, to abate any imminent and substantial endangerment to health, welfare or the environment that an actual or threatened release of a hazardous substance may present. *See, United States v. Conservation Chemical Company*, 589 F.Supp. 59, 62 (W.D.Mo. 1984). Thus, the elements of Section 107(a) will be considered first.

▮▮▮▮ Certain of the requisite elements of a prima facie case under Section 107(a) relate to the site in general, while others relate to the individual defendants. With respect to the CCC site, the United States must establish the following:

(1) the CCC site is a "facility";

(2) a "release" or a "threatened release" of a or any "hazardous substance" from the CCC site has occurred; and

(3) the release or threatened release has caused the United States to incur "response costs."

*See, New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir.1985). Proof of "imminent and substantial endangerment" (discussed in the next section) is not required in a Section 107 action. *See, United States v. Hardage*, 13 Env'tl L.Rep. 20188 (W.D.Okla. Sept. 29, 1982). To complete the prima facie case against each defendant, the United States must prove that the defendant is one of the following persons:

(1) a person[6] who owns or operates the facility [§ 107(a)(1)];

(2) a person who owned or operated the facility when a hazardous substance was disposed of at the facility [§ 107(a)(2)];

(3) a person who arranged for disposal or treatment of a hazardous substance which such person owned or possessed, at a facility containing such hazardous substance [§ 107(a)(3)]; or

(4) a person who accepted a hazardous substance for transport to a disposal or treatment facility or to a site which such person selected [§ 107(a)(4)].

If undisputed facts establish each of these elements with respect to a defendant, then the United States would be entitled to a partial summary judgment that such defendant is a responsible party under Section 107(a) of CERCLA.

#### 2. Application of the Elements of Liability in This Case

##### a. The CCC Site is a "Facility"

"Facility" is defined in CERCLA as follows:

"Facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . .

---

6. Pursuant to Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), a "person" is, among other things, a corporation, a partnership or an individual. Norman B. Hjersted is an individual; all of the other defendants are corporations. Therefore, each of the defendants is a "person" within the meaning of CERCLA.

42 U.S.C. § 9601(9). This definition is intentionally expansive:

> The definition of "facility" is necessarily a broad one. It explicitly defines facility as, among other things, any site or area where a hazardous substance has been deposited, stored, disposed of, or otherwise come to be located.

126 Cong.Rec. H 11773, H 11789 (Dec. 3, 1980), *reprinted in* 1 *Legis.Hist.* at 783 (remarks of Representative Florio).

Notably, "facility" is defined in the disjunctive. It means not only "(A) any ... pit, pond, lagoon, impoundment, [or] landfill ...," but also *"any site or area where a hazardous waste substance has been deposited ... or placed, or otherwise come to be located."* CERCLA § 101(9), 42 U.S.C. § 9601(9) (emphasis added). Simply put, the term "facility" includes every place where hazardous substances come to be located:

> [T]he legislative history makes clear Congress' intent to address the problem of hazardous wastes rather than merely a particular category of disposal sites. Indeed, it appears that Congress sought to deal with every conceivable area where hazardous substances come to be located ...

*New York v. General Electric Company,* 592 F.Supp. 291, 296 (N.D.N.Y.1984) (drag-strip to which contaminated oil had been applied is a "facility"). In order to show that an area is a "facility," the plaintiff need only show that a hazardous substance, as defined by CERCLA, has been placed there or has "otherwise come to be located" there. *See United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143, 1148 (D.Ariz.1984) (a real estate subdivision having asbestos fibers on the ground is a "facility").

Unquestionably, the CCC site is a "site or area where a hazardous substance has been deposited, stored, disposed of or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). For approximately twenty years, the CCC site was operated as a waste disposal facility. During that time, four major types of wastes were disposed of or treated at the site: acidic wastes (including metal finishing wastes and "pickle liquor" from steel finishing operations); alkaline wastes (including wastes containing cyanides); organic wastes (including trichloroethylene and toluene); and miscellaneous wastes (including arsenic). As indicated previously, any number of hazardous substances, within the meaning of CERCLA Section 101(14), 42 U.S.C. § 9601(14) have "come to be located" at the CCC site. Given the presence of these hazardous substances at the site, the CCC site is a "facility" within the meaning of CERCLA.

b. *There has been a release or threatened release of hazardous substance from the CCC site*

CERCLA Section 101(22) defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment ..." 42 U.S.C. § 9601(22). This definition has been construed broadly. *See Missouri v. Independent Petrochemical Corp.,* 22 E.R.C. 1167 (E.D.Mo. Jan. 8, 1985). A "release" occurs, for example, when asbestos fibers are blown from a site by the wind, *United States v. Metate Asbestos Corp., supra* 584 F.Supp. at 1149, or when hazardous substances leach into soil and groundwater. *See United States v. Wade,* 577 F.Supp. 1326, 1334 (E.D.Pa.1983); *United States v. Northeastern Pharmaceutical and Chemical Company,* 579 F.Supp. 823 (W.D.Mo.1984) (*"NEPACCO"*). The release or threatened release "of *a* or *any* hazardous substance" is sufficient to establish liability. *See United States v. South Carolina Recycling and Disposal, Inc.,* 14 Env'tl L.Rep. 20272 (D.S.C. Feb. 23, 1984); *United States v. Wade, supra,* 577 F.Supp. at 1333 ("the release which results in the incurrence of response costs and liability need only be of 'a' hazardous substance and not necessarily one contained in the defendant's waste.").

In their response to the plaintiff's motion, the four generator defendants dis-

pute that there has been a "release" into the groundwater. However, the defendants' Remedial Investigation Report revealed that hazardous substances are "leaking, escaping, and leaching" at least into the soil at the CCC site. Such leaking, leaching and escaping will continue until the source of such hazardous substances is removed or other remedial actions are taken. Thus, there is both a release and a threatened release of a hazardous substance from the CCC site.

c. *The Government's Response Costs*

Although the term "response costs" is not defined in CERCLA, "response" is defined to mean "remove, removal, remedy, and remedial action." "Remove" or "removal" are defined in Section 101(23), 42 U.S.C. § 9601(23), and "remedy" or "remedial action" are defined in Section 101(24), 42 U.S.C. § 9601(24). In holding that the language of CERCLA provides the government with broad cost recovery rights, Judge Clark in the *NEPACCO* case stated that the activities for which the government could recover response costs included the following:

(a) Investigations, monitoring and testing to identify the extent of danger to the public health or welfare or the environment.

(b) Investigtions, monitoring and testing to identify the extent of the release or threatened release of hazardous substances.

(c) Planning and implementation of a response action.

(d) Recovery of the costs associated with the above actions, and to enforce the provisions of CERCLA, including the costs incurred for the staffs of the EPA and the Department of Justice.

*United States v. Northeastern Pharmaceutical and Chemical Company, supra,* 579 F.Supp. at 850. By affidavit dated April 3, 1985, Robert L. Morby, chief of the Superfund Branch, Waste Management Division of the Environmental Protection Agency in Kansas City, Missouri, states that as of February 22, 1985, the United States had incurred response costs in the amount of $2,018,387.89, and that the United States continues to incur response costs. However, in order for the government to be able to collect its response costs under Section 107, it must be established that those costs are "not inconsistent with the National Contingency Plan." 42 U.S.C. § 9607(a). Although the burden of proving that the costs incurred were inconsistent with the National Contingency Plan is on the defendants, *United States v. Northeastern Pharmaceutical and Chemical Company, supra,* 579 F.Supp. at 850, the original generator defendants have raised a question of disputed fact concerning this issue. Neither CCC, CCCI nor Norman Hjersted, however, have disputed the issue of response costs. Since material facts have been put in issue by the four original generator defendants, the Court is precluded from entering summary judgment against them, although presumably, the Court might enter summary judgment against CCC, CCCI or Norman Hjersted if the final element of liability under Section 107 is established.

d. *The Defendants as "Covered Persons"*

(i) *CCC*

CCC is a corporation organized under the laws of the State of Missouri. CCC has owned the KC site since 1959, and operated the site as a disposal facility from 1960 until CCC stopped accepting waste in late 1979 or early 1980. During that period, CCC stored, treated and disposed of various chemical wastes in Basins 1 through 6. CCC also operated one or more incinerators at the site to destroy chemical waste. Among the wastes that were disposed of at the site while it was being operated by CCC were: (1) sludges containing arsenic sulfide and elemental phosphorous; (2) filter cake containing arsenic sulfide; and (3) solid cyanides. All of these substances are "hazardous substances" within the meaning of CERCLA.

As indicated previously, among the "covered persons" who are liable for re-

sponse costs under Section 107 are the owner and operator of the facility, Section 107(a)(1), and any person who at the time of disposal of any hazardous substance owned or operated the facility at which such hazardous substance was disposed of, Section 107(a)(2). 42 U.S.C. § 9607(a)(1)–(2). Clearly, CCC is liable under both subsections (a)(1) and (a)(2) of Section 107 since it is both the current owner of the CCC site and was the owner and operator of the site when hazardous substances were disposed of at the site.

### (ii) *Norman B. Hjersted*

Norman Hjersted founded CCC in 1960, and has been its president since its inception. He has also owned at least 93% of CCC's stock since 1960.

Initially, Hjersted was CCC's sole technical person. "Plant managers" were subsequently hired, but they reported directly to Hjersted. He controlled the company's fiscal matters and made decisions about the types of projects and business ventures CCC would undertake. He was primarily responsible for environmental controls at CCC and also acted as a chemical engineer. Even when he resided in Gary, Indiana (from approximately 1968 to 1974), Hjersted personally visited the KC site several times a month. After he returned to Kansas City in 1975 he was much more closely involved with the day-to-day operations of the KC site. In short, Hjersted "[is] the boss of CCC operations and ha[s] been all along."

The recent case of *New York v. Shore Realty Corp., supra,* held the owning stockholder who managed a corporation liable under CERCLA Section 107, after analyzing the meaning of "owner or operator." The court determined that "owner or operator" is defined to mean "any person owning or operating" an onshore facility, 42 U.S.C. § 9601(20)(A), and "person" includes individuals as well as corporations, 42 U.S.C. § 9601(21). 759 F.2d at 1051.

More important, the definition of "owner or operator" excludes "a person, who, without participating in the management of a … facility, holds indicia of ownership primarily to protect his security interest in the facility." *Id.* § 9601(20)(A). The use of this exception implies that an owning stockholder who manages the corporation, such as Leo Grande, is liable under CERCLA as an "owner or operator." That conclusion is consistent with that of other courts that have addressed the issue. *See, e.g., United States v. Carolawn Co.,* 14 Envtl.L.Rep. (Envtl.L. Inst.) 20,699, 20,700 (D.S.C. June 15, 1984); *NEPACCO,* 579 F.Supp. at 847–48. In any event, Leo Grande is in charge of the operation of the facility in question, and as such is an "operator" within the meaning of CERCLA.

*Id.* at 1052. The court held LeoGrande liable for the abatement of the nuisance without piercing the corporate veil. New York courts have held that a corporate officer who controls corporate conduct, and thus is an active individual participant in that conduct, is liable for the torts of the corporation, so it was unnecessary to reach the question of piercing the corporate veil. The court concluded:

As a final note, however, the district court should take into account one additional factor in supervising its injunction, a principle limiting perhaps to some extent, Leo Grande's liability for the future costs of abatement. The injunctive remedy is an equitable one; that abatement expenses may become prohibitive and disproportionate therefore may be taken into consideration.

*Id.* at 1053.

Corporate officers were also held personally liable under CERCLA in *United States v. Northeastern Pharmaceutical and Chemical Company, supra.* Lee, the vice president of NEPACCO, the corporate entity that contracted through corporate representatives for the transport and disposal of hazardous waste, was held personally liable. He was directly responsible for arranging the disposal and transport of the hazardous waste at the site. He had direct knowledge and supervision of the contract.

He assisted in the selection of the hazardous waste site.

Lee argued that corporate officers are normally not personally liable for acts of the corporate entity. He contended that he did not own or possess the hazardous waste since the corporate entity had the ownership rights to the hazardous waste. He also alleged that the hazardous waste substance contained in the barrels dumped at the site was manufactured by another corporate entity.

The court found such arguments of little significance to the imposition of liability. The court reasoned that Lee had actual knowledge of the drums and storage. Lee possessed the barrels within the meaning of Section 107(a)(3) and had direct supervision and knowledge of the disposal of the barrels. Further, under Section 107(a)(3), the person arranging for the disposal is not required to actually own or possess the hazardous waste. *United States v. NEPACCO, supra,* 579 F.Supp. at 847.

Lee was found to be a "person" within the definition in 42 U.S.C. § 9601(21). An analogous situation was dealt with in *Apex Oil Co. v. United States,* 530 F.2d 1291 (8th Cir.1976). There the court construed the statutory language of 33 U.S.C. § 1321(b)(5) and (6), the liability provisions of the Clean Water Act which imposes the same strict liability standard as CERCLA. The court held

> ... that a "person in charge" can include both the individual employee and the corporation. Although the issue in *Apex Oil Co.* was whether an owner-operator (the corporation in that case) could be held liable as a "person in charge," *Id.* at 1292–93, this Court considers the Eighth Circuit's analysis significant in defining an employee's liability under CERCLA: "Section 1321(b)(5) speaks in terms of any person in charge. We note that it would not be inconsistent with the statutory language to hold both the employee and the corporation to its penaliies [sic] for failure to report a spill." *Id.* at 1293 n. 6.

579 F.Supp. at 848. The definition of "person" under the Clean Water Act is almost identical to the definition of "person" under CERCLA. The court found that the term "person" arranging for the disposal of hazardous substance should be given a liberal interpretation that may include both the employee and the corporation. Lee, then, acting as an employee, had the responsibility to and did arrange for the disposal of the hazardous waste pursuant to Section 107(a)(3).

Lee can be classified as both an owner and operator of the NEPACCO plant due to his position as vice president and as a major stockholder. 42 U.S.C. § 9601(20)(A) states that an "owner or operator"

> means ... (ii) in the case of an onshore facility, any person owning or operating such facility ... Such term does not include a person, who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect his interest in the ... facility.

579 F.Supp. at 848. From the language of the statute a person who owns an interest in a facility and is actively participating in its management can be held liable for the disposal of hazardous waste.

The court, in sum, found sufficient evidence to impose liability on Lee:

> Lee had the capacity to control the disposal of hazardous waste at the NEPACCO plant; the power to direct the negotiations concerning the disposal of wastes at the Denney farm site; and the capacity to prevent and abate the damage caused by the disposal of hazardous wastes of the Denney farm site. Finally, Lee was a major stockholder in NEPACCO and actively participated in the management of NEPACCO in his capacity as vice-president.

579 F.Supp. at 849.

Michaels, founder and president of NEPACCO as well as a major stockholder in the corporation, was also found to be strictly liable as an "owner and operator." The court found that the same policy considera-

tions expressed by Congress holding Lee liable would also necessitate the imposition of liability on Michaels.

Personal liability of three corporate officers was found under CERCLA in *United States v. Carolawn Co.*, 14 Env'tl L.Rep. 20699 (D.S.C. June 15, 1984). Officers or representatives Tischler, McClure, and Gergel of Columbia Organic Chemical Company ("COCC") purchased the bankrupt Southeastern Pollution Control Company ("SEPCO"). The three officers or representatives incorporated a new company, known as South Carolina Recycling and Disposal, Inc. ("SCRDI") and served as officers of the new company. Tischler and McClure were personally involved in the operation of the site as a hazardous waste storage site. The three officers eventually sold the site to Carolawn.

The court held the three subject to liability as owners of the site and also held Tischler and McClure liable as operators of the site. To reach the holding, the court examined the definition of "person" and "owner or operator." The court also found the analysis in *NEPACCO* persuasive and concluded:

> Thus, to the extent that an individual has control or authority over the activities of a facility from which hazardous substances are released or participates in the management of such a facility, he may be held liable for response costs incurred at the facility notwithstanding the corporate character of the business.

14 Env'tl L.Rep. at 20700. In addition, the defendants did not substantiate that the government could not pierce the corporate veil of SCRDI or COCC to reach them personally. The court referred to the well-established principles set forth in *Dewitt Truck Brothers v. Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976) that must be considered before a determination can be made to pierce the corporate veil.

Examining the definitions in CERCLA of "person" and "own or possess," the Court in *United States v. Mottolo*, 14 Env'tl L.Rep. 20497 (D.N.H. Mar. 27, 1984) ruled that Sutera, the president and principal shareholder of the corporation disposing of the hazardous wastes, was liable. The court found that Sutera was responsible for the conduct and management of the affairs and activities of the corporation and participated in arranging for the disposal of the wastes. Sutera argued that he operated the corporation to limit his personal liability and that he is not a "person" who arranged for the transport or disposal of hazardous wastes within the meaning of CERCLA. He maintained that any relevant activities occurred while he acted in his capacity as president and shareholder, but that he did not engage in relevant activities as an individual. Sutera also argued that he did not "own or possess" hazardous substances which is required for liability under CERCLA.

The court noted that corporate officers may be individually liable for the torts of a corporation where they participate in the tortious conduct. Determining that Sutera was responsible for the entire operation of the corporation and that he did just about everything in the corporation, the court found him liable. As in the cases discussed above, the court found the corporation to be a "person" within the meaning of CERCLA and that the person who arranges for disposal or transport for the disposal of hazardous substances need not own or possess the waste. *United States v. Mottolo, supra,* at 20499.

Finally, the court addressed the issue of piercing the corporate veil. There was no allegation of fraud or misuse of the corporate form, and the court stated that to warrant piercing the corporate veil, it must be alleged with sufficient particularity that the corporation had no will or existence of its own separate from that of Sutera. Failure to state such a claim obviated the need to consider piercing the corporate veil.

The former owner of the company which transported hazardous substances to the site was not held personally liable in *United States v. Wade, supra.* Citing *In Re Arthur Treacher's Franchisee Litigation*, 92 F.R.D. 398 (E.D.Pa.1981) and *Amabile*

*v. Auto Kleen Car Wash,* 249 Pa.Super. 240, 376 A.2d 247 (1977), the court said:

> A corporate officer may be held liable if he personally participates in the wrongful, injury-producing act.

577 F.Supp. at 1341. In *Wade,* the former owner, Barnhouse, personally delivered drums to the site. However, the court said that the testimony was inadequate to establish the individual liability of Barnhouse since there was no evidence presented concerning the number or frequency of drums delivered, or their content. In addition, the court found that negotiations of Barnhouse to dispose of wastes were insufficient to establish personal liability. Finally, the court found that allegations that Barnhouse directed or participated in the disposal of wastes at the site were inadequate to establish personal liability. In this case, then, the court recognizes personal liability of a former owner, but does not find personal liability because of inadequate evidence.

■ Thus, corporate officials who actively participate in the management of a disposal facility can be held personally liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Hjersted could, therefore, be held personally liable under both subsection (a)(1) and (a)(2) of Section 107 of CERCLA as a current owner and as a person who owned and operated the facility at the time hazardous substances were disposed of if it were established that his participation was of the nature and degree which would warrant imposition of personal liability. However, the Special Master is reluctant to impose such liability based upon the factual record before him. While Hjersted may not have disputed the factual assertions made by the plaintiff, Hjersted has vigorously opposed the imposition of personal liability. Under these circumstances, and giving due consideration to the caution which a court must exercise in ruling on summary judgment motions, the Special Master recommends that the Court not enter summary judgment against Hjersted at this time.

### (iii) *CCCI*

CCCI is a corporation organized under the laws of the State of Illinois. By contract, agreement or otherwise, CCCI arranged with CCC for the disposal of wastes containing cyanide possessed by CCCI at the KC site. By contract, agreement or otherwise, CCCI also arranged with a transporter for transport for disposal or treatment of cyanide-bearing wastes owned or possessed by CCCI at the KC site. In addition, CCCI accepted cyanide-bearing waste for transport to CCC–KC for treatment and disposal with CCCI selecting the KC site as the disposal site. At least some of the cyanide-bearing wastes actually were disposed of at the KC site.

■ CCCI is liable as a waste generator under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3). In *United States v. Wade, supra,* the Court stated the test for a prima facie case against a generator as follows:

> Stripping away the excess language, the statute appears to impose liability on a generator who has (1) disposed of its hazardous substances (2) at a facility which now contains hazardous substances of the sort disposed of by the generator (3) if there is a release of that or some other type of hazardous substance (4) which causes the incurrence of response costs. Thus, the release which results in the incurrence of response costs and liability need only be of "a" hazardous substance and not necessarily one contained in the defendant's waste. The only required nexus between the defendant and the site is that the defendant had dumped his waste there and that the hazardous substances found in the defendant's waste are also found at the site.

577 F.Supp. at 1333. *See also, United States v. South Carolina Recycling and Disposal, Inc., supra. But see, United States v. Ottati & Goss, Inc.,* No. C 80–225–1 (D.N.H. Dec. 8, 1983); *State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1306 (N.D.Ohio 1983). More recently, the United States Court of Appeals for the

Second Circuit concluded that a landowner's argument for a causation requirement was at odds with the structure of the statute: "[i]nterpreting section 9607(a)(1) as including a causation requirement makes superfluous the affirmative defenses provided in section 9607(b), each of which carves out from liability an exception based on causation." *New York v. Shore Realty Corp., supra*, at 1044. The Special Master concludes that the minimal causation standard established by *Wade* is appropriate.[7] Therefore, CCCI's protestations that its cyanides have not been proven to be releasing from the site are to no avail.

▉ In addition, CCCI is also liable as a transporter of hazardous substances under Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4). As indicated, CCCI has admitted that it accepted cyanide-containing wastes for transport for the KC site, and further that it selected the KC site as the disposal site for such wastes.

### (iv) *The four original generators*

▉ Even had the four original generators not challenged the plaintiff's response costs, summary judgment could still not be entered against them. The four companies have adroitly disputed material facts concerning the shipment of their wastes to the CCC site. For example, while admitting that invoices and shipping records reflect that their wastes were intended to be disposed of at the CCC site, they rely on Norman Hjersted's deposition testimony that some or all of such wastes may not have been disposed of at the CCC site and thereby put those facts in issue. Therefore, the Court should not rule that the four generators are "covered persons" within the meaning of Section 107(a)(3) for purposes of summary judgment.

### 3. *The Standard and Scope of Liability Under Section 107*

▉ The Court has previously ruled that Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), imposes strict liability upon re-

sponsible parties. *See United States v. Conservation Chemical Company, supra*, 589 F.Supp. at 62. In response to the plaintiff's motion, neither CCC nor CCCI asserted that any of the defenses to liability under Section 107(b) of CERCLA, 42 U.S.C. § 9607(b), were applicable. In its previous opinion, this Court also held that liability under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), is joint and several where the harm arising from a release or threatened release of a hazardous substance is indivisible. *See United States v. Conservation Chemical Company, supra*, 589 F.Supp. at 63. Thus, if the endangerment resulting from the conditions at the CCC site is indivisible, CCC and CCCI may be held jointly and severally liable (together with any other parties found liable at that time) for the United States' response costs under Section 107, 42 U.S.C. § 9607. Notwithstanding the plaintiff's suggestions to the contrary, the Special Master submits that the question of the indivisibility of the harm cannot be determined on summary judgment.

### C. *Liability Under CERCLA Section 106*

### 1. *Imminent and Substantial Endangerment: The Statutory and Decisional Framework*

As indicated previously, this Court has already ruled that Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), identifies those persons who will not only be liable for response costs incurred under Section 104 of CERCLA, 42 U.S.C. § 9604, but also those persons who may be ordered under Section 106 of CERCLA, 42 U.S.C. § 9606, to abate any imminent and substantial endangerment to health, welfare or the environment that an actual or threatened release of a hazardous substance may present. *See, United States v. Conservation Chemical Company, supra*, 589 F.Supp. at 62. Therefore, the discussion in the previous section as to the elements of liability, with the exception of the discus-

7. Similar arguments based on causation in the motions for summary judgment filed by U.S.M.

Corporation and Colgate-Palmolive Company must also be rejected.

sion of the response costs, are equally applicable to the government's claim under Section 106, 42 U.S.C. § 9606.

Section 106 authorizes the United States to seek a mandatory injunction against responsible parties "when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility ..." 42 U.S.C. § 9606. The term "imminent and substantial endangerment" is not defined in CERCLA. As a result, there is no abbreviated guidance as to the specifics of the circumstances that Congress intended would warrant injunctive relief. To ascertain Congress' intent requires examination of CERCLA's statutory framework, its legislative history, and other probative evidence. "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived ..." *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805), quoted in *United States v. Northeastern Pharmaceutical and Chemical Company, supra*, 579 F.Supp. at 834.

■ The starting point for the Court's analysis must be the language of the statute itself. While the words employed by Congress must be given their ordinary meaning, *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979), they must also be interpreted "in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). Furthermore, "statutes which are enacted for the protection and preservation of public health" are to be given "an extremely liberal construction for the accomplishment and maximization of their beneficent objectives." 3 Sutherland, *Statutes and Statutory Construction*, § 71.02 at 313.

■ Examining the language of Section 106, it must be noted that the United States does not have to prove that an "imminent and substantial endangerment" actually exists. The statute clearly authorizes the

United States to obtain relief when "there *may* be an imminent and substantial endangerment." 42 U.S.C. § 9606(a) (emphasis added). Secondly, the United States does not have to show that *people* may be endangered. Section 106(a) authorizes relief where there may be an endangerment to "the public health *or* welfare *or* the environment." 42 U.S.C. § 9606(a) (emphasis added). Use of the disjunctive "or" mandates the conclusion that a possible endangerment to the public welfare alone, or a possible endangerment to the environment alone, will warrant relief. The term "public welfare" is exceptionally broad, and encompasses "health and safety, recreational, aesthetic, environmental and economic interests." *City of El Paso v. Reynolds*, 597 F.Supp. 694, 700 (D.N.M.1984). The term "environment," as used in CERCLA, includes "(A) the navigable waters, ... and (B) any other surface water, groundwater, drinking water supply, land surface or subsurface strata, or ambiant air within the United States or under the jurisdiction of the United States ..." 42 U.S.C. § 9601(8).

The expansive scope of the terms "public welfare" and "environment" mandates the conclusion that Congress intended injunctive relief to issue whenever any aspect of the nation's interest in a clean environment may be endangered imminently and substantially by a release. As Senator Stafford, one of CERCLA's sponsors, stated, "[T]he purpose of this bill ... is to protect the public health and welfare in its broadest sense." 126 Cong.Rec. S 16427 (Dec. 12, 1980).

■ Finally, the term "imminent and substantial endangerment" itself demonstrates the expansive scope of Section 106. An "endangerment" is not actual harm, but a threatened or potential harm. *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1 (D.C.Cir.1976), (*en banc*), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Reserve Mining Company v. Environmental Protection Agency*, 514 F.2d 492, 528 (8th Cir.1975) (*en banc*) (construing the word "endangering"

as used in the emergency powers provision of the Clean Water Act prior to 1970). Because endangerment entails only a threat of harm, the endangerment provisions "have enhanced the courts' traditional equitable powers by authorizing the issuance of injunctions when there is but a *risk of harm,* a more lenient standard that traditional requirement of threatened irreparable harm." *United States v. Price,* 688 F.2d 204, 211 (3rd Cir.1982) (emphasis added). It is submitted that the standard is in fact even more lenient than the *Price* opinion suggests, because CERCLA Section 106 authorizes injunctive relief when there *may* be a risk of harm, not just when there *is* a risk of harm. Thus, if "the public health or welfare or the environment" may be exposed to a risk of harm, an endangerment may exist.

Similarly, the United States need not quantify the risk of harm in order to establish an endangerment. Both the courts and Congress have recognized that the evaluation of a risk of harm involves medical and scientific conclusions that "clearly lie 'on the frontiers of scientific knowledge'", such that "proof with certainty is impossible." *Reserve Mining Company v. Environmental Protection Agency, supra,* 514 F.2d at 519–520. The *Reserve Mining* case involved a question of whether the discharge of a substance which, "under an acceptable but unproved medical theory may be considered carcinogenic," into Lake Superior was "'endangering the health or welfare of persons'" and thus subject to abatement under the Clean Water Act. *Id.* at 529. In determining that injunctive relief was appropriate, the Court reasoned as follows:

> In assessing probabilities in this case, it cannot be said that the probability of harm is more likely than not. Moreover, the level of probability does not readily convert into a prediction of consequences. On this record it cannot be forecast that the rates of cancer will increase from drinking Lake Superior water or breathing Silver Bay air. The best that can be said is that the existence of this asbestos contaminant in air and

water gives rise to a reasonable medical concern for the public health. The public's exposure to asbestos fibers in air and water creates some health risk. Such a contaminant should be removed. *Id.* at 520.

■■■■■ Contrary to the Defendants' contentions, an endangerment need not be an emergency in order for it to be "imminent and substantial." *See, United States v. Waste Industries,* 734 F.2d 159, 165 (4th Cir.1984). An endangerment need not be immediate to be "imminent," and thus warrant relief. In rejecting the argument that the endangerment provision analogous to CERCLA Section 106 found in Section 7003 of RCRA, 42 U.S.C. § 6973, was confined to true emergency situations, the Court in *United States v. Reilly Tar and Chemical Corp.,* 546 F.Supp. 1100 (D.Minn.1982), quoted from a House committee report accompanying the Safe Water Drinking Act discussing the meaning of the phrase "imminent and substantial endangerment" as follows:

> ... administrative and judicial and implementation of this authority must occur early enough to prevent the potential hazard from materializing. This means that "imminence" must be considered in light of the time it may take to prepare administrative orders or moving papers to commence and complete litigation and to permit issuance, notification, implementation, and enforcement of administrative or court orders to protect the public health.
>
> Furthermore, while the risk of harm must be "imminent" for the administrator to act, the harm itself need not be. Thus, for example, the administrator may invoke this section when there is an imminent likelihood of the introduction into drinking water of contaminents that may cause health damage after a period of latency.

546 F.Supp. at 1109–1110. *See also United States v. Northeastern Pharmaceutical and Chemical Company, supra,* 579 F.Supp. at 846 n. 28. Thus, an endanger-

ment is "imminent" if factors giving rise to it are present, even though the harm may not be realized for years.

Congress has accepted these interpretations of the words "endangerment" and "imminent." In amending Section 7003 of RCRA, 42 U.S.C. § 6973, to clarify its application to past generators of hazardous wastes, Congress declared:

> [D]ue to the nature of the hazards presented by disposal sites, Section 7003 is "intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risks posed by toxic wastes." *United States v. Price,* 688 F.2d 204, 213–214 (3rd Cir.1982). An endangerment means a risk of a harm, not necessarily actual harm, and proof that the past or present handling, storage, treatment, transportation or disposal of any solid or hazardous waste *may* present an imminent and substantial endangerment is grounds for an action seeking equitable injunctive relief. *United States v. Price, supra,* and *United States v. Vertac Chemical Corp.,* 489 F.Supp. 870, 885 (E.D.Ark., W.D.1980). The *primary intent of the provision is to protect human health and the environment;* hence, the courts should consider both the nature of the endangerment which may be presented and its likelihood, recognizing that risk may be "assessed from suspected, but not completely substantiated, relationships between facts, from trends among facts, from theoretical projections, from imperfect data, or from probative preliminary data not yet certifiable as 'fact'." *United States v. Vertac Chemical Corp., supra,* at 885, citing *Ethyl Corporation v. Environmental Protection Agency,* No. 73–2205 (D.C.Cir. Jan. 28, 1975) (dissenting op. at 11, 31–33), *reversed en banc* at 541 F.2d 1 (D.C.Cir.1976), *cert. denied* 426 U.S. 941 [96 S.Ct. 2663, 49 L.Ed.2d 394] (1976). An endangerment is "imminent" and actionable when it is shown that it presents a threat to human health or the environment, even if it may not eventuate or be fully manifest for a peri-

od of many years—as may be the case with drinking water contamination, cancer, and many other effects. *United States v. Price, supra,* and *United States v. Reilly Tar & Chemical Corp.,* [546 F.Supp. 1100, 1109–10] Civ. No. 4–80–469 (D.Minn. Aug. 23, 1982) at 10–13. S.Rep. No. 284, 98th Cong., 1st Sess., at 59 (Oct. 28, 1984).

 Congress' emphasis on the protection of health and the environment, and especially its approval of the use of nondefinitive data in risk assessment, means that if an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment. Thus, just as the word "imminent" does not require proof that harm will occur tomorrow, and the word "endangerment" does not require quantitative proof of actual harm, the word "substantial" does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that "excess deaths" will occur, or that a water supply will be contaminated to a specific degree). Instead, the decisional precedent demonstrates that an endangerment is substantial if there is reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken, keeping in mind that protection of the public health, welfare and the environment is of primary importance. A number of factors (e.g., the quantities of hazardous substances involved, the nature and degree of their hazards, or the potential for human or environmental exposure) may be considered in determining whether there is reasonable cause for concern, but in any given case, one or two factors may be so predominant as to be determinative of the issue.

*United States v. Northeastern Pharmaceutical and Chemical Company, supra,* is one of two cases decided to date under Section 106(a) of CERCLA that have applied the imminent and substantial endangerment criteria. In *NEPACCO,* 85 bar-

rels of waste materials containing as much as 319 ppm of dioxin, 40 ppm of toluene, and 63 ppm of trichlorophenol, had been buried in an area underlain by limestone bedrock. The bedrock was marked by sinks, underground streams and caverns, such that the waste ultimately could reach drinking water supplies, even though it was impossible to predict the rates and direction of groundwater movement. In discussing the endangerment at the site, Judge Clark noted as follows:

> Because of the region's soil conditions, there was a substantial likelihood of the hazardous waste in the trench at the Denny Farm site entering the environment and going into the groundwater system; whereupon, the contaminants *may* have come into contact with members of the public who *may* have been adversely affected by their exposure to these wastes.
>
> Pursuant to the consent decree ... Syntex removed the deteriorated drums and other contaminated materials from the trench and placed them in a temporary storage, a concrete bunker, on the Denny Farm site... *The wastes no longer present an imminent and substantial endangerment.*

579 F.Supp. at 833 (emphasis added). Thus, without considering the concentration of the hazardous substances at the point of exposure, the number of persons or other living organisms who might be exposed, or the extent to which excess deaths or illnesses would occur, the court found that the conditions of the site presented an imminent and substantial endangerment.[8]

*United States v. Seymour Recycling Corp.*, 618 F.Supp. 1 (S.D.Ind.1984), is apparently the only other action under CERCLA Section 106(a) wherein a court has applied the "imminent and substantial" endangerment criteria. In *Seymour*, a shallow aquifer passing beneath the disposal site contained benzene, phthalates, trichloroethylene and other organic com-

pounds. Preliminary studies indicated that the groundwater in the aquifer flowed in the direction of a subdivision which used well water. Although the studies did not show that any immediate danger existed to people using the wells in the subdivision, the court found that because the groundwater flowed in the direction of the subdivision and the contaminants could be expected eventually to reach those residences, that it presented an imminent and substantial endangerment.

Because hazardous substances are, by definition, capable of causing serious harm, a substantial endangerment may exist whenever the circumstances of a release or threatened release of a hazardous substance are such that the environment or members of the public may become exposed to such substances and are therefore put at risk. For very hazardous substances, such as those which are toxic at low concentrations or known or suspected carcinogens, a substantial endangerment will arise when small amounts are released or threatened to be released. *See United States v. Northeastern Pharmaceutical and Chemical Company, supra.* As was observed in *United States v. Wade, supra,* wherein the court rejected the defendant's argument that CERCLA imposed liability only for releases containing reportable quantities of hazardous substances:

> [G]iven the standard established by § 102 for designating additional substances as hazardous, Congress may well have intended to vest a great deal of discretion in the Executive branch in its prosecutorial decisions. A substance may be designated as hazardous if, upon release into the environment, it "may present substantial danger to the public health or welfare or the environment." (footnote omitted.) 42 U.S.C. § 9602(a). Similarly, the interim standards for reportable quantities under CERCLA—one pound for all substances except those designated pursuant to § 311(b)(2)(A) of

---

8. While an appeal has been docketed in the *NEPACCO* case, No. 84–1837–WM (8th Cir. June 28, 1984), this aspect of the *NEPACCO* decision has not been appealed.

FWPCA—suggests that Congress intended a result almost as drastic as the one the generator defendants posit (i.e., that liability could be imposed for release of a copper penny, since copper is a hazardous substance). If Congress intended CERCLA liability only for those whose discharges contained reportable quantities of hazardous substances, and if the reportable quantities are determined by reference to § 102, defendant could be held liable for the disposal, not of one penny, as the defendants fear, but of a pound of pennies.

577 F.Supp. at 1340.

### 2. *Imminent and Substantial Endangerment for Purposes of the Motion*

 The language of CERCLA, the decisional precedent, the definition of "hazardous substance" and the expressions of Congressional intent discussed above all lead to the conclusion that an endangerment is "substantial" whenever members of the public or the environment may be exposed to a risk of harm by virtue of a release or threatened release of hazardous substances. While a number of factors (e.g., the amounts of hazardous substances, the nature and degree of their hazards, the routes of releases and potential exposure routes) may be considered in determining whether there is a substantial endangerment in any given case, one or two factors may be so predominant as to be determinative of the issue. Here, there is ample evidence to demonstrate that given the types and amounts of hazardous substances being released from the site and the potential for exposure, that as a matter of law an imminent and substantial endangerment exists.

Numerous hazardous substances are present and releasing from the CCC site. Humans or wildlife who venture onto the site [9] may come into direct contact with the hazardous substances. Humans and other living organisms off the site may also be exposed to hazardous substances that migrate from the site via groundwater, surface water or air. In addition, the groundwater, air and surface waters that these substances may reach are all part of the "environment" that CERCLA is intended to protect. *See,* CERCLA Section 101(8), 42 U.S.C. § 9601(8).

Although the endangerment assessment portion of the generator defendants' Remedial Investigation Report only addresses "the magnitude and probability of actual or potential harm to *humans* " (R.I. 9–1) (emphasis added), and assumes that there will never be changes in the use and character of the site and the property in the vicinity of the site, or in the use of water from the Missouri River downstream of the site, and that the security fence and warning notices will remain in place and in good condition forever [10], that report nevertheless demonstrates sufficient cause for concern for defendants to recommend that remedial action be taken at the site. The report recognizes, for example, that persons working on the site, trespassers and Mobay and KCP & L employees face some risk from exposure to airborne contaminants from the site.[11] Therefore, the report recommends that means to reduce access to the site and to "mitigate against" possible dispersion of windblown constituents be installed and maintained.[12] Similarly, the report recognizes that "uncontrolled prolonged contact or ingestion of ... materials in the soil or stabilized waste matrix may present a risk to humans" [13], and classifies

---

**9.** Defendants assert that direct contact is unlikely because a chain link fence has been erected around the site and warning notices have been posted. Of course, fences can be climbed and pose no barrier whatsoever to birds and other wildlife.

**10.** *See, e.g.,* RI 9–5 ("Because a fence and warning signs have been erected, and adjacent woodlands and fields act as buffer zones, the risks associated with constituents ... in the soil ...

have been mitigated."); RI 9–6 ("The groundwater is not currently used for drinking water supply").

**11.** RI 9–21.

**12.** *Id.*

**13.** RI 9–4.

this as a "moderate" risk that requires remediation.[14] Defendants also concede that remedial action is necessary to "mitigate migration of soils and/or waste materials under heavy precipitation or flood conditions."[15]

Although the defendants state that "[w]hile it is readily admitted from the results of the remedial investigation that contaminants do exist in the Conservation Chemical site and that such contaminants are leaching slowing from that site ...", they argue vigorously that "[a]t no place [in the remedial investigation report] have defendants agreed that any of the conditions and risks associated therewith ... constitute an imminent and substantial endangerment." Suggestions of Original Generator-Defendants in Opposition to Plaintiff's Motion for Partial Summary Judgment of Liability Pursuant to Sections 106(a) and 107(a) of CERCLA and Section 7003 of RCRA, at pp. 7–10. The defendants appear to be playing a game of semantics. Assuming a given set of facts, the determination of whether or not those facts constitute an "imminent and substantial endangerment" is a question of law. The Special Master concludes—even if the defendants do not—that under the limited facts assumed for purposes of this motion [16], there is "an imminent and substantial endangerment to the public health or welfare or the environment" because of the release or threat of a release of hazardous substances from the site.

### D. Liability Under RCRA Section 7003

#### 1. The Case Law and the 1984 Amendments

The case law concerning liability issues under RCRA Section 7003, 42 U.S.C. § 6973, addresses a number of issues. As indicated previously, interpretation of the phrase "imminent and substantial endangerment" has been litigated. *See, United States v. Reilly Tar and Chemical Corp., supra,* 546 F.Supp. at 1109–1110. The question has been raised as to whether RCRA applies at all to inactive disposal sites. *See, United States v. Waste Industries, Inc., supra,* 734 F.2d at 165; *United States v. Price,* 688 F.2d 204, 214 (3rd Cir.1982); *Mola Development Corp. v. United States,* 22 E.R.C. 1443 (C.D.Calif. Feb. 11, 1985); *United States v. Solvents Recovery Service of New England,* 496 F.Supp. 1127, 1140–1141 (D.Conn.1980). The issue creating the most dissension in the ranks of the courts has been whether RCRA Section 7003 could be applied to past, off-site, non-negligent generators. *See, Jones v. Inmont Corp.,* 584 F.Supp. 1425, 1437 (S.D.Ohio 1984); *United States v. Northeastern Pharmaceutical and Chemical Company, supra,* 579 F.Supp. at 837; *United States v. Wade,* 546 F.Supp. 785, 792 (E.D.Pa.1982); *United States v. Price,* 523 F.Supp. 1055, 1073 (D.N.J.1981). Of more than passing interest to the courts has been the extent to which CERCLA was enacted to cure perceived inadequacies of RCRA. *See, United States v. Shell Oil Company,* 605 F.Supp. 1064, 1070–1071 (D.Colo.1985); *Bulk Distribution Centers, Inc. v. Monsanto Company,* 589 F.Supp. 1437, 1441 (S.D.Fla.1984); *United States v. Northeastern Pharmaceutical and Chemical Company, supra,* 579 F.Supp. at 839.

However, on November 8, 1984, President Reagan signed the Hazardous and Solid Waste Amendments of 1984, H.R. 2867, 98th Cong., 2d Sess., 130 Cong.Rec. H 11,103–11,125, which, *inter alia,* amended Section 7003 of RCRA, 42 U.S.C. § 6973. As amended, that section now provides, in pertinent part, as follows:

**14.** RI 9–20 to 9–22.

**15.** *Id.*

**16.** The United States is quick to point out that it does not agree that the defendants' remedial investigation report accurately depicts the risk at the site or the remedial actions necessary to remedy the situation. The United States has accepted the defendants' Remedial Investigation Report only for purposes of the motion for summary judgment. The defendants have also objected that summary judgment is not appropriate where discovery has not been completed. Since the government has accepted the defendants' own report for purposes of the motion, however, this objection has no merit.

Notwithstanding any other provision of this Act, upon receipt of evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste may present an imminent and substantial endangerment to health or the environment, the administrator may bring suit on behalf of the United States in the appropriate district court against any person (including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility) who has contributed or who is contributing to such handling, storage, treatment, transportation or disposal to restrain such person from such handling, storage, treatment, transportation or disposal, to order such person to take such other action as may be necessary, or both
. . .

The Special Master is unaware of any cases construing RCRA Section 7003 as amended. The plaintiff contends that the 1984 amendment merely clarifies what had been the Congressional intent all along, i.e., that RCRA applies to inactive sites, that Section 7003 applies to past operators, generators and transporters, that the standard of liability is one of strict liability, and that the scope of liability is joint and several where the endangerment is indivisible. The four original generator defendants acknowledge the 1984 amendment but are silent as to its implications, with the exception that they argue, based upon the conference report concerning the amendments, that the amendments reaffirm the fact that causation is an element of the cause of action under Section 7003. Neither CCC, Norman Hjersted nor CCCI address the effects of the 1984 amendment at all.

 The conference report alluded to above does, in fact, confirm that the amendment was designed to clarify Congress' intent and resolve some of the uncertainties that had arisen in the course of litigation. The Joint Explanatory State-

ment of the Committee of Conference states, in pertinent part:

Section 7003 focuses on the abatement of conditions threatening health and the environment and not particularly human activity. Therefore, it has always reached those persons who have contributed in the past or are presently contributing to the endangerment, including but not limited to generators, regardless of fault or negligence. The amendment, by adding the words "have contributed," is merely intended to clarify the existing authority. Thus, for example, non-negligent generators whose wastes are no longer being deposited or dumped at a particular site may be ordered to abate the hazard to health or the environment posed by the leaking of the wastes they once generated and which have been deposited on the site. The amendment reflects the long-standing view that generators and other persons involved in the handling, storage, treatment, transportation or disposal of hazardous wastes must share the responsibility for the abatement of the hazards arising from their activities. The section was intended and is intended to abate conditions resulting from past activities. Hence, the district court decisions in *United States v. Wade*, 546 F.Supp. 785 (E.D.Pa. 1982), *United States v. Waste Industries*, No. 80–4–Civ.–7 (E.D.N.C. Jan. 3, 1983) and *United States v. Northeastern Pharmaceutical and Chemical Company, Inc., et al.*, 579 F.Supp. 823 (W.D.Mo. 1984), which restricted the application of Section 7003, are inconsistent with the authority conferred by the section as initially enacted and with these clarifying amendments.

98th Cong., 2d Sess., 130 Cong.Rec. H 11137. Thus, it is clear that RCRA Section 7003 applies to inactive sites and that past operators, generators and transporters may be held to a standard of strict liability for their activities.[17] The report does not

---

17. Those portions of the motions for summary judgment filed by Northwest Central Pipeline Corporation, Kansas City Power & Light Com-

pany and Schwinn Bicycle Company claiming that RCRA does not apply to non-negligent off-

address, however, the claim of the plaintiff herein that the scope of liability under Section 7003 is joint and several where the endangerment is indivisible, or the claim of the original generator defendants that proof of causation is required to establish liability. The Special Master agrees with both claims.

 The Court has broad authority under Section 7003 to grant the equitable relief necessary to eliminate the endangerment. *See, United States v. Price, supra,* 688 F.2d at 213–214. By its terms, Section 7003 provides that *any* person "contributing" to an imminent and substantial endangerment may be ordered to take whatever action is necessary to abate the endangerment. Congress, by providing the courts with this broad power to order the relief necessary to abate the hazard, has authorized the imposition of joint and several liability to ensure complete relief. The propriety of joint and several liability is confirmed by the relevant legislative history of Section 7003, which demonstrates Congress' clear intent to give broad authority to the courts to grant all relief necessary to ensure complete protection of public health and the environment. *See,* S.Rep. No. 284, 98th Cong. 1st Sess., at 59 (Oct. 28, 1984) (Section 7003 "is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risks posed by toxic wastes", citing *United States v. Price, supra,* 688 F.2d at 213–214).

Moreover, it is quite clear that Section 7003 is essentially a codification of the common law of public nuisance. *See,* S.Rep. No. 172, 96th Cong., 2nd Sess., at 5 (1980), U.S.Code Cong. & Admin.News 1980, 5019, 5023; *Jones v. Inmont Corp., supra,* 584 F.Supp. at 1436. Since Congress intended Section 7003 to be both a codification and expansion of the common law of public nuisance, Congress must also have intended for joint and several liability to be applied where the injury is indivisible. As this Court has recognized, joint and several

site generators must be rejected for the same

liability is the evolving, modern rule applied in environmental cases where the injury is indivisible. *United States v. Conservation Chemical Company, supra,* 589 F.Supp. at 63. It is proper to assume that Congress was aware of these common law decisions and intended for joint and several liability to be applied in like cases. *See, Cannon v. University of Chicago,* 441 U.S. 677, 696–697, 99 S.Ct. 1946, 1957–1958, 60 L.Ed.2d 560 (1979).

 The common law of nuisance also provides for causation as an element of the cause of action. The original defendant generators rightfully point to language in the 1984 conference report which supports their argument that some causation requirement should be applied under Section 7003: "Thus, for example, non-negligent generators whose wastes are no longer being deposited or dumped at a particular site may be ordered to abate the hazard to health or the environment *posed by the leaking of the wastes they once generated and which have been deposited on the site.*" 98th Cong., 2d Sess., 130 Cong.Rec. H 11137 (Oct. 3, 1984) (emphasis added). Thus, to maintain a cause of action under Section 7003, the government must show that a particular generator's waste (or at least waste of the same type where the wastes have been commingled) "has contributed or ... is contributing" to a situation which may present an imminent and substantial endangerment to health or the environment.

2. *Application for Purposes of This Motion*

 To be entitled to injunctive relief under Section 7003 of RCRA, 42 U.S.C. § 6973, the government must establish three elements: (1) that the conditions at the CCC site "may present an imminent and substantial endangerment"; (2) that the endangerment stems from "the handling, storage, treatment, transportation or disposal of any solid or hazardous waste"; and (3) that the defendant "has contributed

reason.

or is contributing to such handling, storage, treatment, transportation or disposal." 42 U.S.C. § 6973. As indicated previously, the Special Master has concluded that sufficient evidence has been presented by undisputed facts to establish that a "imminent and substantial endangerment" exists at the CCC site. Therefore, the first element is satisfied.

"Disposal" is defined in RCRA:

The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or any hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters.

42 U.S.C. § 6903(3). Because the definition includes the word "leaking", "disposal" occurs not only when a solid waste or a hazardous waste is first deposited, dumped, spilled or placed onto or into the ground or water, but also when such wastes migrate from their initial location. As was observed in *United States v. Waste Industries, Inc., supra:*

The inclusion of "leaking" as one of the diverse definitional components of "disposal" demonstrates that Congress intended "disposal" to have a range of meanings, including conduct, a physical state, and an occurrence. Discharging, dumping, and injection (conduct), hazardous waste reposing (a physical state) and movement of the waste after it has been placed in a state of repose (an occurrence) are all emcompassed in the broad definition of disposal. "Leaking" ordinarily occurs when landfills are not constructed soundly or when drums and tank trucks filled with waste materials corrode, rust, or rot. Thus, "leaking" is an occurrence included in the meaning of "disposal."

734 F.2d at 164. See also, *United States v. Price, supra,* 523 F.Supp. at 1073.

The defendants' Remedial Investigation Report demonstrates that a number of substances have migrated into and are migrating the soil and groundwater beneath the CCC site. Included among the substances which are "leaking" from the site are arsenic, cadmium, chromium, nickel, zinc, cyanides and trichloroethylene. Each of these substances is a "hazardous waste" for purposes of Section 7003.

RCRA defines "hazardous waste" as follows:

The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

Arsenic, cadmium, chromium, nickel, zinc, cyanides and trichloroethylene, all of which were sent to and are found at the site, are "hazardous wastes" within the meaning of Section 7003. Each of these substances is listed in Appendix VIII to 40 C.F.R. Part 261. The substances listed in that appendix "have been shown in scientific studies to have toxic, carcinogenic, mutagenic or teratogenic effects on other life forms," and as such to be "capable of posing a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of ..." 40 C.F.R. § 261.11. Thus, such substances satisfy the definition of "hazardous wastes" under 42 U.S.C. § 6903(5)(B), and the second element of liability under RCRA Section 7003 can be established.

■ The third element of liability cannot be established as to any of the defendants other than CCC for purposes of summary judgment. As the current owner of the KC site, and as the owner and operator of the site when the materials were dis-

posed of, CCC is clearly liable for any endangerment that exists. Even assuming that personal liability might potentially be imposed against Norman Hjersted as a corporate officer/shareholder under RCRA Section 7003, such liability should not be found at this stage of the proceedings for the reasons discussed previously. Liability may not be imposed on the four original generator defendants at this time for the reason discussed previously, i.e., that they have disputed the allegations that their wastes were disposed of at the CCC site, and for the additional reason that there would be insufficient evidence of causation under the factual record presented for this motion. Although it has admitted to disposing of cyanide wastes at the KC site, CCCI may not be held liable at this stage for the reason that it is disputed whether or not CCCI's wastes are contributing to the endangerment.

The government contends, that in addition to the injunctive relief specifically authorized by Section 7003, that that section also provides authority for the United States to recover the costs it has incurred at the CCC site. The defendants, on the other hand, contend that recovery of response costs is not an appropriate form of relief under Section 7003.

Section 7003 gives the courts authority to issue prohibitory injunctions and to order "such other action as may be necessary ..." 42 U.S.C. § 6973. The statute thereby invokes on behalf of the United States "the full equity powers of the federal courts in the effort to protect the public health, the environment and public water supplies from the pernicious effects of toxic wastes." *United States v. Price, supra,* 688 F.2d at 214. The court in *Price* upheld the denial of a preliminary injunction seeking to require defendants to fund a diagnostic study. The court of appeals found that the district court had authority under Section 7003 to order defendants to fund the study, but sustained the denial of the preliminary injunction as within the district court's discretion, since a more practical solution was to have EPA undertake the study without delay, with "[r]eimburse-

ment ... thereafter be[ing] directed against those parties ultimately found to be liable." *Id.* Significantly, the Senate report on the 1984 amendments to RCRA quoted with approval the statement found in *Price* (688 F.2d at 213–214) that Section 7003 is "intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate risks posed by toxic waste." S.Rep. No. 284, 98th Cong., 1st Sess., at 59.

By seeking relief in the form of recovery of the government's costs incurred after the enactment of RCRA in 1976, the United States seeks the equitable remedy of restitution. In *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), restitution was granted to the United States for the costs of removing from a waterway a sunken vessel containing chlorine gas. In *Reserve Mining Co. v. Lord,* 529 F.2d 181, 184 (8th Cir.1976) (*en banc*), the court held that reimbursement for expenditures by the United States in removing pollutants discharged into Lake Superior in violation of the Federal Water Pollution Control Act was within the jurisdiction of the district court. The district court thereupon found the polluter liable for interim filtration expenses incurred by the United States, relying in part upon *Wyandotte. See, United States v. Reserve Mining Co.,* 408 F.Supp. 1212, 1214–1216 (D.Minn.1976).

The Special Master concludes that the recovery of costs incurred by the United States pursuant to its activities under RCRA may be an appropriate form of relief in an action brought pursuant to RCRA Section 7003. Unlike the recovery of response costs pursuant to Section 107 of CERCLA, however, such cost recovery devolves purely from the court's exercise of equitable discretion and must necessarily await a full and detailed analysis of the equities of the case. Therefore, to enter such relief at the summary judgment stage would be inappropriate.

### E. Summary

In summary, the Special Master recommends that the Court grant in part and

deny in part the United States' motion for partial summary judgment on liability issues. Specifically, the Special Master recommends that the Court enter an order finding that the United States will be entitled to relief as follows:

(1) for recovery of response costs under CERCLA Section 107 from CCC and CCCI;

(2) for injunctive relief to abate the endangerment under CERCLA Section 106 from CCC and CCCI; and

(3) for injunctive relief to abate the endangerment under Section 7003 of RCRA from CCC.

It must be emphasized that the summary judgment recommended to be entered against CCC and CCCI is partial only. At trial, the government must establish its response costs and must establish the extent of the endangerment. Summary judgment should not be entered against the four original generator defendants for the following reasons: regarding the CERCLA Section 107 claim, they have disputed facts concerning the government's response costs and their shipment of wastes to the CCC site; regarding the CERCLA Section 106 claim, they have disputed facts concerning their shipment of wastes to the CCC site; and regarding the RCRA Section 7003 claim, they have disputed facts concerning their shipment of wastes to the CCC site and causation. Summary judgment should not be entered against Norman Hjersted on any of the claims for the reason that the nature and degree of his personal participation has not been established sufficiently at this stage. Summary judgment should not be entered against CCI on the RCRA claim because it has disputed causation.

## II. THE UNITED STATES' MOTIONS REGARDING DEFENSES

Plaintiff United States of America has filed two motions for partial summary judgment against the original defendants pertaining to defenses asserted by the defendants. Motion One relates to certain equitable affirmative defenses and Motion Two relates to certain legal defenses. A Memorandum of Points and Authorities in Opposition to the United States' Motion for Partial Summary Judgment has been filed to each of the motions by the original generator defendants. In addition, CCCI and Norman B. Hjersted filed a consolidated Memorandum in Opposition to Plaintiff United States' Motion for Partial Summary Judgment As To Certain Equitable and Legal Affirmative Defenses (United States' Motions One and Two).

The following arguments are made in these documents:

UNITED STATES

1. The only defenses available are those enumerated in CERCLA Section 107(b).

2. Lack of negligence or use of due care is not cognizable under CERCLA or RCRA.

3. Equitable defenses cannot be used to defeat liability.

4. Causation defenses as set forth by defendants are insufficient as a matter of law.

5. Defenses relating to the government's right to recover its response costs under CERCLA are insufficient as a matter of law.

6. The defense that injunctive relief is inappropriate because the U.S. has an adequate remedy at law is insufficient as a matter of law.

7. There is no statute of limitations to bar this action.

8. Constitutional defenses are without merit.

9. Defendant FMC's wastes are not exempt from the operation of CERCLA.

GENERATOR DEFENDANTS

1. All equitable defenses are proper under CERCLA Sections 106 and 107.

2. Affirmative equitable defenses are relevant to a decision of the government's other claims.

3. U.S. allegations of sovereign immunity and public interest are insufficient to defeat equitable defenses.

4. Proof of causation is essential in a CERCLA action.

5. Defenses are sufficient as a matter of law regarding the government's right to recover response costs.

6. Injunctive relief is inappropriate because the U.S. has an adequate remedy at law.

7. This action is barred by a statute of limitations.

8. Defendants' constitutional defenses are meritorious.

9. FMC's mining wastes are exempt under CERCLA.

CCCI AND HJERSTED

1. The due care defense is an appropriate defense and is properly asserted.

2. Laches and estoppel are appropriate defenses and are properly pleaded.

3. There is a denial of due process in the application of CERCLA.

The points listed above will be discussed in sections below concerning the enumerated statutory defenses, equitable defenses, and legal defenses.

A. *Statutory Defenses Enumerated in CERCLA Section 107(b)*

Section 107 of CERCLA addresses liability, and Section 107(b) specifically enumerates the defenses to liability:

(b) There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) an act of omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b). The listing in Section 107(b) is narrow. Releases and damages are protected only if solely caused by acts of God or war, or acts or omissions of certain third parties. The defendant must establish that he or she exercised due care with respect to the substances and with respect to the selection of the third parties causing the release if the intervening cause was a third party.

The courts have not generally been called upon to interpret the defenses provided by Section 107(b) when examining the liability section of CERCLA. Decisions which address the enumerated defenses usually refer to and rely upon interpretation of the language of the statute and the legislative history.

If the statutory language is clear and unambiguous, then the language is controlling. *See, Touche Ross v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). "Without a clear congressional command otherwise, we will not construe a statute in any way that makes some of its provisions surplusage." *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 (2d Cir.1985), citing *United States v. Mehruranesh,* 689 F.2d 822, 829 (9th Cir.1982) and *National Insulation Transportation Committee v. ICC,* 683 F.2d 533, 537 (D.C.Cir.1982).

The legislative history of a statute is, of course, always important in determining the legislative intent for its implementation. In the instance of the "Superfund" legislation, a hastily assembled bill and a fragmented legislative history add to the usual difficulty of discerning the full meaning of the law.

■■■ This Court has held that strict liability is the standard to apply in implementing the liability section of CERCLA. *See, United States v. Conservation Chemical Co., supra*, 589 F.Supp. at 62. Although the term "strict" was deleted at the last minute, it still appears that Congress intended to impose a strict liability standard subject only to the affirmative defenses listed in Section 107(b). 42 U.S.C. § 9601(32) provides that "liability" under CERCLA "... shall be construed to be the standard of liability" under Section 311 of the Clear Water Act, 33 U.S.C. § 1321, which courts have held to be strict liability, *see, e.g. Steuart Transportation Co. v. Allied Towing Corp.*, 596 F.2d 609, 613 (4th Cir.1979), and which Congress understood to impose such liability. *See*, S.Rep. No. 848, 96th Cong., 2d Sess. 34 (1980), *reprinted in* 1 *CERCLA Legislative History* at 308, 341.

Courts interpreting Section 311 have carefully examined the Clean Water Act's legislative history. *See, U.S. v. LeBeouf Bros. Towing Co.*, 621 F.2d 787 (5th Cir. 1980), *cert. denied*, 452 U.S. 906, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981); *Steuart Transportation Co. v. U.S.*, 596 F.2d 609 (4th Cir.1979); *Burgess v. M/V Tamano*, 564 F.2d 964 (1st Cir.1977), *cert. denied*, 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978). In each case, the courts have found that Congress intended to impose strict liability. These findings came in the context of determining the liability of parties intimately involved in the challenged pollution activity, and thus, congressional intent was relatively clear. CERCLA, on the other hand, imposes liability upon various parties whose nexus to the damage or injuries may be less clear.

As the standard of liability under CERCLA is strict liability, the defenses listed in Section 9607(b) are affirmative defenses available to preclude imposition of strict liability. The provision of a strict liability standard in a statute does not mean that legal or equitable defenses cannot be asserted.

The placement of Section 9607 within the Act was noted in *U.S. v. Price, supra:*

> The heading used for § 107, "Liability," denotes an intention to have this section define liability for the entire act. This conclusion is reinforced by the fact that § 107 does not contain any qualifying language. Instead, it appears that Congress desired to use quite broad and unrestrained terminology. In this manner, § 107 sets forth standards of liability and associated defenses.

577 F.Supp. at 1113. The Special Master concludes that the defenses enumerated in Section 107 go solely to the question of strict liability.

### B. Lack of Negligence or Use of Due Care

■■■ As has been previously discussed, the standard of liability under CERCLA Sections 106 and 107 and RCRA Section 7003 is strict liability. Therefore, defenses based upon the claims that defendants were not negligent or that they exercised due care cannot be used to avoid liability. Under appropriate circumstances, however, such "defenses" may be relevant to issues of apportionment of liability among the defendants at some later date.

### C. Equitable Defenses

■■■ Equitable defenses are proper under CERCLA in determining liability, the nature of the remedy and the amount of damage.

Section 106(a) specifically states that a court may "grant such relief as the public interest and the equities of the case may require." 42 U.S.C. § 9606(a). On its face, Section 106 incorporates traditional equitable defenses. *United States v. Reilly Tar & Chemical Corporation*, Civil No.

4–80–469 (D.Minn. June 14, 1984) states that:

> ... since the court may consider the equities of the case in fashioning relief under § 106 of CERCLA should the United States prevail, resolution of this motion [United States' motion to strike laches defense] at this time could not narrow the necessary factual inquiries at trial.

Slip op. at 5. In construing the same section of CERCLA, *United States v. A & F Materials Company, Inc.*, 578 F.Supp. 1249 (S.D.Ill.1984) the court said that it "... must be guided by the equities of the case." 578 F.Supp. at 367. Similarly, in *United States v. Stringfellow*, No. 83–2501 (C.D.Cal. April 5, 1984) the court stated in regard to CERCLA: "In conferring jurisdiction on the District Courts ... Congress intended that the Courts' equitable powers be used." Slip op. at 11.

As discussed, Section 101(32) provides that liability under CERCLA shall follow the liability standard of Section 311 of the Clean Water Act. In a recent case, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), the Supreme Court held that the traditional equitable defenses to injunctive relief must be considered in construing Section 311. That section, like Section 106, provides for injunctive relief subject to a limited number of defenses. The Supreme Court stressed that an injunction is an extraordinary remedy, noting that if a statute did not expressly abrogate equitable principles, they were available:

> Unless a statute in so many words, or by necessary and unescapable reference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.

456 U.S. at 313, 102 S.Ct. at 1804. As equitable defenses are appropriate under Section 106 and the same standard of liability and associated defenses apply to Section 107, equitable defenses should be available under Section 107 also.

The Court has recently recognized that the plaintiff's Section 107 claims seek the equitable remedy of restitution when it approved the Special Master's Recommendation Regarding General Dynamics Corporation's Demand For a Jury Trial. *See*, Order, May 14, 1985. That recommendation provided, in pertinent part, as follows:

> There is no right to a jury trial in CERCLA actions for cost reimbursement under Section 107 of CERCLA because the action seeks the equitable remedy of restitution. *See, United States v. Northeastern Pharmaceutical and Chemical Company*, 19 E.R.C. 2186 (W.D.Mo. Sept. 30, 1983); *United States v. Mottolo*, Civil No. 83–547–D, Civil No. 84–90–D, slip op. (D.N.H. March 15, 1985); *United States v. Georgeoff*, No. 83–1656–A, slip op. (N.D.Ohio Aug. 2, 1984); *United States v. Tyson*, No. 84–2663, slip op. (E.D.Pa. Nov. 28, 1984); *United States v. Union Gas Company*, No. C83–2454, slip op. (E.D.Pa. Aug. 2, 1984); *United States v. Wade*, No. 79–1426, slip op. (E.D.Pa. Feb. 21, 1984); *United States v. Argent Corporation*, No. 83–523–HB, slip op. (D.N.M. Dec. 20, 1983); *United States v. Reilly Tar and Chemical Company*, 13 Env't.L.Rep. 20897 (D.Minn. June 23, 1983).
>
> What both plaintiff and third-party plaintiffs are seeking under Section 107 is the return of monies spent on behalf of others' legal obligation to clean up hazardous waste. As in *Mottolo*, the parties in this action "seek restitution, that is, to restore the *status quo* by receiving their rightful reimbursement." *United States v. Mottolo*, Civil No. 83–547–D, Civil No. 84–90–D (D.N.H. March 15, 1983), slip op. at 36. Restitution is an equitable remedy, *see Porter v. Warner Holding Co.*, 328 U.S. 395, 400–402 [66 S.Ct. 1086, 1090–1091, 90 L.Ed. 1332] (1946), and there is no jury trial where a purely equitable remedy is sought. *See, Ross v. Bernhard*, 396 U.S. 531, 533 [90 S.Ct. 733, 735, 24 L.Ed.2d 729] (1970); *Dairy Queen v. Wood*, 369 U.S. 469, 471–473 [82 S.Ct. 894, 896–897, 8 L.Ed.2d 44] (1962). Accordingly, there is no constitutional right to a jury trial on the Section 107 and Section 7003 claims included in this case.

Special Master's Recommendation Regarding General Dynamics Corporation's Demand For a Jury Trial at 7–8.

■■■ In *Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049 (D.Ariz.1984), the court noted that Section 107(b) did not prohibit *inter alia,* defenses such as waiver or laches. The general rule is well-established that laches is unavailable as a defense against the United States in enforcing a public right. *See, United States v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); *United States v. Summerlin,* 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940); *Utah Power and Light Co. v. United States,* 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917). However, a determination of whether the doctrine of laches should bar a claim requires consideration of all the circumstances of a particular case. *See, Citizens & Landowners Against the Miles City/New Underwood Powerline v. Secretary, United States Dept. of Energy,* 683 F.2d 1171 (8th Cir. 1982). In *United States v. Reilly Tar & Chemical Corp.,* No. 4–80–469 (D.Minn. June 14, 1984), the court used its discretion to defer ruling on the laches defenses until the record was fully developed. The court stated that "[a] determination of whether the doctrine of laches should bar a claim requires consideration of all the circumstances of a particular case." Slip op. at 5. *But see, United States v. Mottolo,* 605 F.Supp. 898 (D.N.H.1985).

The unclean hands doctrine may properly be asserted against the United States as an equitable consideration, but, given the language and intent of CERCLA, the Special Master doubts if that doctrine could ever bar the government's claims merely because, for example, federal agencies generated waste to the site (thus making the United States a responsible party). In *Mardan Corp. v. C.G.C. Music Ltd., supra,* the court rejected claims that the enumerated defenses in section 107(b) were exclusive and that "unclean hands" was barred as a defense to a private cause of action under Section 107. The court reasoned that the public policy of assuring that responsible parties bear the costs of hazardous waste clean-up was not defeated by application of the clean hands doctrine. [Parenthetically, it should be noted that the Special Master does not concur with the *Mardan* court's interpretation of *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135 (E.D.Pa.1982), or its conclusion that a responsible party is absolutely barred from recovering response costs under Section 107 under the unclean hands doctrine. *See, Mardan Corp. v. C.G.C. Music, Ltd., supra,* 600 F.Supp. at 1057–1058.]

Equitable defenses of waiver and estoppel have not been reviewed by the courts in CERCLA cases. Waiver is referred to in the *Mardan* case. There, Mardan argued that contractual defenses were not allowed because subsection (a) of Section 107 states that liability is subject only to the enumerated defenses in subsection (b), which is an exclusive list. The court rejected Mardan's argument, stating that under such an interpretation:

> ... defendants would not be able to raise such defenses as statute of limitations, *waiver,* laches, etc. For the foregoing reasons, the defenses listed in subsection (b) cannot be considered as exclusive.

600 F.Supp. at 1056, n. 9 (emphasis added). Estoppel would be an appropriate affirmative equitable defense under this same reasoning.

### D. Causation Under CERCLA

The question of the necessity for proof of causation under CERCLA has been discussed previously in this report.

### E. Right to Recover Response Costs

■■■ Defendants have raised four defenses relating to the government's right to recover its response costs under CERCLA. Generally, defendants claim that the United States failed to comply with Section 104 statutory prerequisites to CERCLA recovery. The United States seeks summary judgment with regard to these defenses on the grounds that it is not required to meet Section 104 statutory requirements. The

United States argues that Section 104 serves as a guardian of Superfund resources, and, as such, restrictions in Section 104 are unrelated to Section 107 actions.

*United States v. Wade, supra,* supports the contentions of the United States and states that Section 104 places restrictions on the use of the funds within Superfund to prevent:

unprovident or disproportionate use of a limited fund to clean up only a few of the many sites for which no solvent, responsible parties can be found. ·Section 107, on the other hand, is intended to impose liability on the responsible parties who created and/or dumped the hazardous wastes ... Thus, the fact that government expenditures at [the] site are not authorized by § 104 affects only the availability of superfund money, and not ... defendants' liability.

577 F.Supp. at 1336.

 Defendants' first defense is that the action cannot be brought under CERCLA since the CCC site is not listed on the National Priority List (the "NPL").[18] Section 107(a) provides for CERCLA liability for "all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a). In an amendment to Section 105, the National Contingency Plan (the "NCP") was revised to include the NPL, which would prioritize the government's response efforts. Defendants claim that the United States seeks to compel the recovery of costs associated with remedial actions, which, according to defendants, can only be directed to sites listed on the NPL.

The holding in *New York v. General Electric Company,* 592 F.Supp. 291 (N.D. N.Y.1984) directly refutes the argument of defendants. Finding that the liability provisions of Section 107 were independent of the NPL, the argument that remedial actions can only be undertaken at sites listed

on the NPL was rejected. General Electric argued that under Section 107(a)(4)(A), States can recover only costs of remedial or removal action which are not inconsistent with the NCP. General Electric claimed that remedial costs may not be recovered because the dragstrip where the wastes were disposed was not among the EPA's priority list of hazardous sites. The court found General Electric's ·contentions unpersuasive and stated:

The fundamental flaw in its position stems from General Electric's belief that section 107 "must be read in tandem with section 104, which sets standards for what costs are recoverable and the conditions under which such costs may be recovered." ... The plaintiffs have demonstrated, however, that every court that has addressed this issue has held that the liability provisions of section 107(a) are separate and independent from the requirements of section 104, *United States v. Northeastern Pharmaceutical Company,* 579 F.Supp. 823, 20 E.R.C. 1401, 1425 (W.D.Mo.1984); *United States v. Wade,* 577 F.Supp. 1326, 20 E.R.C. 1277, 1283 (E.D.Pa.1983); *Ohio ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1315 (N.D.Ohio 1983); *United States v. Reilly Tar & Chemical Corporation,* 546 F.Supp. 1100, 1118 (D.Minn. 1982).

592 F.Supp. at 303. Previously, the court had noted:

The liability provisions were an essential element of the statute because the Fund itself could not adequately remedy the pervasive waste problem. It is clear beyond doubt that the liability provisions are independent of the national priorities list of sites eligible for Superfund money, since the "requirement for a National Priorities List was not intended to be a limitation on liability but rather was the result of the great concern voiced in Congress that the limited trust fund monies not be used for ill-conceived or disorga-

---

**18.** The Environmental Protection Agency has recently taken steps to have the CCC site put on the national priority list.

nized cleanup efforts." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Complaint at 20. *See, e.g.,* 126 Cong.Rec. S14982 (daily ed. Nov. 24, 1980) (comments of Sen. Dole); *id.* at S14978 (comments of Sen. Humphrey); *id.* at S15007 (comments of Sen. Helms).

592 F.Supp. at 302. The Special Master agrees that listing of a site on the NPL is not a condition to bringing a CERCLA action.

■ Defendants' second defense is the claim that a cooperative agreement under Sections 104(c)(3) and 104(d) between the United States and the State of Missouri is a requirement to liability under Section 107, and cite as authority *Wickland Oil Terminals v. ASARCO, Inc.,* 21 E.R.C. 1640 (N.D.Cal.1984) and *Bulk Distribution Centers, Inc. v. Monsanto,* 589 F.Supp. 1437, 1439 (S.D.Fla.1984). In *Wickland,* declaratory and injunctive relief and damages to recover removal of wastes of the previous owner was sought by Wickland. On a motion to dismiss, the defendant argued that the costs were not recoverable because the cleanup was not done by designated enforcers under CERCLA. Wickland and the California Department of Health Services performed the cleanup. The court held that absent a cooperative agreement between the Department of Health Services and EPA, no nexus existed between the actions of the Department of Health Services with regard to the site and CERCLA. Therefore, the actions would not be considered CERCLA enforcement actions. This language does not mean that a cooperative agreement is mandatory. Rather, cooperative agreements must be site-specific, and not generic, and as there was not such an agreement as to the site in question, there was no nexus to establish a CERCLA action.

Defendants cite *Bulk* for the proposition that Section 107(a) should not be considered completely independent of CERCLA's other provisions, as to do so would permit parties to take unilateral actions when a joint effort may have been possible, resulting in inefficiency and added cost. Although *Bulk* does not concern a cooperative agreement, *New York v. General Electric Company, supra,* has held otherwise. There, General Electric argued that contrary to Section 104, the costs incurred by the State had not been incurred pursuant to a cooperative agreement with the federal government, and were therefore not recoverable under Section 107. The court stated that "cooperative agreements [are] irrelevant for purposes of liability ..." 592 F.Supp. at 303.

Defendants also urged the court to imply the requirement of a cooperative agreement as a prerequisite to suit under Section 107 in *State ex rel. Brown v. Georgeoff, supra.* The court found no authority for such a position in its analysis of Sections 104 and 107:

In fact, the contrary view—that the provisions, though related, are not coterminous—is supported by the fact that § 9607 makes no reference to the provisions of § 9604. This Court concludes that a § 9607 action might be brought where Superfund response authority does not exist under § 9604 ... Accordingly, this Court concludes that Ohio may maintain a lawsuit under § 9607 without first entering into an agreement with the federal government for response costs under § 9604.

562 F.Supp. at 1315.

In *United States v. Reilly Tar & Chemical Company,* 546 F.Supp. 1100 (D.Minn. 1982) the court held that liability under Section 107(a) was independent of the authorized uses of the Fund and separate from the cooperative agreement called for in Section 104(c)(3). The court stated:

There is no claim before the court seeking recovery from the Fund. The authorized uses of the Fund provided by section 111 are therefore not relevant to this action. Nor is there any suit before this Court seeking to compel the President to enter into a cooperative agreement with Minnesota under section 9604(c)(3). Whether there should be a cooperative agreement between the President and

Minnesota as provided by section 104(c)(3) is not material in determining Reilly Tar's potential liability under section 107(a).

546 F.Supp. at 1118.

*United States v. Northeastern Pharmaceutical and Chemical Company, Inc., supra,* held defendants in the government's successful action to recover costs for clean-up of hazardous waste disposal site jointly and severally liable. In finding that the government had very broad cost recovery rights, the court said:

The fact that there is not a claim before this Court seeking recovery on behalf of the fund does not bar recovery by the plaintiff. An action brought pursuant to sections 106(a) and 107(a) are independent and separate of the provisions authorizing use of the Superfund, sections 104(c)(3) and 111. *The plaintiff is not required* to present a claim to the fund, *nor enter into a cooperative agreement with the state of Missouri, prior to bringing suit under sections (106(a) and 107(a). Georgeoff,* 562 F.Supp. at 1315; and *Reilly Tar & Chemical Co.,* 546 F.Supp. at 1117–18. The language of Section 107(a) makes this finding explicitly clear, "Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of the section ... "

579 F.Supp. at 850 (emphasis added). The Special Master concurs with Judge Clark that a cooperative agreement with the State of Missouri is not a condition precedent to bringing suit under either Section 106 or Section 107.

▌ Defendants' third defense is the assertion that the United States cannot recover damages unless they first comply with Section 112, which provisions govern claims against the Fund. Section 112(a) applies to "[a]ll claims which may be asserted against the Fund pursuant to section 111 of this title."

The *General Electric* court held that an action under Section 107 may be brought independently of CERCLA's other provisions, including Section 112(a). Rejecting General Electric's argument that plaintiff's claim must be dismissed for failure to comply with the sixty-day notice requirement of Section 112(a), the court found that the sixty-day notice requirement was not dispositive for three reasons:

First, and perhaps most importantly, defendant's reliance on the sixty-day notice requirement is misplaced. The first sentence of section 112(a) expressly provides that "[a]ll claims which may be asserted against the Fund [the Superfund] pursuant to section 9611 of this title shall be presently in the first instance to the owner...." 42 U.S.C. § 9612(a). It is clear, therefore, that the notice provision applies only to actions in which a claim is sought to be made against the Fund; it does not apply when a CERCLA case is merely brought against a responsible party such as GE. Notification in Fund cases is a necessary prerequisite aimed at conserving the assets of the Superfund by encouraging responsible parties to pay clean-up costs before a plaintiff is forced to look to Fund money. Because New York's suit here involves claims for certain costs which may not be asserted against the Fund, but only against GE, the provisions of section 112(a) are not applicable.

Second, the Court is persuaded that in any event, the sixty-day requirement is not jurisdictional. The cases cited by GE, which arose in the context of suits involving other environmental statutes, embodied interpretations of significantly different statutory mechanisms. Unlike the Clean Water Act and the Clean Air Act, which impose notice requirements that are compatible with those statutes' preference for initial administrative rather than private action, *see Massachusetts v. United States Veterans Administration,* 541 F.2d 119, 121 (1st Cir.1976), the purpose of CERCLA seems only to require notice in order to facilitate negotiated settlements. The fact that sixty days elapsed prior to the instant motions comports with the pragmatic approach to the notice requirement, since the parties

were afforded adequate time in which to avoid any court intervention.

Finally, it is apparent that the rule in this circuit embodies the principle that such notice requirements are not jurisdictional.

592 F.Supp. at 300–301.

However, *Bulk Distribution Centers, Inc. v. Monsanto, supra,* held that presentment of a demand letter to other potentially responsible parties was a condition precedent to bringing a cost recovery action under Section 107(a)(4)(B). Plaintiff pointed out that *NEPACCO* and *Wehner v. Syntex Corp.,* 14 Env'tl L.Rep. 20265 (E.D.Mo. Dec. 30, 1983) held that Section 107(a) should be read independently of Section 112(a) because of the qualifying language in Section 107(a) "notwithstanding any other provision or rule of law, and subject to the defenses set forth in subsection b of this section ..." 589 F.Supp. at 1448. The *Bulk* court stated that declaring Section 107(a) completely independent of CERCLA's other provisions would be inefficient and costly because it would permit parties to take unilateral actions when a joint effort might have been possible. The *Wehner* court had based its decision on the "clear meaning of the statute," but the *Bulk* court said that CERCLA and Section 107(a) in particular are "hardly clear and certainly susceptible to the reasonable and practical construction given to them ..." 589 F.Supp. at 1449.

Similarly, in *United States v. Allied Chemical Corp.,* 587 F.Supp. 1205 (N.D. Cal.1984), the court agreed with defendant that failure to allege that a claim was made pursuant to Section 112(a) resulted in failure to state a claim under CERCLA. The court found that the claims procedure required by Section 112(a) governed actions by the Government pursuant to Section 107(a). The court's reasoning was similar to that in defendant's argument: "All claimants are first required to make a claim in writing before instituting court action or presenting a claim to the Fund." 587 F.Supp. at 1207. "Claimant" is defined as "any person who presents a claim for compensation under this Act." 42 U.S.C. § 9601(5). "Person" is defined to include the United States government. 42 U.S.C. § 9601(21). Referring to Section 107(g), the court found that Section 112(a) applied to the federal government. Consequently, the court found that a claim by the government under Section 107 was governed by Section 112(a). The court in its discretion granted plaintiff leave to amend its complaint to allege compliance with Section 112(a), as justice required, since plaintiff had presented a claim to defendant by letter.

Defendant contended that because the City had failed to aver that it made demand upon them at least sixty days before commencing suit as required by Section 112(a), the court was without jurisdiction in *City of Philadelphia v. Stepan Chemical Company,* 544 F.Supp. 1135 (E.D.Pa.1982). The City conceded that notice was not pleaded, but represented in its brief that the required claim was timely made against defendant. The court was "inclined to reject defendant's mechanistic interpretation of the claims procedure under 9612(a)," 544 F.Supp. at 1144, but did not need to rule on this issue in light of the City's representation that defendant did receive the requisite notice.

The court in *Dedham Water Company v. Cumberland Farms Daily, Inc.,* 588 F.Supp. 515 (D.Mass.1983) found that plaintiff had constructively complied with the notice requirement of Section 112, which it stated was required for parties seeking response costs under Section 107. *See also, United States v. Cramblit,* Civ. Action No. 84–0188 (RAR) (E.D.Cal. June 20, 1984).

■ The Special Master concludes that the plaintiff's construction of the statute is correct and that the procedures in Section 112 apply only when the government is making a "claim" against the Fund. This conclusion is buttressed by the legislative history and the more general determination that Section 107 "was meant to stand by itself," independent of the requirements in

Sections 104, 111 and 112.[19] *United States v. Reilly Tar & Chemical Corp., supra,* 546 F.Supp. at 1118. The Special Master recommends that the Court so rule notwithstanding that this conclusion may be against the "weight" of case law authority.

 Defendants lastly contend that the United States is not entitled to recover "costs" not yet incurred. The United States admits this, but argues that it is entitled to a present determination of the defendants' liability or costs incurred in the future by the United States, since the United States has incurred some response costs. The United States is entitled to such a determination.

In *Pinole Point Properties, Inc. v. Bethlehem Steel Corporation,* 596 F.Supp. 283 (N.D.Cal.1984), plaintiff had already expended funds for investigation and cleanup. The court denied defendant's motion to dismiss plaintiff's claim for future liability of defendant because "[t]he contours of plaintiff's controversy with Bethlehem with regard to future costs are defined clearly enough to render appropriate a determination of future liability." 596 F.Supp. at 292. The court found the reasoning in *Jones v. Inmont Corp.,* 584 F.Supp. 1425 at 1430 (S.D.Ohio 1984) persuasive, which refused to dismiss a private plaintiff's claim for declaratory relief as to future response costs under Section 107(a)(4)(A):

> To require either the government or a private party to complete cleanup prior to filing suit would defeat the dual purposes of CERCLA to promote rapid response to hazardous situations and to place financial burden on the responsible parties. Therefore, as the plaintiff's complaint does allege that they have already incurred some portion of the response costs necessary to clean up the site, the controversy is sufficiently real to allow the courts to determine defendant's liability for future costs.

584 F.Supp. at 1430.

Plaintiff sought recovery of response costs incurred, including attorney fees, pre-

judgment interest and a declaratory judgment for future response costs in *NEPACCO, supra.* The court acknowledged that granting declaratory relief was within the discretion of the court, citing C. Wright, A. Miller & Kane, *Federal Practice and Procedure,* § 2759 (2nd ed. 1983):

> The Court finds that granting plaintiff declaratory relief would be of benefit to all parties concerned. The issues have been firmly established and there is a real, present controversy between the plaintiff and defendants. While the Court cannot award costs until they are incurred, the Court can presently determine liability for future costs. *Georgeoff,* 562 F.Supp. at 1315. Plaintiff established that it has already incurred thousands of dollars in costs and has proven that it expects to incur future costs in monitoring and assessing the maintenance of hazardous waste at the Denney farm site. Accordingly, the Court concludes that the defendants are jointly and severally liable for all future costs of removal or remedial action incurred by the plaintiff relative to the Denney farm site that are not inconsistent with the national contingency plan.

579 F.Supp. at 852.

The State's complaint included a prayer for a declaratory judgment on the issue of the defendants' liability for reasonably incurred costs in *State ex rel. Brown v. Georgeoff, supra:*

> Determination as to the availability of declaratory relief is left to the discretion of the Court. C. Wright, & A. Miller, *Federal Practice and Procedure,* Civil § 2759 (2d ed. 1983). In making this determination, this Court must consider whether this case represents "a real controversy between parties having adverse legal interest of such immediacy and reality as to warrant a declaratory judgment." C. Wright, *Federal Courts,* § 100. In this case, the controversy be-

---

**19.** Similarly, the claims of third-party defendants U.S.M. Corporation and Colgate-Palmolive Company that the third-party plaintiffs have failed to timely give notice of claim must also be rejected.

tween the parties has advanced to a very "real" level. Ohio alleges that it has already sustained at least $825,000.00 in damages and seeks over $9 million more in damages. Further, the legislative history of CERCLA indicates that Congress intended to encourage states to promptly respond to the threats posed by hazardous waste dump sites. Response actions were not intended to await a determination of liability. In light of these factors, the Court concludes that this is an appropriate case for declaratory judgment on the issue of liability. Accordingly, the Court concludes that Ohio's complaint sufficiently alleges "costs incurred" as required by § 9607(a)(4)(A).

562 F.Supp. at 1316.

The case law appears clear that the United States is entitled to a present determination of the defendants' liability for costs to be incurred in the future by the United States.

### F. Applicability of RCRA Section 3008

■ In its motion, the plaintiff suggests that defendants contend that plaintiff's claim under Section 7003 of RCRA is barred because the United States did not comply with the notice provisions of Section 3008 of RCRA, 42 U.S.C. § 6928 (and also failed to exhaust its administrative remedies under that section). The defendants have not addressed this issue in their response to the plaintiff's motion. The Special Master agrees with the plaintiff that these defenses, if they are still being asserted, are insufficient as a matter of law because actions under Section 7003 are not subject to requirements contained in other sections of RCRA. *See, United States v. Waste Industries, supra,* 734 F.2d at 164.

### G. Availability of an Adequate Remedy at Law

■ Defendants contend that traditional equitable principles governing injunctive relief should be applied to the government's Section 106 claim, and among the equitable considerations to be taken into account is the availability of an adequate remedy at law. *See, United States v. A & F Materials Company,* 578 F.Supp. 1249, 1258 (S.D.Ill.1984); *United States v. Reilly Tar and Chemical Corp., supra,* 546 F.Supp. at 1113 n. 3. Although the plaintiff's position on this issue is not entirely clear, it appears to suggest that the availability of an adequate remedy at law can never bar its claims for injunctive relief under either RCRA or CERCLA. The government argues that when a court is called upon to enforce a federal statutory injunction, its reliance upon traditional practices of equity must be "conditioned by the necessities of the public interest which Congress has sought to protect." *Hecht Co. v. Bowles,* 321 U.S. 321, 330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). Plaintiff asserts that it is this principle which the Fourth Circuit Court of Appeals followed in *United States v. Waste Industries, supra,* where the court rejected the argument that an injunction under RCRA Section 7003 was not appropriate because an adequate remedy was available under CERCLA Section 107. The court's discussion of that issue was as follows:

> Finally, the landfill group contends that an injunction cannot issue because CERCLA provides an adequate remedy at law. This lawsuit was not brought in common law equity, however, but pursuant to an express statutory command giving the EPA an injunctive remedy. Congress chose to enhance the court's traditional equitable powers in order to protect the public and the environment. *United States v. Price,* 688 F.2d at 211. Any other decision would, in effect, interpret CERCLA as repealing the act—a result obviously not intended by Congress.

734 F.2d at 168.

The Special Master agrees with the Fourth Circuit that the injunctive remedies provided in RCRA Section 7003 and CERCLA Section 106 were both designed to enhance the court's traditional equitable powers in order to protect the environment. Therefore, the mere existence of another

available remedy should not preclude injunctive relief. However, the Special Master also agrees with the position of the defendants that in determining whether injunctive relief is appropriate, the Court must take into consideration "the equities of the case." The equities of the case—which may include the availability of another remedy—may dictate that injunctive relief be denied. That determination, however, cannot be made at this stage.

### H. Application of the Statute of Limitations in CERCLA Section 112

■ The plaintiff contends that the statute of limitations contained in CERCLA Section 112, 42 U.S.C. § 9612(d), does not apply to its claims brought under Section 106 and Section 107. After exhaustively analyzing three proposed constructions of the statute of limitations provision in Section 112, the Court in *United States v. Mottolo, supra,* concluded that the limitations provision applies only to claims against the hazardous substance response fund under Section 111 and to judicial actions for damages to natural resources under Section 107. The Special Master concurs in that interpretation.

After concluding that the statute of limitations in Section 112 was not a bar to the state's cost recovery claim under Section 107, the *Mottolo* court next considered what statute of limitations, if any, was applicable:

> As CERCLA contains no statute of limitations apart from Section 9612(d), the general rule in an ordinary damage action would be to seek an analogous state or federal statute of limitations. [Citations omitted.] But where, as here, the state's federally-created claim is essentially equitable in nature, seeking reimbursement for monies expended, the doctrine of laches, rather than an analogous federal or state statute of limitations, is generally applied. [Citations omitted.] However, in the specific case of a suit brought by a federal or state government in its sovereign capacity, even the doctrine of laches may not be applied to

bar the suit. [Citations omitted.] Thus, the claim of New Hampshire for reimbursement of remedial and response costs under CERCLA is not barred by any statute of limitations or the doctrine of laches.

Slip op. at 24–25. As indicated previously, the Special Master is of the opinion that a determination of whether the doctrine of laches should bar a claim requires consideration of all the circumstances of the particular case, and agrees with the decision in *United States v. Reilly Tar and Chemical Corp.,* No. 4–80–469 (D.Minn. June 14, 1984), slip op. at 5, that the court should use its discretion to defer ruling on the laches defenses until the record is fully developed.

### I. Constitutional Defenses

Defendants have moved for summary judgment on the grounds that RCRA and CERCLA, on their face and as applied, are unconstitutional as violative of the Due Process Clause of the Fourteenth Amendment and as a "taking."

Defendants' principal arguments can be classified (for ease of discussion and ultimate disposition) as follows: (1) that retroactive applications of RCRA and CERCLA are unconstitutional; (2) that a "no fault, no causation, no-time limit, retroactive, concentrate-the-cost-on-a-few application of Superfund, *taken as a whole,* " violates the fundamental principle of fairness which is the essence of due process (*see,* Suggestions in Support of Defendant Western Electric Company Inc.'s Motion to Dismiss, filed February 22, 1983, at 71) (emphasis added); and (3) that assessing upon a single generator the entire cost of clean-up of a disposal site which hundreds of generators have used is such a disproportionate allocation of liability as to constitute a "taking" without due process of law. Defendants claim that the RCRA/CERCLA statutory scheme is unconstitutional both "on its face" (i.e., generally) and "as applied" to the parties and fact situation presented in this case (i.e., specifically).

Defendants raise several other constitutional defenses which are addressed summarily below.

(1) The Master declines to consider at this time any "as applied" challenge to the RCRA/CERCLA statutory scheme because the factual basis that would be necessary to support such a challenge has not been fully developed in this case. Therefore, we find it inappropriate and, in fact, impossible to consider the "as applied" challenges on these Motions. *See United States v. Reilly Tar and Chemical Co.,* Civil No. 4–80–469 (D.Minn. June 14, 1984).

■■■■■ (2) CERCLA does not violate the Contracts Clause (Art. I, Section 10) of the United States Constitution because, by its express terms, that clause applies only to State legislation, not to federal laws. *See, United States v. South Carolina Recycling and Disposal, Inc.,* No. 80–1274–6 (D.S.C. February 23, 1984) citing *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 257, 98 S.Ct. 2716, 2728, 57 L.Ed.2d 727 (1978), *reh. den.,* 439 U.S. 886, 99 S.Ct. 233, 58 L.Ed.2d 201; *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935), *reh. den.,* 296 U.S. 661, 56 S.Ct. 82, 80 L.Ed. 471; *Hanover National Bank v. Moyses,* 186 U.S. 181, 188, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902). Moreover, even if the Contract Clause were construed to apply to CERCLA, the Act does not operate substantially to impair the defendants' waste disposal contracts with CCC, but, rather, establishes liability. As noted by the Court in the *SCRDI* case, the contracts remain valid and enforceable between the parties and there is nothing to prevent a generator defendant held liable under the Act from serving indemnity on the owner/operator under their contract, *United States v. SCRDI, supra.*

■■■■ (3) CERCLA is not an ex post facto law (U.S. Const. Art. I, section 9, clause 3) because the Constitution's explicit prohibition against ex post facto lawmaking applies only to criminal laws which inflict punishment. *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 17 n.

13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1977). CERCLA's liability provisions contain no criminal penalties.

■■■■ (4) The imposition of joint and several liability (with the correlative right of contribution) (see discussion herein) does not raise a constitutional equal protection issue and, even if it did, would not violate the constitutional standard requiring equal protection of the laws.

Defendant IBM asserts that CERCLA should not be construed to impose joint and several liability because to do so would raise a serious constitutional question. Therefore, in order to adhere to the oft-stated rule that a statute should be construed, if at all possible, to avoid the constitutional question, defendants argue for a finding that the statute does not provide for joint and several liability.

Aside from the fact that the Court in this case and in every other case in which joint and several liability has been in issue have consistently held that CERCLA provides for joint and several liability, defendants' argument is flawed because there is no support for the underlying premise, i.e., that imposition of joint and several liability creates a constitutional question. In the Master's view, no constitutional issue exists; therefore, the rule of statutory construction has no applicability. *See, United States v. Shell Oil Co.,* 605 F.Supp. 1064 (D.Colo.1985).

The application of the principle of joint and several liability where there is indivisible injury resulting from multiple causes has been applied in many contexts, without constitutional challenge. *See, e.g., Mosby v. Manhattan Oil Co.,* 52 F.2d 364 (8th Cir.1931); *Manhattan Oil Co. v. Mosby,* 72 F.2d 840 (8th Cir.1934); *Edmonds v. Campagnie Generale Transatlantique,* 443 U.S. 256, 260–261, 99 S.Ct. 2753, 2756, 61 L.Ed.2d 521 (1979) and RCRA/CERCLA cases cited herein, *infra.* Where there are opportunities for contribution (see extensive discussion herein suggesting that contribution is available) as well as for joinder or impleader of responsible parties (Fed.R.

Civ.P. Rules 14, 20 and 21), it can hardly be said that imposition of joint and several liability would be unconstitutional.[20] The allegedly improper classification that defendants complain renders the imposition of joint and several liability unconstitutional as violative of the equal protection clause is that of "deep pocket," *de minimis* generators who have no correlative right of contribution.

As mentioned previously, it is recommended herein that there is a correlative right of "contribution" under CERCLA. We have also held that *de minimis* generators may be liable under CERCLA. *See,* Special Master's Recommendation Concerning Third Party Generators' "De Minimis" Motions, filed November 14, 1984, approved by Order of the Court filed November 27, 1984, attached hereto as Appendix B. Moreover, CERCLA does not make the allegedly unconstitutional classification described by defendants. CERCLA classifies the persons liable under the Act (*see, e.g.,* Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)) including owners and operators, generators and transporters. The Master has little difficulty in finding that this classification is "rationally related" to the objective sought to be achieved—the test for an equal protection analysis of economic legislation where no suspect classification is involved. *See, Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *City of New Orleans v. Duke,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). There is ample evidence that Congress intended for CERCLA to impose the costs of cleaning up hazardous waste sites on all of those persons linked to their creation and operation.

There is no classification in the statute of "deep pocket," *de minimis* generators as alleged by defendants and, therefore, there can be no equal protection challenge based on such classification. Plaintiff's choice of defendants does not raise a constitutional equal protection claim and is clearly contemplated by joint and several liability. *See, e.g., Landers v. East Texas Salt Waste Disposal Co.,* 151 Tex. 251, 248 S.W.2d 731 (1952).

### 1. *The "Taking" Issue*

While defendants allege that there has been a "taking" as a result of the statutory scheme creating a possibility of a disproportionate allocation of cost to waste generated, the Master suggests that the defendants have misused the term "taking." Defendants' argument is, in reality, a substantive due process and/or equal protection argument that is already embodied in their contention that the "concentrate-the-cost-on-a-few" application of CERCLA (i.e., joint and several liability) violates fundamental fairness and is arbitrary and capricious. The Court has previously ruled in this case that joint and several liability is applicable under RCRA and CERCLA where the conduct of two or more persons liable under the statutes have combined to cause a single and indivisible harm. *See, U.S. v. Conservation Chemical Co., supra,* relying upon *United States v. Chem-Dyne Corp., supra,* 572 F.Supp. 802, 810 (S.D.Ohio 1983). In such cases, when one or more of the defendants seeks to limit his liability on the ground that the entire harm is capable of apportionment, the burden of proof as to such apportionment is upon each defendant. Defendants in this case have not submitted such proof nor is it likely to be possible to meet the burden of proof on a motion to dismiss or motion for summary judgment. *See, United States v. Argent Corp.,* 14 Env'tl L.Rep. 20497 (D.N.M. May 4, 1984). The Court's determination on this issue has been amply supported by prior and subsequent case law and is additionally discussed herein.

*See, Texas Industries Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1980).

**20.** Nor is it implied that a constitutional issue would be raised by the application of joint and several liability without a right of contribution.

The so-called "taking" clause is part of the Fifth Amendment to the U.S. Constitution and provides, in relevant part: "... nor shall private property be taken for public use without just compensation."

The classic statement of the applicable test for determining whether a taking has occurred was announced by Justice Holmes in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) as follows: "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a *taking*." In other words, a taking may result only from an over-regulation of property by the government (i.e., an exercise of the police power that has gone too far). The police power provides for the public regulation of property to prevent the use thereof in a manner that is detrimental to the public interest (as opposed to the eminent domain power which involves the acquisition of possessory or legal rights in property because of its need for public use). Acquisition of property or an interest in property through the use of the eminent domain power and after payment of fair compensation is known as "condemnation."

■ The taking clause has never been applied to rights other than "property" rights. *See, Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); and the more recent cases of *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Kaiser-Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *San Diego Gas & Elect. Co. v. City of San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Each of these cases involves real property or interests in real property. There is considerable doubt that money, standing alone, constitutes property that can be subject to the "taking" clause. *See, e.g., Omnia Commercial Co.*

*v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923); *United States v. General Motors Corp.*, 323 U.S. 373, 379–380, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945). Defendants have no property rights at issue in this case that could be subject to being "taken" by the government and, in fact, the RCRA/CERCLA statutory scheme, to the extent that it affects any property rights at all, affects only the rights of the owner of the "facility" at issue. Since RCRA/CERCLA requires a showing that the site presents "imminent and substantial endangerment" to the public health, safety and welfare and to property and the environment, it is difficult to see under what set of facts a requirement to clean up the site would constitute an *over*-regulation resulting in a "taking."

The fact that certain generators may be liable under the statutory scheme for paying some or all of the costs of remediating an identified hazardous condition that exists on property does not rise to a "taking" claim under the Fifth Amendment which requires government *over-regulation* of the property at the least, and perhaps, actual physical invasion or possession of the property (see cases cited, *supra*).

The "taking" that defendants allege is their potential liability, due to the application of joint and several liability, for an amount in excess of its "fair share." There is no precedent in law or in fact for the application of the "taking" doctrine to joint and several liability; nor is there any support for the premise that "fair share" is the applicable test for a "taking" claim. Moreover, it has already been held that joint and several liability is valid and constitutional and that a correlative right of contribution exists. The right of contribution operates to insulate defendant from being exposed to liability for more than its "fair share" (which has not yet been determined).

If the resultant harm under CERCLA were divisible such that joint and several liability would then be inappropriate, defendant could be sued only for its "fair share," which could be specifically identi-

fied and apportioned. Because the harm is indivisible, joint and several liability is appropriate and does not transform such joint and several liability for cleanup costs into a valid constitutional "taking" claim.

What defendants have loosely referred to as a "taking" is, in reality, nothing more than an attempt to transform a substantive due process challenge of an economic regulation (which is subject only to the "rational purpose" and "arbitrary and capricious" standards), into a confiscation of defendants' property rights. This characterization is, however, inappropriate and the claim lacks merit. Similarly, the claim of Schwinn Bicycle Company that application of CERCLA (or RCRA) to third-party defendants constitutes a "taking" should also be denied.

2. *Retroactivity*

a. *Section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973*

In the several cases in which the retroactivity of this provision was placed at issue, the courts have generally held that it is not retroactive in nature because its objective is to obtain relief to abate current and future hazardous conditions, notwithstanding that the conditions might be attributable to past acts. The reasoning of these cases has been that a Section 7003 action is not a particular defendant's dumping activities which may or may not have ceased prior to passage of RCRA in 1976, but the *present* imminent hazard posed by the site. The statute had been held not to impose liability for past acts, but to be essentially prospective, relating only to current and future conditions. *See, United States v. Solvents Recovery Service of New England,* 496 F.Supp. 1127 (D.Conn.1980); *United States v. Price,* 523 F.Supp. 1055, 1071–72, aff'd 688 F.2d 204 (3d Cir.1983); *United States v. Diamond Shamrock Corp.,* 17 E.R.C. 1329 (N.D.Ohio, May 29, 1981). *See also, United States v. South Carolina Recycling and Disposal, Inc.,* 14 Env'tl L.Rep. 20272 (D.S.C., February 23, 1984).

In the recent case of *Jones v. Inmont Corp., supra,* defendant made the specific argument that application of Section 7003 of RCRA does not apply to activities that occurred prior to passage of RCRA because the Section is written in the present tense. The court, relying on *United States v. Price,* 523 F.Supp. 1055 (D.N.J.1981), *aff'd,* 688 F.2d 204 (3d Cir.1982) and *United States v. Diamond Shamrock, supra,* held that RCRA could be applied to past acts without amounting to an impermissible retroactive statute. 584 F.Supp. at 1436–37. The opposite conclusion was reached by the Court in *United States v. Northeastern Pharmaceutical and Chemical Co., Inc., supra,* 579 F.Supp. at 833–837, relying upon *United States v. Wade,* 546 F.Supp. 785 (E.D.Pa.1982) and *United States v. Waste Industries,* 556 F.Supp. 1301 (E.D.N.C.1982), which reasoning was found to be unpersuasive in *Jones v. Inmont, supra.* Moreover, the reliance of the *NEPACCO* court on *United States v. Waste Industries, supra,* appears to have been misplaced as the reasoning in that decision has since been overruled. *See, United States v. Waste Industries, Inc.,* 734 F.2d 159 (4th Cir.1984).

The diversity among the various district and appellate courts has now been resolved legislatively by the 1984 Amendments to RCRA which clear up any lingering doubts on this issue by amending the language of Section 7003 to explicitly apply to past, non-negligent off-site generators. The amended Section 7003 provides as follows:

Notwithstanding any other provision of this Act, upon receipt of evidence that the *past or present* handling, storage, treatment, transportation or disposal or any solid waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court against any person (including any *past or present* generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility) who has *contributed* or

who is contributing to such handling, storage, treatment, transportation or disposal to restrain such person from such handling, storage, treatment, transportation, or disposal, to order such person to take such other action as may be necessary, or both.

(Emphasis added.) Note particularly the addition of the words "past or present" and "who has contribut*ed* or who is contributing."

b. *Section 107 of the Comprehensive Environment Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607.*

Courts (and commentators) have faced and addressed two separate, though related, issues regarding the retroactive application of CERCLA. The first issue is whether responsible parties are liable under CERCLA for acts committed before enactment of the statute. This issue may, but does not necessarily, have constitutional overtones. (It is the constitutionality of retroactive application of CERCLA as to liability that is raised by third party plaintiffs in the case at bar.) The second issue is whether responsible parties are liable for government response costs incurred before CERCLA's enactment.

■ As the most recent decision in *United States v. Shell Oil Company*, 605 F.Supp. 1064 (D.Colo.1985) notes, "Relying on CERCLA's overriding scheme and purpose, courts have had no difficulty in imposing liability on responsible parties for acts committed before enactment." 605 F.Supp. at 1072. The Court in *Shell Oil Co.* finds that CERCLA is retroactive. 605 F.Supp. at 1073. Nevertheless, the Court agrees with the reasoning and conclusions announced in *United States v. South Carolina Recycling and Disposal, Inc., supra,* 20 E.R.C. at 1761–62 and *United States v. Northeastern Pharmaceutical & Chemical Co., supra,* 579 F.Supp. at 840–41, to the effect that retroactive application of Section 107(a) of CERCLA to pre-CERCLA conduct does not offend due process. The Court in *Shell Oil Co.* goes on to note that the issue actually raised in that case, whether Shell may be held liable for govenment response costs incurred before CERCLA's enactment does *not* raise due process issues and that once it is accepted that Shell may be liable for its pre-CERCLA acts, it is irrelevant, from a due process perspective, whether the government commenced clean-up before or after the act became law. There are no serious constitutional due process concerns in holding responsible parties liable for pre-CERCLA response costs. 605 F.Supp. at 1072–1073.

In response to the argument, also made in the case at bar, that a statute should be construed, if possible, to avoid a difficult constitutional issue, the Court in *Shell Oil* posits that "In my view no such serious constitutional issue exists." 605 F.Supp. at 1073, fn. 2.

*State ex rel. Brown v. Georgeoff, supra,* contains an extensive analysis of the retroactivity question, but, because defendants did not raise the constitutional due process issue, is silent on that point. The court considers three interrelated questions: whether application of CERCLA to pre-enactment conduct requires a retroactive application of CERCLA; if so, given the presumption and standards against retroactive application, should the Court construe the statute to apply retroactively; and finally, whether the text and legislative history of CERCLA meet the standards for construing a statute to apply retroactively.

These questions are answered as follows: imposition of CERCLA liability requires a retroactive application of CERCLA (in part because there is no post-enactment conduct alleged); the presumption against retroactive application, if applicable, has been overridden with respect to CERCLA; and the statutory language and legislative intent of CERCLA meet the standard of "clear and unequivocal statements" necessary to override a presumption against retroactivity. The first question is the most significant for our purposes because, if it is determined that imposition of CERCLA liability does *not* require retroactive application, the constitutional due process issue, as raised by defendants, evaporates. It is only where there is retroactive application

that the due process issue raised by defendants is relevant.

Relying on the analysis of Section 7003 of RCRA, the Court in *United States v. South Carolina Recycling and Disposal, Inc.,* No. 80–1274–6 (D.S.C. February 23, 1984) held that Section 107 of CERCLA was not retroactive because it too is a broad remedial provision premised upon present and future effects of defendants' past actions—the present or future effect being a release or a threatened release. A statute that attaches liability to present conditions stemming from past acts does not necessarily have retroactive effects that are subject to due process limitations. *Id.* "A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment." *Reynolds v. United States,* 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934). In *SCRDI,* the Court found that CERCLA was not retroactive as applied, noting that such a construction avoids a constitutional question and is therefore preferred. *See, Lorriland v. Pons,* 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978); *Crowell v. Boston,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). Moreover, the Court noted in dicta, that even if CERCLA were considered retroactive it would clearly satisfy the requirements of due process based on the test enunciated by the leading case on the constitutionality of retroactive statutes, *Usery v. Turner Elkhorn,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976): "in the area of economic regulation, legislation that operates retroactively does not violate due process if it is rationally related to a valid Congressional purpose." 428 U.S. at 15–16, 96 S.Ct. at 2892.

In *United States v. Reilly Tar and Chemical Corporation,* Civil No. 4–80–469 (D.Minn. June 14, 1984), the Court, relying on the analysis in *State ex rel. Brown v.*

*Georgeoff, supra,* found, contrary to *SCRDI* that Section 107 does apply retroactively. The Court's reasoning revolved around the opinion that CERCLA does not simply fine-tune existing remedies, but creates a new statutory liability.[21] The government argued that even if the case required retroactive application, Section 107 was clearly intended to apply retroactively and further, that under *Turner Elkhorn* such retroactivity can withstand a due process challenge. Therefore, the government argued, if Section 107 can withstand a facial attack on substantive due process grounds, there can be no "as applied" challenge by those classes of persons encompassed by the statute. However, the Court declined to rule on a summary judgment motion that there can be no "as applied" challenge on substantive due process grounds, until the record has been fully developed.

### c. *Standard for Claim of Retroactivity*

The classic definition of retroactivity is as follows:

> [E]very statute which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retroactive.

*Society for Propagating the Gospel v. Wheeler,* 22 F.Cas. 857, 767 (C.C.D.N.H. 1814) (No. 13,156). Thus, with respect to a given situation, two things must be demonstrated for the application of RCRA or CERCLA to be deemed retroactive: first, that it imposes new duties or liabilities; and second, that it applies to past acts.

In order to meet the first prong of this test, it is necessary to identify whether the defendant could have been held liable for its acts under then existing law. The bur-

---

**21.** The Eighth Circuit has recently ruled that CERCLA does not impose new obligations on a landowner and former tenant and therefore is not retroactive with respect to such parties. *Caldwell v. Gurley Refining Company,* 755 F.2d 645, 652 (8th Cir.1985). The Master finds that the Court's ruling as to retroactivity is limited to the particular parties and the facts presented in that case.

den is on defendant to show that RCRA or CERCLA creates new liability for acts for which it would not have been liable under previously existing law. While there are conflicting opinions by the district courts that have considered this point, the Master believes the more persuasive and better reasoned view to be that CERCLA and RCRA do create new duties and new liabilities.

■ With respect to the second prong of the test, the majority of RCRA cases and a few CERCLA cases on this point have held that the Act is being applied to a current hazardous condition and that even though the condition was caused by past activities of a defendant, this does not constitute a retroactive application. *See, United States v. Diamond Shamrock Corp., supra; United States v. Price,* 523 F.Supp. 1055 (D.N.J.1981); *United States v. South Carolina Recycling & Disposal, Inc., supra.* This reasoning relies upon a line of Supreme Court cases holding that "[a] statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment." *Reynolds v. United States,* 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934). This reasoning is, however, dependent upon the facts in a particular case and a determination of the extent to which the defendant's antecedent acts affect the resulting action. The application of RCRA and CERCLA do not merely draw upon antecedent acts, but attach a completely new legal significance to these acts and therefore should be considered a retroactive law. *See, United States v. Shell Oil Co., supra; State ex rel. Brown v. Georgeoff, supra; United States v. Reilly Tar and Chemical Corp., supra.*

d. *Is Retroactive Application of RCRA and CERCLA Unconstitutional?*

■ Mere retroactive application does not render a statute unconstitutional. Defendants assert, as a defense, that the retroactive application of RCRA and CERCLA are violative of substantive due process. Their argument lacks precedential support and is unpersuasive.

Ignoring the numerous cases discussed herein which consistently hold either that RCRA/CERCLA are not retroactive or that they are retroactive but are nevertheless not unconstitutional by virtue of their retroactive application, defendants place complete reliance on two recent cases, neither of which involves RCRA or CERCLA, and both of which found that retroactive application of the subject statute did not violate the Due Process Clause of the Fifth Amendment, such retroactive effect being in furtherance of a rational legislative purpose. *See, Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).

In *Turner Elkhorn,* the Court considered a constitutional challenge to the retroactive effects of the Federal Coal Mine Health & Safety Act of 1969 as amended by the Black Lung Benefits Act of 1972. Under Title IV of that Act, coal mine operators were required to compensate former employees disabled by pneumoconiosis even though those employees had terminated their work in the industry before the statute was enacted. The Court had no difficulty in upholding the statute against constitutional attack under the Due Process Clause, noting:

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

428 U.S. at 15, 96 S.Ct. at 2892. The Court further explained that the strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively; provided that the retroactive application of the statute is supported by a legitimate legislative purpose furthered by rational

means. Against arguments that the liability imposed by the Act was not anticipated at the time of actual employment of the affected coal mines, the Court commented:

> ... our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. [Citations omitted]. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts. [Citations omitted].

428 U.S. at 15–16, 96 S.Ct. at 2892. The Court in *R.A. Gray* specifically distinguished *Railroad Retirement Board v. Alton Railroad Co.,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935) and *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), two principal cases cited by defendants, on the grounds that those cases do not control judicial review of retroactive federal legislation affecting economic benefits and burdens.

■■■ The test for retroactive legislation is the same as that for prospective legislation—due process. But that burden is met by showing that the retroactive legislation is itself justified by a rational legislative purpose. Thus, in *Turner Elkhorn,* the Court readily found the necessary justification in the rationality of imposing liability and spreading the costs thereof to those who profited from the fruits of the miners' labors. 428 U.S. at 18, 96 S.Ct. at 2893. Similarly, the Court in *R.A. Gray* had little difficulty in finding the rational legislative purpose in retroactivity, commenting that: "Indeed, Congress was quite explicit when explaining the reason for the statute's retroactivity." 104 S.Ct. at 2718. In *R.A. Gray,* the Court even rejected arguments that "some form of heightened judicial scrutiny" should be applied to retroactive application of a statute. 104 S.Ct. at 2719.

e. *Conclusion*

■■■ In the light of the strong presumption of constitutionality that attaches to economic legislation and the heavy burden on one complaining of a due process viola-

tion to establish that the legislature has acted in an arbitrary and irrational way, the Master concludes that the retroactive features of the RCRA and CERCLA statutory schemes, judged by the applicable constitutional test—"rational purpose"—readily pass constitutional muster as against a facial challenge to their validity. The Master makes no recommendation at this time on the constitutional validity of the statutory schemes as applied to particular generators in a range of specific factual contexts because, at this stage in the judicial proceedings, insufficient uncontroverted factual support has been presented to reach that question.

3. *The Statutory Scheme as a Whole*

Defendants assert that "the government's attempted no-fault, no-causation, no-time-limit, retroactive, concentrate-the-cost-on-a-few application of Superfund, taken as a whole, violates due process ..." because "... it violates the fundamental principle of fairness which is the essence of due process."

Each of the attributes of CERCLA referenced above have been discussed individually in the case law and most have been specifically decided in this case, either by virtue of the Court's decision of February 3, 1984 (*United States v. Conservation Chemical Co., supra*), or by virtue of the recommendations incorporated herein:

(1) past off-site generators are subject to strict liability; *see, United States v. Conservation Chemical Co., supra;*

(2) CERCLA permits joint and several liability where two or more individuals cause a single and indivisible harm; *see, United States v. Conservation Chemical Co., supra,* and see discussion herein to the effect that such joint and several liability is not violative of equal protection nor is it a "taking";

(3) CERCLA applies retroactively, but such retroactivity does not render the statute unconstitutional as violative of due process; (see discussion herein);

(4) CERCLA imposes only a minimal causation requirement; (see discussion herein);

(5) there is no statute of limitations applicable to liability under CERCLA Section 106 or for reimbursement of response costs under Section 107.

■■■■■ The applicable standard for evaluating a substantive due process challenge to economic legislation is that the legislation have a rational purpose; be rationally related to a legitimate government objective; and not be "arbitrary and capricious." The Master recommends that given this standard, the presumption of constitutionality which attaches to legislation, the heavy burden placed on one challenging the constitutionality of an Act, and the obvious purpose and intent of CERCLA as established by the plain language of the statute and its legislative history, that defendants' naked assertions of "collective" unconstitutionality do not overcome the presumption of constitutionality which attaches to the Act. The Master finds, further, that none of the statutory elements mentioned and reviewed above individually renders the Act unconstitutional on its face.

### J. FMC's Mining Wastes

■■■■■ FMC has asserted that its mining wastes are not "hazardous substances" because under CERCLA, "hazardous substances" does not include mining wastes which have been exempted under RCRA. *See* 42 U.S.C. § 9601(14)(C). The plaintiff, on the other hand, argues that under the plain language of Section 101(14) of CERCLA, a substance is a "hazardous substance" if it comes within any one of the statutes listed within that section and that the mere fact that a substance may not be a hazardous waste under RCRA does not mean that it is not a hazardous substance under CERCLA. The plaintiff's position has been vindicated by a very recent decision by the United States Court of Appeals for the District of Columbia Circuit. In *Eagle-Picher Industries, Inc. v. United States Environmental Protection Agency,* 759 F.2d 922 (D.C.Cir.1985), the court held as follows:

> As EPA notes, a substance is a "hazardous substance" within the meaning of CERCLA if it qualifies under *any* of the several subparagraphs of Section 101(14). The exception for mining wastes and fly ash is found only in a parenthetical clause in subparagraph (c). The ordinary, straight forward reading of that exception is that it applies only to subparagraph (c), not to any of the other five subparagraphs. Had Congress intended to exempt mining wastes and fly ash from the entirety of Section 101(14), *it obviously could have placed the exemption at the beginning of the section, not in one of the several subparagraphs. Indeed, this is precisely what Congress did do with respect to other specific substances. At the conclusion of Section 101(14), a *general exception* from the definition of "hazardous substance" is carved out for petroleum and natural gas products. Had Congress intended to create a similarly broad exception for mining wastes and fly ash, the legislature readily could have placed that exception along side the petroleum and natural gas exceptions.

At 927. *See also, United States v. Union Gas Company,* 586 F.Supp. 1522 (E.D.Pa. 1984); *United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143 (D.Ariz.1984). The Special Master submits that the mere fact that FMC's mining waste may not be a hazardous waste under RCRA does not mean that it cannot be a "hazardous substance" under CERCLA.

## III. THIRD–PARTY PLAINTIFFS' RIGHT TO CONTRIBUTION UNDER CERCLA

### Introduction

Defendants and third-party plaintiffs Armco, FMC, IBM and AT & T have filed a Motion For Partial Summary Judgment Or, In The Alternative, For An Order Declaring As a Matter of Law Third-Party Plaintiffs' Right To Contribution and Third-Party Defendants' Joint and Several Liability.

Certain third-party defendants have also filed motions for summary judgment arguing, *inter alia,* that there is no right of contribution under CERCLA.

Although certain parts of the motions and briefs of the parties have raised issues which are more properly resolved in Phase Two of these proceedings, nonetheless, as a matter of law, this section of the Report will discuss the primary issue raised by the parties: rights of contribution under CERCLA, 42 U.S.C. § 9607.

In their suggestions, the third-party plaintiffs extensively discuss the rationale of such a right under CERCLA; however, the only mention of a similar right under RCRA is a brief footnote stating that: "the same rationale with respect to the liability of the third-party defendants would apply to plaintiffs' RCRA claims." Whether or not Congress intended to create that right under RCRA is, to the contrary, a separate and distinct issue from the intent of Congress under CERCLA. To the extent that any parallel can be drawn, it would be necessary to compare the provisions of 42 U.S.C. § 6973(a), not to the provision of 42 U.S.C. § 9607, but to the provisions of 42 U.S.C. § 9606(a). The latter provision does not expressly create a private cause of action for reimbursement. *See, New York v. Shore Realty Corp., supra; U.S. v. Stringfellow,* 14 Env'tl L.Rep. 20385, 20387 (C.D.Cal. April 5, 1984); and, *United States v. Westinghouse Electric Corp.,* 14 Env'tl L.Rep. 20483, 20485 (S.D.Ind.1983). Again, no recommendation will be made on issues which have neither been squarely raised nor briefed by the parties. Consequently, no recommendation will be made with respect to a right of contribution under RCRA.

### Background

This Court, in *United States v. Conservation Chemical Company, et al.,* 589 F.Supp. 59, 63 (W.D.Mo.1984), citing *United States v. Chem-Dyne Corp.,* 572 F.Supp. 802 (S.D.Ohio 1983), recognized *Chem-Dyne's* holding that the deletion of the term "joint and several liability" from a

prior draft of the legislation is not dispositive of the scope of liability under CERCLA and that the scope of liability is to be determined by the judiciary on a case by case basis. The opinion continued by stating:

> The *Chem-Dyne* court recognized the common rule that when two or more persons acting independently cause a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total hard he caused, but where two or more individuals cause a single and indivisible harm, each is subject to liability for the entire harm. *Id.* at 811. Therefore, the analysis applicable to the instance case, as stated by the *Chem-Dyne* court, is that where the conduct of two or more person liable under CERCLA has combined to violate the statute, and one or more of the defendants seeks to limit his liability on the ground that the entire harm is capable of apportionment, the burden of proof as to apportionment is upon each defendant.

The Court also denied the defendant's motion for joinder of other alleged joint tortfeasors under Fed.R.Civ.P., Rule 19, citing the traditional rule that one tortfeasor may not compel the joinder of another. 589 F.Supp. at 63.

*Chem-Dyne* had relied upon the Restatement (Second) of Torts §§ 433A, 433B, 875, and 881 in finding "a uniform federal rule of decision which delineates the scope of liability." Section 433B, comment d states:

> The reason for the exceptional rule placing the burden of proof as to apportionment upon the defendant or defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned. In such a case the defendant may justly be required to as-

sume the burden of producing that evidence, or if he is not able to do so, of bearing the full responsibility. As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former. Illustrations:

. . . . .

7. Through the negligence of defendants A, B, and C, water escapes from irrigation ditches on their land, and floods a part of D's farm. In D's action against A, B, and C, or any of them, each defendant has the burden of proving the extent to which his negligence contributed to the damage caused by the flood, and if he does not do so is subject to liability for the entire damage to the farm.

Modern principles of joint and several liability are also well summarized in the remarks of Representative Gore, 126 Cong. Rec. H 9463–65 (daily ed. Sept. 23, 1980), and substantial comment about the issue under CERCLA exists. *See* Note, Joint and Several Liability for Hazardous Waste Releases Under Superfund, 68 Va.L.Rev. 1157 (1982); Comment, Generator Liability Under Superfund for Cleanup of Abandoned Hazardous Waste Dump Sites, 130 U.Pa.L.Rev. 1229, 1265 (1982); Note, Liability Under Federal Law for Hazardous Waste Injuries, 6 Harv. Envt'l L.Rev. 1 (1982); Note, Liability for Generators of Hazardous Waste: The Failure of Existing Enforcement Mechanisms, 69 Geo.L.Rev. 1047 (1981); Note, Strict Liability for Generators, Transporters and Disposers of Hazardous Waste, 64 Minn.L.Rev. 949 (1980); and, Note, The Role of Injunctive Relief and Settlements in Superfund Enforcement, 68 Cornell L.Rev. 706 (1983).

If the defendants in this case meet their burden of proof as to divisibility and apportionment, contribution issues on the defendants' third party petitions will not arise simply because each defendant will be initially subject to liability only for the portion of the total harm he caused. If, on the other hand, the harm is determined in the Phase One trial to be indivisible, CERCLA allows a right of contribution against the third-party defendants. However, the method of apportionment, given that right, should be determined in the Phase Two proceedings.

### Contribution Generally

The principle of "contribution" is that a tortfeasor against whom a judgment is rendered is entitled to recover proportional shares of the judgment from other joint tortfeasors whose conduct contributed to the injury and who were also liable to the plaintiff. When two or more persons share responsibility for a common injury, "it is inequitable to require one to pay the entire cost of reparation, and it is sound policy to deter all wrongdoers by reducing the likelihood that any will entirely escape liability." *Northwest Airlines, Inc. v. Transport Workers Union of America,* 451 U.S. 77, 88, 101 S.Ct. 1571, 1579, 67 L.Ed.2d 750 (1981).

The Restatement (Second) of Torts § 886A states the general rule:

(1) Except as stated in subsections (2), (3) and (4), when two or more persons become liable in tort to the same person for the same harm, there is a right of contribution among them, even though judgment has not been recovered against all or any of them.

(2) The right of contribution exists only in favor of a tortfeasor who has discharged the entire claim for the harm by paying more than his equitable share of the common liability, and is limited to the amount paid by him in excess of his share. No tortfeasor can be required to make contribution beyond his own equitable share of the liability.

(3) There is no right of contribution in favor of any tortfeasor who has intentionally caused the harm.

(4) When one tortfeasor has the right of indemnity against another, neither of them has a right of contribution against the other.

The rule stated in subsection (1) above applies to all "joint tortfeasors," in the sense of two or more persons who are liable to the same person for the same harm. It is not necessary that they act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants. The rule makes the tortfeasor liable for contribution although no action has been brought against him by the injured plaintiff.

Subsection (2) provides that contribution is determined according to the "equitable shares" of the obligation of the parties liable. One is pro rata contribution, while the second method provides that contribution is based according to the comparative fault of the tort feasors. *Id*, Comment h.

Contribution is a remedy that developed in equity; thus, courts are expected to do what is fair and equitable under the circumstances. *Id.*, Comment c.

### Contribution Under Federal Law

In *Northwest Airlines Inc. v. Transport Workers Union of America, supra*, 451 U.S. at 90–91, 101 S.Ct. at 1580; the Supreme Court concluded that a right of contribution may arise in either of two ways: first, through the affirmative creation of a right of action by Congress, either expressly or by clear implication; or, second, through the power of federal courts to fashion a federal common law of contribution. *See also, Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 638, 101 S.Ct. 2061, 2065, 68 L.Ed.2d 500 (1980). If a federal statute does not expressly provide for a particular private right of action, determination of an implicit right of action is almost exclusively determined by Congressional intent. Factors relevant to that inquiry are the language of the statute itself, its legislative history, the underlying purpose and structure of the statutory scheme, and the likelihood that Congress intended to supercede or to supplement existing state remedies. *See, Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Hofbauer v. Northwest-*

*ern Nat'l Bank of Rochester*, 700 F.2d 1197, 1200 (8th Cir.1983).

Nonetheless, if a right of action has not been expressly or impliedly created by Congress, there are certain limited areas within which the federal courts may formulate common law through the exercise of judicial power to fashion appropriate remedies for unlawful conduct. Instances of such "federal common law" are "few and restricted," *Wheeldin v. Wheeler*, 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963), and fall into essentially two categories: those in which a federal rule of decision is necessary to protect uniquely federal interests and those in which Congress has given the courts the power to develop substantive law. *Texas Industries, Inc. v. Radcliff Materials, Inc., supra*, 451 U.S. at 640, 101 S.Ct. at 2066.

In the *Northwest Airlines, Inc.* and *Texas Industries, Inc.* cases, the Supreme Court rejected causes of action for contribution under the Equal Pay Act, Title VII, and the antitrust laws. These cases, among others, were viewed by the court in *Hofbauer* as indicative of the Court's increasing reluctance to imply new private causes of action for damages in federal regulatory schemes. *See, Hofbauer v. Northwestern Nat'l Bank of Rochester, supra*, 700 F.2d at 1200; *see also, Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 377, 102 S.Ct. 1825, 1838, 72 L.Ed.2d 182 (1981) ("the increased complexity of federal legislation and the increased volume of federal litigation strongly supported the desirability of a more careful scrutiny of legislative intent ...").

However, the failure of Congress expressly to provide for a cause of action is not always inconsistent with an intent on its part to have such a remedy available to persons benefited by its legislation. *See, Cannon v. University of Chicago*, 441 U.S. 677, 717, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979). Existence of a private cause of action under related statutory schemes is persuasive as to the implied recognition of such a remedy under another statute.

*Merrill Lynch, Pierce, Fenner & Smith v. Curran, supra,* 456 U.S. at 379, 102 S.Ct. at 1839. Elected representatives, like other citizens, are assumed to know the law; and, accordingly, Congressional action must be viewed in "its contemporary legal context." *Cannon v. University of Chicago, supra,* 441 U.S. at 698–699, 99 S.Ct. at 1958.

To date, eighty percent of the states have recognized the equities of a right of contribution where joint and several liability exists. Although the right of contribution does not inevitably flow directly from joint and several liability, and although state rules of decision do not control determination of a federal right to contribution, this background of state law does establish the legal context within which CERCLA was enacted.

### Affirmative Creation of a Right to Contribution by CERCLA

Statutory construction appropriately begins with analysis of the language of the statute itself. In certain instances, Congress has expressly provided for "contribution" among joint wrongdoers in its legislation. *See e.g.,* 15 U.S.C. §§ 77k(f), 78i(e), 78r(b). The Securities Act of 1933, § 77k(f), by way of example, states:

> All of any one or more of the persons specified in subsection (a) of this section shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover a contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation.

The word "contribution" does not appear in CERCLA. However, 42 U.S.C. § 9607(a)(4)(B) specifies that responsible parties can be liable to other private persons for response costs. Moreover, Section 107(e)(2) of CERCLA, 42 U.S.C. § 9607(e)(2), states:

> Nothing in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

The plaintiff and the third party plaintiffs in this case persuasively argue that the above-quoted language expressly indicates that Congress anticipated that a "person subject to liability" under CERCLA would have rights to contribution as a result of that liability.

However, just as CERCLA has no express provision dealing with the joint and several liability of multiple tortfeasors, likewise it has no provision expressly stating that a person held jointly and severally liable with one or more other persons is entitled to seek contribution from such persons to the extent of the proportionate liability of such persons.

CERCLA developed from a compromise measure drafted in the Senate at the close of the 96th Congress. Two bills, HR 7020 and S 1480, had been the primary focus of Congress' legislative efforts. The compromise eliminated controversial language providing for strict liability to be imposed on a joint and several liability basis, along with provisions which would have clearly created a right of contribution. *See,* 126 Cong.Rec. S 14,941 (daily ed. Nov. 24, 1980); S. 1480, 96th Cong.2d Sess., § 4(a), 4(f)(2) (July 11, 1980); 126 Cong.Rec. H 9465 (daily ed. Sept. 23, 1980). Similarly, it has been observed that 42 U.S.C. § 9607(e)(1) may implicitly preclude contribution. Note, The Role of Injunctive Relief in Settlements in Superfund Enforcement, 68 Cor.L.Rev. 706, 722, fn. 114.

Sufficient ambiguity exists in the language of the statute to forestall a holding either that CERCLA expressly creates a right of contribution, or, conversely, that CERCLA provides an integrated system of procedures for enforcement precluding such a right.

## The Legislative History

Even though CERCLA may not have expressly created a right of contribution, the legislative history of CERCLA does support implication of such a right. Discussion in the legislative history regarding imposition of joint and several liability for damages and removal costs is inextricably linked with discussion concerning the right of contribution. *See,* 126 Cong.Rec. H 11,-787–11,788 (daily ed. Dec. 3, 1980) ("a right of contribution is only of value to a defendant who has been held jointly and severally liable") (statement submitted on behalf of the Justice Department by Rep. Florio); *see also,* references to the legislative history in *United States v. Chem-Dyne, supra* 572 F.Supp. at 808. Other statements of House sponsors reveal a concern about making joint and several liability (and strict liability) more acceptable by allocating the burdens of CERCLA through a right of contribution. *See,* 126 Cong.Rec. H 9465 (daily ed. Sept. 23, 1980) ("the paying defendant would then have the right to go against the other 'non-apportioned' defendants for contribution"); 126 Cong.Rec. H 9461 (Representative Gore's criteria for contribution and apportionment of costs); 126 Cong.Rec. S 14964 (daily ed. Nov. 24, 1980) (inviting the judiciary to fashion CERCLA-common law contribution).

Statements made during floor consideration of the final language of CERCLA also show that its sponsors understood the contemporary legal context of the law pertaining to imposition of joint and several liability and corresponding rights of contribution. Likewise, these debates revealed a knowledge of the same issues under previous statutory law. Clearly it was Congress' intent to encourage the development of a uniform federal standard regarding the issues of joint and several liability and contribution rights.

The legislative history thus recognizes *some* right to contribution, although it leaves to the federal courts the development of methods of allocation under the general principles of justice and fairness—principles which gave rise to the right of contribution in the first instance. *See, United States v. South Carolina Recycling and Disposal, Inc.,* 14 Env'tl L.Rev. 2272, 2275–76 (D.S.C.1984).

## The Statutory Scheme

The CERCLA statutory scheme expanded the class of private parties liable for unsafe hazardous substance disposal sites to include site owners and operators, as well as waste transporters and generators. 42 U.S.C. § 9607(a). CERCLA has also, in essence, created a no-fault, minimal causation basis of liability. Instead of detailing limited or specific proceedings, Congress anticipated a broad variety of proper remedies. Claims for response costs under Section 107 were expressly created as an equitable, restitutionary remedy.

Contribution rights are particularly appropriate, given the nature of the CERCLA legislative scheme. The broad character of the remedial scheme fashioned by Congress strongly evidences an intent not to foreclose the right of contribution. The federal courts have not been left with open-ended lawmaking powers; they have, however, been charged with the responsibility of filling in the gaps left in CERCLA's wake.

Congress has enacted numerous laws concerning pollution of our environment. For example, by the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.,* Congress "authorizes and directs" that "the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act" and that "all agencies of the Federal Government shall ... identify and develop methods and procedures ... which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations." 42 U.S.C. § 4332. To state that federal rights are concerned in the field of hazardous waste disposal, given this array of federal legislation, is to state the obvious.

The broadly-worded provisions of CERCLA, even more than with other environmental laws, must necessarily be given concrete meaning and application by the federal judiciary in the common law tradition. "It is not uncommon for federal courts to fashion federal law where federal rights are concerned." *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957); *see also Illinois v. City of Milwaukee*, 406 U.S. 91, 103, 92 S.Ct. 1385, 1392, 31 L.Ed.2d 712 (1971).

Because Congress has largely left the judiciary with the responsibility for fashioning rules of joint and several liability and remedies resulting therefrom, the federal judiciary has no choice but to accept its charge by fashioning a federal remedy of contribution in CERCLA cases, as it has done in similar circumstances under other statutes. *See, United States v. Bear Marine Services, Inc.*, 509 F.Supp. 710, 716 (E.D.La.1980), *remanded on other grounds,* 696 F.2d 1117 (5th Cir.1983) (Federal Water Pollution Control Act); *Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 110, 94 S.Ct. 2174, 2176, 40 L.Ed.2d 694 (1974) (admiralty); and *In re Berkley Curtis Bay Co.*, 557 F.Supp. 335, 339 (S.D.N.Y.1983) (Federal Water Pollution Control Act).

The Federal Water Pollution Control Act cases were decided under 33 U.S.C. § 1321. CERCLA Section 101(32), 42 U.S.C. § 9601(32), states that the standard of liability under CERCLA is that "which obtains under Section 1321 of Title 33."

A right of contribution, then, is encompassed by CERCLA itself, not by independent considerations of fundamental fairness and not by the federal common law, as such. The mere vesting of jurisdiction in the federal courts does not give rise to authority to formulate federal common law. Rather, some congressional authorization to formulate federal rules of decision must exist, as it does in this case for the right of contribution. Evolving principles of common law may guide formation of such rules, but they do not themselves authorize formulation.

This conclusion is supported by *Wehner v. Syntex Agribusiness, Inc.*, 616 F.Supp. 27 (E.D.Mo.1985); *Mola Development Corp. v. United States*, 22 E.R.C. 1443 (C.D.Cal.1985); *United States v. Chem-Dyne Corp., supra*, 572 F.Supp. at 807, n. 3; *United States v. South Carolina Department of Health and Environmental Control*, 20 E.R.C. 1753 (D.S.C.1984); *United States v. Northeastern Pharmaceutical and Chemical Company*, 14 Env'tl L.Rep. 20212 (W.D.Mo.1984); *United States v. A & F Materials Company, supra; United States v. Wade*, 14 Env'tl L.Rep. 20096 (E.D.Pa.1983); *United States v. Ward*, 22 E.R.C. 1235 (E.D.N.C.1984); and, *Pinole Point Properties v. Bethlehem Steel Corporation, supra.* It is also consistent with the prior order in this case, *see, United States v. Conservation Chemical Company, supra. See also,* Note, The Right to Contribution for Response Costs Under CERCLA, 60 Notre Dame Law 345 (1985) and the various notes and comments, *supra,* discussing joint and several liability; *but see* Smith, A Right to Contribution in Superfund Cost-Recovery Actions, 8 *Chem & Rad. Waste Lit. Rep.* 41 (1984).

One court may have decided that there is no statutory or common law right to contribution under CERCLA. In *United States v. Westinghouse Electric Corp.*, 22 ERC 1230 (S.D.Ind.1984) the court merely noted that Westinghouse, in asserting claims for money damages against Monsanto, had not cited any statutory language, legislative history or cases that disclosed the existence of a claim on its behalf. Westinghouse had alleged and contended that the federal courts were empowered by 42 U.S.C. § 9606(a) to allow a private right of action against Monsanto. Neither the parties nor the court discussed 42 U.S.C. § 9607. The actual question addressed in that case was primarily whether CERCLA makes a manufacturer of chemicals liable where that manufacturer did not generate or dispose of any hazardous wastes nor contract for disposal of wastes. The decision only indirectly addresses the availability of contribution among jointly liable parties.

Other cases, such as *D'Imperio v. United States*, 575 F.Supp. 248, 253 (D.N.J. 1983) ("premature to adjudicate the question of eligibility for reimbursement"), have passages which bear on the availability of contribution on a case by case basis. These cases, however, do not reject the right of contribution as a general matter in all CERCLA cases.

■ Congress did not intend to preclude actions under CERCLA for contribution, but rather intended that the scope of liability for contribution under 42 U.S.C. § 9607 be determined as a matter of federal common law, by superseding or supplementing existing state remedies. Accordingly, third-party plaintiffs' alternative arguments that they are entitled to contribution under the law of the State of Missouri need not be addressed. Where Congress has authorized federal courts to formulate federal rules of decision, our federal system does not permit the controversy to be resolved under state law. *See, Texas Industries, Inc. v. Radcliff Materials, Inc., supra,* 451 U.S. at 641, 101 S.Ct. at 2067; and *United States v. Chem-Dyne, supra,* 572 F.Supp. at 808.

### Contribution: Several Liability

In their motion for partial summary judgment, third-party plaintiffs Armco, FMC, IBM and AT & T seek, in the alternative, an order declaring as a matter of law that the third-party defendants have joint and several liability in the event the harm is determined to be indivisible. Third-party plaintiffs argue that the third-party defendants are jointly and severally liable for contribution under principles of the federal common law and pursuant to the provisions of CERCLA. Essentially, the third-party plaintiffs again seek to have liability apportioned among the third-party defendants in Phase One.

■ Aside from the fact that the bifurcation of this case states that the plaintiff is entitled to receive full relief in Phase One from the original defendants if the original defendants are found jointly and severally liable for implementing the mandatory injunctive relief, it is clear that neither the federal common law, nor CERCLA, give rise to any joint and several liability of the third-party defendants to the third-party plaintiffs for contribution.

■ But for bifurcation, the third-party plaintiffs' right to contribution might be resolved in Phase One; however, even then, the nature of third-party defendants' liability would be several, not joint and several. No tortfeasor can be required to make contribution beyond his own equitable share of the liability. *See,* Restatement (Second) of Torts, § 886A(2) at 337. The Uniform Comparative Fault Act and the Uniform Contributions Among Tortfeasors Act also recognize that liability for contribution is not joint. *See also,* 18 Am. Jur.2d, Contribution, § 3, at 10; and 18 C.J.S., Contribution § 5 at 9.

The absence of joint liability on the contribution claims in this case is not altered by the choice of the methods for apportionment, whatever that choice may be. Moreover, the method of apportionment must await determination in Phase Two of these proceedings. *Compare, United States v. South Carolina Recycling and Disposal, Inc.,* 14 Env'tl L.Rep. 20272, 20276, n. 8 (D.S.C.1984).

The right to contribution is potentially available in CERCLA actions; however, neither CERCLA nor the common law would make the third-party defendants in this case jointly and severally liable to the third-party plaintiffs for contribution.

### Summary

It is recommended that the motion of defendants and third-party plaintiffs for partial summary judgment be overruled. It is further recommended that the alternative request of the defendants and third-party plaintiffs for an order declaring as a matter of law third-party plaintiffs' right to contribution and third-party defendants joint and several liability be sustained only as to the right of contribution. Lastly, it is recommended that the motions of third-party defendants for summary judgment argu-

ing, *inter alia*, that there is no right of recovery against such third-party defendants for response costs and expenses incurred by or imposed upon third-party plaintiffs in regard to the CCC KC site under CERCLA be overruled insofar as such motions are inconsistent with the above conclusions.

## IV. THE ABILITY OF THE THIRD-PARTY PLAINTIFFS TO OBTAIN INJUNCTIVE RELIEF AGAINST THE THIRD-PARTY DEFENDANT GENERATORS

Throughout this litigation, the third-party plaintiffs (Armco, AT & T, FMC and lBM) have maintained that if injunctive relief is entered against them on the government's Amended Complaint, that they are entitled to obtain injunctive relief against the third-party defendant generators. The efficacy of the third-party plaintiffs' position has been the subject of briefing and vigorous argument in hearings before the Special Master. The Special Master's Recommendation Concerning Class Certification and Bifurcation, approved by Order of the Court on November 27, 1984, makes the following statement:

> The United States government, the plaintiff, has sought injunctive relief under § 106(a) from seven original defendants. Notably, it has been held that the right to seek injunctive relief under Section 106(a) is vested only in the United States. See, *Velsicol Chemical Corp. v. Reilly Tar and Chemical Corp.*, No. 1–81–389, slip op. at 4–5 (E.D.Tenn. August 16, 1984) (hereinafter *Velsicol* ). Section 106 provides: "[w]hen the President determines that there may be an imminent and substantial endangerment ... he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, ... " In *Velsicol,* the plaintiff sought an order under § 106(a) requiring Reilly Tar to clean a tank containing coal

tar sludge. The court dismissed Velsicol's claim for injunctive relief, stating:

> CERCLA, 42 U.S.C. § 9606 provides a procedure for the bringing of an action to abate an actual or a threatened release of a hazardous substance from a facility. By its terms, the action is limited to one brought by the Attorney General of the United States at the request of the President. This court is unaware of, and the counsel for plaintiff has not directed the court to, any other provision of the act providing for an order such as the one plaintiff seeks.

Slip op. at 6. See also, *Cadillac Fairview/Caifornia, Inc. v. Dow Chemical Company,* 14 Env'tl L.Rep. 20376, 20380 (C.D.Cal. March 5, 1984).

The Special Master's Recommendation Concerning Class Certification and Bifurcation at 6–7. Later in that same recommendation, it was suggested that "the Court should reserve final judgment as to the ability of the Court to enter such relief [injunctive relief against the third-party defendants] pending further briefing and argument by the parties in trial briefs." Special Master's Recommendation Concerning Class Certification and Bifurcation at 23. In its motion for summary judgment, third-party defendant Kansas City Power & Light Company has challenged the ability of the third-party plaintiffs to obtain injunctive relief under either CERCLA Section 106, 42 U.S.C. § 9606, or RCRA Section 7003, 42 U.S.C. § 6973. In addition, although not in response to KCPL's motion or any other motion for summary judgment, third-party plaintiff AT & T has filed a lengthy memorandum regarding this issue. *See,* Memorandum of Law Concerning the Equitable Jurisdiction of the Court with Respect to the Third-Party and Counterclaim Defendants ("AT & T Memorandum").[22]

AT & T presents two questions in its memorandum:

---

**22.** Suggestions in opposition to the AT&T memorandum were filed by several third-party defendants.

I. Whether the court retains jurisdiction to impose discretionary equitable remedies on third-party and counterclaim defendants in an action under 42 U.S.C. § 9606(a).

II. Whether, at the conclusion of Phase I of the instant proceeding, the court may make an initial allocation of liability under 42 U.S.C. § 9607(a) that includes the liability of third-party and counterclaim defendants as well as of original defendants, and may order them to make payments accordingly.

AT & T Memorandum at 3. Following the presentation of the questions, AT & T provides summary answers to the questions as follows:

I. The court does retain equitable jurisdiction under CERCLA 106(a), and otherwise, to impose equitable cleanup remedies on the third-party and counterclaim defendants. To require the four original non-negligent, off-site defendants to bear 100% of the costs of the injunctive cleanup would be in itself inequitable, and would be contrary to the admonition of the statute authorizing such injunctive cleanups that relief be "such ... as ... the equities of the case may require." 42 U.S.C. § 9606(a) (1982), *United States v. Price*, 688 F.2d 204, 214 (3rd Cir.1982).

II. The court has equitable jurisdiction to require the third-party and counterclaim defendants to make payments pendente lite of approximate amounts owing to original defendants in contribution, subject to adjustment at the conclusion of the action.

AT & T Memorandum at 4. Thereafter, AT & T exhaustively surveys a variety of other factual situations in which the type of relief requested by AT & T was granted. Conspicuous by its absence, however, is any discussion of the case law which has developed under CERCLA which specifical-ly rejects the proposition which is fundamental to AT & T's position, i.e., that there is a private right of action under CERCLA Section 106, 42 U.S.C. § 9606. Indeed, AT & T does not even discuss the one CERCLA case which provides lukewarm support for its position. Although the statement was dicta because the court had already found that the State of New York had the right to seek injunctive relief on its state law claims, the court in *New York v. General Electric Co.*, 592 F.Supp. 291 (N.D.N.Y.1984), indicated that it was not entirely certain that the State might not be entitled to seek injunctive relief under Section 106 or that the court was totally without power to entertain a claim for such relief under its inherent equitable powers. 592 F.Supp. at 301.

■ The Special Master is convinced that the position taken by the courts in the *Velsicol* and *Cadillac/Fairview* cases is the proper one. Moreover, it is now clear that the dicta in the *General Electric* case has little chance of becoming the law in that jurisdiction by virtue of the decision of the United States Court of Appeals for the Second Circuit in *New York v. Shore Realty Corp., supra.* The following discussion in the slip opinion in that case is instructive:

Having held Shore liable under CERCLA for the State's response costs, we nevertheless are required to hold that injunctive relief under CERCLA is not available to the State. *See supra* note 1. Essentially, the State urges us to interpret the right of action under section 9607 broadly, claiming that "limiting district court relief [under section 9607] to reimbursement would have a drastic effect upon the implementation of Congress's [sic.] desire that waste sites be cleaned." Conceding that section 9607 does not explicitly provide for injunctive relief, the State suggests that the court has the inherent power to grant such equitable relief, citing *Hecht Company v. Bowles*, 321 U.S. 321, 329 [64 S.Ct. 587, 591, 88 L.Ed. 754] (1944).

The statutory scheme, however, shows that Congress did not intend to authorize such relief. Section 9606 expressly authorizes EPA to seek injunctive relief to abate "an actual or threatened release of a hazardous substance from a facility." Implying the authority to seek injunctions under section 9607 would make the express injunctive authority granted in Section 9606 surplusage. *See supra* text accompanying note 18; *see also Minnesota v. Northern Securities Co.,* 194 U.S. 48, 71 [24 S.Ct. 598, 604, 48 L.Ed. 870] (1904) (denying private persons a right to injunctive relief under the Sherman Act because it expressly authorized only the federal government to seek relief); cf. *Paine Lumber Company v. Neal,* 244 U.S. 459, 471 [37 S.Ct. 718, 719, 61 L.Ed. 1256] (1917) (holding that section 4 of the Clayton Act provides a right of action for damages but not injunctions); *Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482, 489 n. 20 (2d Cir.1984) (stating that no private right to an injunction may be implied from the government's right), *cert. granted* [—— U.S. ——, 105 S.Ct 901, 83 L.Ed.2d 917], (1985). In addition, the scope of injunctive relief under section 9607 would conflict with the expressed scope of section 9606. The standard for seeking abatement under section 9606 is more narrow that the standard of liability under section 9607. Section 9606 authorizes injunctive relief only where EPA "determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment." Section 9607 contains no such limitation. Finally, we recognize that "it is an elemental canon of statutory construction that were a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19 [100 S.Ct. 242, 247, 62 L.Ed.2d 146] (1979).

If there were any doubt about the statutory language, the legislative history would compel us to reject the State's argument. Congress specifically declined to provide states with a right to injunctive relief. The early Senate version empowered either EPA "or the State" to seek injunctive relief, *see* S. 1480, 96th Cong., 2d Sess. § 3(d), 126 Cong.Rec. 30, 908, *reprinted in* 1 *CERCLA Legislative History, supra* at 484–85, yet the compromise limited that power to EPA alone, *see* 42 U.S.C. § 9606(a). Moreover, the House version, which authorized EPA to order cleanup, *see* H.R. 7020, 96th Cong., 2d Sess., § 3041(a), 126 Cong.Rec. 26, 775–76, *reprinted in* 2 *CERCLA Legislative History, supra,* at 406–12—rather than to seek an injunction in federal court—did not give states that authority even though the National Association of Attorneys General urged Congress to extend the same power to the states as it gave to the federal government. *See* 126 Cong.Rec. 26, 761–62, *reprinted in* 2 *CERCLA Legislative History, supra,* at 307.

Slip op. at 27a–30. Accepting the analysis of the Second Circuit Court of Appeals, the Special Master submits that there is no right for injunctive relief to clean up a hazardous waste site granted under CERCLA to any party other than the United States. The Special Master also submits, in accordance with established case law, that the same rule would apply to injunctive relief under RCRA Section 7003, 42 U.S.C. 6973. See, *Mola Development Corp. v. United States,* 22 E.R.C. 1443 (C.D.Cal. Feb. 11, 1985); *United States v. Hooker Chemicals and Plastics,* No. Civ. 79–988C, slip op. (N.D.N.Y. March 12, 1984); *United States v. Stringfellow,* No. CV–83–2501–MML, slip op. (C.D.Cal. February 14, 1984); *United States v. Hooker Chemicals and Plastics,* 540 F.Supp. 1067, 1080–81 n. 7 (W.D.N.Y.1982). Therefore, to the extent that Kansas City Power & Light's Motion for Summary Judgment asks for a declaration that injunctive relief is not available to the third-party plaintiffs under RCRA or CERCLA, partial summary judgment should be entered accordingly.

## V. ARGUMENTS BASED UPON THE PRINCIPLE OF DE MINIMIS NON CURAT LEX

A number of third-party defendant generators [23] have filed motions seeking dismissal on the principle of *de minimis non curat lex*. That principle, which has its origin in the English common law, stands for the proposition that "the law does not concern itself about trifles." Put simply, as applied to this case, each such generator argues that the amount of waste it sent to the CCC site was so insignificant as compared to the total amount of wastes disposed of at the site that it should not be required to participate in the cleanup of the site or the cost thereof. As the Court is aware, a number of identical motions were filed and considered earlier in this litigation. Concerning those earlier motions, the Special Master recommended to the Court that the application of *de minimis non curat lex* in CERCLA cases would be inconsistent with Congressional intent. The Special Master's Recommendation Concerning Third-Party Generators' "De Minimis" Motions was approved by Order of the Court on November 27, 1984. A copy of the prior recommendation is attached hereto as Appendix B.

The prior recommendation is, of course, "the law of the case." Regardless, the Special Master remains of the opinion that application of the *de minimis* principle would be improper in CERCLA cases. Moreover, the Special Master is aware of two additional CERCLA decisions, not cited in the prior recommendation, which reinforce the analysis and conclusion in that recommendation. In *United States v. Stringfellow*, 14 Env'tl L.Rep. 20385 (C.D. Cal. April 5, 1984), the court discussed the use of joint and several liability under CERCLA and the fact that apportionment may be appropriate on equitable grounds utilizing the criteria of the Gore Amend-

ment. The court noted that the use of the Gore Amendment criteria would allow the court to take into consideration the plight of a small contributor that was unable to prove the extent of its contribution. In *United States v. Carolawn Company*, 14 Env'tl L.Rep. 20696 (D.S.C. June 15, 1984), the court rejected an argument that a threshold amount of hazardous constituents would be required to make wastes "hazardous substances" within the meaning of CERCLA. The court held that the definition of "hazardous substance" in Section 101(14) does not distinguish hazardous substances on the basis of quantity of concentration. The court noted in a footnote:

> Presumably, if Congress has intended the definition of hazardous substances to be contingent upon the presence of a certain amount or concentration of a hazardous substance, it would have so provided.

14 Env'tl L.Rep. 20697 note 3.

The Special Master recommends that motions based on the principle of *de minimum non curat lex* again be denied.

## VI. SELECTION OF THE DISPOSAL SITE BY A GENERATOR IS NOT A PREREQUISITE TO LIABILITY

A number of third-party generator defendants argue that assuming *arguendo* that evidence shows that their hazardous substances were disposed of at the CCC site, that they cannot be liable under CERCLA Section 107(a)(3) because they did not select the CCC site as the place for disposal. Such arguments take two general forms, neither of which, the Special Master concludes, holds merit.

A number of generators argue that they arranged with a transporter, commonly Jones Chemical Company, to dispose of their wastes, and that it was the transporter that was responsible for selecting the site at which they were disposed.[24]

---

**23.** Motions raising the *de minimis* defense were filed by the following parties: W.R. Grace & Company; Gates Rubber Company; Curators of the University of Missouri; International Harvester Company; McCord Winn, Inc.; Luzier, Inc.; and Northwest Central Pipeline Corporation. In addition, a number of the parties whose motions were not considered due to noncompliance with Rule 56 raised this issue.

**24.** This argument is raised in motions for summary judgment filed by the following parties: Brookside Corporation; Cabot Corporation; Copolymer Rubber and Chemical Corporation; Puritan Equipment, Inc.; Sheldahl, Inc.; National

However, the statute does not require that the generator select the site in order to be liable. Section 107(a)(3) does not say that the generator must have "arranged for disposal or treatment ... at *the* facility"; rather, the statute imposes liability upon any person who "arranged for disposal or treatment ... at *any* facility owned or operated by another party or entity" (emphasis added). Thus, under Section 107(a)(3), a generator whose hazardous substances are treated or disposed of at *any* site owned or operated by someone other than the generator (i.e., an "off-site" generator) is liable for response costs incurred with respect to that site.

To argue otherwise is to ignore the intent behind CERCLA. Its legislative history is replete with statements that generators of hazardous substances remain ultimately responsible for those substances regardless of their place of disposition. In other words, the generators retain a continuing liability. Failure to recognize this liability would produce an anomalous result: generators could avoid liability simply by *not* designating disposal at a particular site, while those who took care to designate or select sites would be held liable. This would be especially unfair in cases such as this, where generators have done business with a hazardous waste enterprise or "broker" which operates a number of sites. Moreover, the defendants' argument was rejected in *United States v. Wade, supra,* where the court held:

> I also reject the arguments that the government must establish that the generator selected the site at which the wastes were dumped and that the transfer of ownership of the waste to [the transporter] at the time of pickup for disposal absolves the generator of liability. Neither argument finds any support in the language of the statute.

577 F.Supp. at 1333 n. 3.

■ Nor is liability on the part of the generator precluded by the fact that by selecting the site, the transporter would also be liable under Section 107(a)(4). Some of the parties have argued that it would be incongruous for two parties (the generator and the transporter) to be held liable for the same waste. The Special Master submits, however, that it is not incongruous for more than one party to be held responsible for a particular hazardous substance; indeed, under the statute it is possible for any number of parties to be held responsible for the same hazardous substance, i.e., the owner of the disposal site, the owner of the disposal site at the time the waste was disposed of, the operator of the disposal site, the generator, and the transporter who selected the site.

■ The second variation on the "site selection" argument involves trans-shipments. Generators argue that they arranged for and, in fact, did ship their hazardous wastes to another location, commonly the CCCI site in Gary, Indiana.[25] They argue that they cannot be held liable if the waste was subsequently trans-shipped to the CCC site. This argument, however, was rejected in *Missouri v. Independent Petrochemical Corp.,* 22 E.R.C. 1167, 1168 (E.D.Mo. Jan. 8, 1985), a result with which the Special Master concurs.

## VII. THE THIRD–PARTY DEFENSE UNDER CERCLA SECTION 107(b)(3)

Third-party defendant Schwinn Bicycle Company claims that it is exempt from liability under CERCLA because it has a valid third-party defense under Section 107(b)(3), 42 U.S.C. § 9607(b)(3). The statutory defense asserted by Schwinn provides as follows:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazard-

Metal Processing, Inc.; Von Durpin, Inc.; Faultless Caster Corporation; AMF, Inc.; and Twigg Corporation.

**25.** This argument is raised in motions for summary judgment filed by the following parties: Sheldahl, Inc.; Schwinn Bicycle Company; International Harvester Company; and Zero Corporation.

ous substance and the damages resulting therefrom were caused solely by—... (3) an act or omission of a third party other than an employee or agent of the defendant, or other than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions ...

42 U.S.C. § 9607(b).

■ The basis of Schwinn's argument is that although it had a contractual relationship with CCC, that relationship was only for disposal of wastes at CCC Indiana site. Therefore, the argument continues, any trans-shipment of Schwinn's waste from the Indiana site to the Kansas City site did not "occur in connection with the contractual relationship" between CCC and Schwinn, but was an act wholly outside and apart from the contract. Schwinn's argument must be rejected for two reasons: first, its interpretation of the third-party defense is inappropriate and inapplicable to the facts presented; and, second, it is unlikely that this defense could be established in a motion for summary judgment. The first reason is based upon the analysis presented elsewhere in this report, i.e., that a generator whose wastes were disposed of at a site other than the CCC site, but which wastes were subsequently trans-shipped to the CCC site, is a liable party within the meaning of Section 107(a)(3).

■ Secondly, the Special Master submits that it would be difficult to establish the third-party defense on a motion for summary judgment and that, in any event,

Schwinn has certainly failed to do so. As is clear from the statutory language quoted above, in order to assert the third-party defense, a party must first establish by a *preponderance of the evidence* that the release or threatened release of a hazardous substance was caused *solely* by a third-party. Schwinn does not allege, let alone prove, that the releases occurring at the CCC site were caused *solely* by an act or omission of an unrelated third-party. In addition, Schwinn does not allege, let alone prove, by a preponderance of the evidence that it "exercised due care with respect to the hazardous substance concerned ... and ... took reasonable precautions against foreseeable acts or omissions of any such third-party and the consequences that could foreseeably result from such acts or omissions ..." 42 U.S.C. § 9607(b)(3). Similarly, in *United States v. Price*, 577 F.Supp. 1103 (D.N.J.1983), the court found that at the summary judgment stage a party was unable to prove that it exercised due care and denied a motion for summary judgment.

## VIII. MISCELLANEOUS GENERATOR LIABILITY ISSUES

As indicated earlier in this report, the Special Master accepts and adopts the four-pronged standard for generator liability stated in *United States v. Wade, supra:*

> Stripping away the excess language, the statute appears to impose liability on a generator who has (1) disposed of its hazardous substances (2) at a facility which now contains hazardous substances of the sort disposed of by the generator (3) if there is a release of that or some other type of hazardous substance (4) which causes the incurrence of response costs.

577 F.Supp. at 1333. A number of motions filed by third-party defendants raise two common issues regarding generator liability under CERCLA. In one group of motions, the generators argue that there is no evidence, or insufficient evidence, that their wastes were ever sent to the CCC site and thus cannot be held liable. In a second

group of motions, the generators argue that even if it were established that their wastes were sent to the site, that their waste did not remain at CCC but were either trans-shipped, re-sold to CCC customers, recycled or incinerated. Both groups of motions raise questions concerning the nature and degree of proof required to establish generator liability under CERCLA.

■ At the outset, it should be noted that under the *Wade* standard, it is unnecessary to "fingerprint" a particular generator's waste in order to establish the liability of that generator:

> The government's experts have admitted that scientific technique has not advanced to a point that the identity of the generator of a specific quantity of waste can be stated with certainty. All that can be said is that a site contains the same kind of hazardous substances as are found in a generator's waste. Thus, to require a plaintiff under CERCLA to "fingerprint" waste is to eviscerate the statute. Given two possible constructions of a statute, one which renders it useless should be rejected. Generators are adequately protected by requiring a plaintiff to prove that a defendant's waste was disposed of at a site and that the substances that make the defendant's waste hazardous are also present at the site.

577 F.Supp. at 1332–1333. *See also, United States v. South Carolina Recycling and Disposal, Inc.*, 14 Env'tl L.Rep. 20272, 20274 (D.S.C. February 23, 1984). The first issue which arises is the type of evidence that is necessary to prove that a generator's waste was disposed of at the CCC site.

■ A significant number of the third-party defendant generators who contend that their wastes were not shipped to the CCC site, although certainly not all of them, share a common element—that they made arrangements with the transporter Jones Chemical Company to dispose of their waste. For purposes of proof at trial,

the Special Master certainly suggests that mere transfer of waste to a suspect waste hauler by a generator is insufficient to permit the fact finder to infer that the wastes were deposited at the CCC site if another location of disposal cannot be shown; rather, third-party plaintiffs will have to show that the generator's waste was, in fact, disposed of at the CCC site. *See, United States v. Wade*, 14 Env'tl L.Rep. 20436 (E.D.Pa. March 8, 1984); *United States v. Wade*, 14 Env'tl L.Rep. 20440 (E.D.Pa. April 27, 1984). However, since these issues are raised in motions for summary judgment, the Special Master submits that the Court is in a position similar to that which confronted the Court in *United States v. Price, supra.* There, the court was presented with a motion for summary judgment filed by Hoffman-La-Roche, Inc. ("Roche"), an alleged generator of waste to the Price Landfill:

> The evidence presented at this early date in the litigation is sufficient to defeat defendant's motion. The government has produced a total of three loading tickets indicating that waste chemicals generated by Roche ended up at Price's Landfill. Furthermore, although the deposition testimony of Carl Ling, president of SCP, is far from dispositive, it does demonstrate that SCP (a transporter) disposed of "lab packs" filled with chemicals and that it was hired by Roche during the relevant time period to transport chemical waste ... While the evidence compiled by the government is not overwhelming, it does serve to illustrate outstanding issues of material facts with respect to Roche's alleged involvement in the dumping at Price's Landfill.

577 F.Supp. at 1116. Although the amount and nature of the evidence proffered to established the liability of the generators varies, the Special Master concludes that the third-party plaintiffs have rebutted the motions for summary judgment with sufficient evidence to raise issues of disputed

material facts which must await trial for resolution.[26]

■ The second group of motions involve claims that assume, for purposes of argument, that it is established that the wastes were sent to the CCC site. The gravamen of the argument, however, is that the wastes no longer exist at the CCC site because they were either trans-shipped, re-sold to a CCC customer, recycled or incinerated. Therefore, the generators argue, there can be no liability for such shipments to the site.

■ Once again, the issues presented are unsuitable for disposition on summary judgment. While proof of the facts asserted in the arguments would preclude a finding of liability, the facts in the instant motions have been sufficiently disputed so as to require the deferral of resolution of those issues until trial.[27] A generator who sent a hazardous substance to a site cannot avoid liability under CERCLA simply by offering conclusory statements that all of the generator's hazardous substances were destroyed or trans-shipped elsewhere when a hazardous substance like the generator's is present at the site. The presence of the substance at the site sufficiently negates such conclusory statements, which do not at all take into account, for example, leaks or spills of the generator's substance which may have occurred prior to destruction or removal, or incomplete destruction. Thus, the generator cannot avoid liability on the ground that its hazardous substance was destroyed or removed where a hazardous substance like the generators' exists at the site, unless it presents at trial a sufficient quantum and degree of proof that all of the hazardous substance that it sent to the site underwent the destruction process, which operated at 100 percent efficiency, or was trans-shipped or re-sold, without any leaks, spills, or other such occurrences occurring prior to its removal, such that it can be said with reasonable certainty that none of the defendant's hazardous substance remains at the site.

## IX. LIABILITY FOR HAZARDOUS SUBSTANCES SOLD TO CCC FOR TREATMENT OF OTHER WASTE

Third-party defendants The BOC Group, Inc. ("BOC") and Kansas City Power & Light Company (KCP & L) have moved the Court to enter summary judgment in their favor and against third-party plaintiffs pursuant to Fed.R.Civ.P., Rule 56, on the grounds that they did not arrange for the disposal of a hazardous substance within the meaning of 42 U.S.C. § 9607(a)(3) [Section 107(a)(3) CERCLA] at the CCC site, but rather sold to CCC, in the normal course of business, a product used to treat and neutralize wastes at the site from other generators.

26. Parties whose motions fall into this category, in whole or in part, are the following: Regency Electronics, Inc.; BN Transport, Inc.; Chemcentral Corporation; Cabot Corporation; Copolymer Rubber and Chemical Corporation; American Saw and Tool Company; Parmelee Pharmaceutical Company; Gates Rubber Company; Von Durpin, Inc.; Curators of the University of Missouri; Russell, Burdsall and Ward Corporation; Fansteel, Inc.; Daisy Manufacturing Company; Northrop Worldwide Aircraft Services, Inc.; Luzier, Inc.; AMF, Inc.; Zero Corporation; Trane Company; Kansas City Power & Light Company; and the United States (regarding the Department of Energy). Some comment does need to be made concerning the motions filed by Northrop Worldwide Aircraft Services, Inc. and the United States (on behalf of the Department of Energy). Both of those motions arise out of the relationship between a federal agency (the United States Air Force and the Department of Energy) and a private corporation doing work for the federal agency (Northrop Worldwide Aircraft Services, Inc. and the Bendix Corporation, respectively). The generation of hazardous substances arising out of the work performed is admitted in each instance. The question which arises, however, is the party or parties to be held responsible for the generation of the waste. In each instance, the details of the relationships between the federal agencies and the private corporations are sufficiently undeveloped so as to render the Special Master unable to make a recommendation to the Court on the motions for summary judgment due to the existence of material facts in dispute.

27. Parties whose motions fall in this category are the following: DeSoto, Inc.; Sosland Companies, Inc.; Faultless Caster Corporation; Co-operative Farm Chemicals Association; McDonell Douglas Corporation; Mobay Chemical Corporation; and Curators of the University of Missouri.

BOC and KCP & L argue that the "sale" of a product is distinguishable from an arrangement for disposal or treatment of a hazardous substance. KCP & L argues that its product—"fly ash"—is not a hazardous substance, but, even if it is assumed to be a hazardous substance under CERCLA, KCP & L did not arrange for the disposal, treatment or transport of fly ash at or to the CCC site. BOC argues from the opposite posture, asserting that it did not arrange for disposal of its product—"lime slurry"—and therefore, even if it is a hazardous substance, it is not liable under CERCLA.[28]

■ Fly ash, which is a byproduct of the combustion of coal, has been held to be a hazardous substance under CERCLA because it contains at least trace amounts of arsenic, cadmium, silenium and other materials regulated under statutes cited in § 101(4) of CERCLA. *See, Eagle-Picher Industries, Inc. v. United States Environmental Protection Agency,* 759 F.2d 922 (U.S.Ct. of App., D.C.Cir., 1985). A waste is a "hazardous substance" under CERCLA if it contains substances listed as hazardous under any of the statutes referenced in CERCLA Section 101(14) regardless of the volumes or concentrations of those substances; presumably, if Congress had intended the definition of hazardous substances to be contingent upon the presence of a certain amount or concentration of a hazardous substance, it would have so provided. *See, United States v. Carolawn Company,* 14 Env'tl L.Rep. 20696 (D.S.C. June 15, 1984). Nor has Congress intended to exempt from CERCLA liability hazardous substances which otherwise may have a useful purpose in certain manufacturing or chemical processes.

■ Although KCP & L asserts that fly ash is not regulated as a hazardous substance, KCP & L has submitted no evidence that its fly ash does not similarly contain trace elements generally common to fly ash. In the absence of such a showing, it must be presumed that the regulated trace elements may be contained in KCP & L's fly ash. The rules for considering summary judgment motions have been discussed in detail at the beginning of this report. The Court is required to review the facts in the light most favorable to third-party plaintiffs and give to third-party plaintiffs the benefit of all reasonable inferences to be drawn from the underlying facts. Third party defendants seeking summary judgment have the burden of establishing with such clarity as to leave no room for controversy, that there are no issues of material fact and that they are, therefore, entitled to judgment as a matter of law. KCP & L has not demonstrated that there are no issues of material fact as to whether fly ash is a hazardous substance within the regulatory purview of CERCLA and, therefore, the Court cannot rule, for purposes of this summary judgment motion, that fly ash is not a hazardous substance. Thus, for purposes of the BOC and KCP & L motions, the Court should assume that fly ash and lime slurry are hazardous substances within the meaning of CERCLA.[29]

28. BOC contends, for purposes of its Motion, that lime slurry is not a hazardous substance within the meaning of CERCLA, but expressly reserves argument on that point. For purposes of ruling on the Motion, it must be assumed that lime slurry is a hazardous substance within the meaning of CERCLA.

29. A number of other third party generator defendants have moved for summary judgment on the ground that the substance allegedly transported to the CCC site is not a "hazardous substance" within the meaning of CERCLA Section 101(14) and/or is not a "solid waste" within the meaning of RCRA [42 U.S.C. § 6903(27) ] and, therefore, that such third-party generator defendant is not liable as a matter of law under CERCLA and/or RCRA. The Master's recommendations herein relate only to the above-mentioned ground. The standard for granting summary judgment in the Eighth circuit has been stated at the outset of this Report and will be relied on herein as to these Motions.

The Motions of the following third party generator defendants should be denied because there are genuine issues of material fact as to the substance or the chemical composition of the substance involved; as to whether the substance is hazardous within the meaning of CERCLA; and as to whether the substance is a solid waste within the meaning of RCRA:

BN Transport, Inc.
Cabot Corporation

Movants both argue that their products are useful (i.e., not wastes) and, in fact, are and were used by CCC to treat and neutralize wastes contributed by other generators at the CCC site. In what may be the most facially appealing argument on this point, BOC contends that the government's own draft remediation plan for the site calls for neutralization and precipitation of waste through the use of lime slurry. BOC and KCP & L contend that their products were used primarily for closure of the site and that subjecting the generators of such substances to liability under CERCLA would frustrate the legislative intent of CERCLA which is to remediate the release of hazardous substances at such sites. This argument, too, has facial appeal, but fails when subjected to careful legal scrutiny and analysis.

"Hazardous substance" is broadly defined in CERCLA (§ 101(14)) and includes "hazardous wastes" as defined under the Solid Waste Disposal Act (42 U.S.C. § 6921). The term "hazardous substance" is intentionally broader and more inclusive than "hazardous waste." "Waste" is defined, *inter alia*, as discarded material (see 42 U.S.C. § 6903). "Substance" has no such connotation and can obviously include primary products intended for manufacture and ultimately for sale to others for use in various manufacturing or commercial operations as well as byproducts and waste products.

 Under the express terms of the applicable definition, hazardous substances (including, for purposes of this motion, fly ash and slurry lime) are intended to be regulated. The definition contains no exemption for hazardous substances which may be used to neutralize other hazardous substances [30] nor for hazardous substances which may be used to effect closure of a site, although such an exemption could quite easily have been drafted and inserted in the legislation if Congress so intended. Neither is there anything in the legislative history of CERCLA that would indicate such an intention on the part of Congress. Hazardous substances come in many varieties and forms, some of which may, in their interaction or through various chemical processes, neutralize other hazardous substances. Congress has chosen not to enter the complex arena of chemical toxicology. Rather, it has chosen to broadly define hazardous substances without regard to how such substances may interact on a particular site. (Of course, if hazardous substances interacted in a way that completely neutralized the site such that there was no actual or threatened release of a hazardous substance from the facility, an action under CERCLA would not lie.) To do otherwise would compel the government, in every instance, to undertake and perform such complex chemical analyses of the commingling and interaction of substances at a given site that CERCLA would not serve the purposes which Congress did intend. The Master therefore rejects the argument that the generator of a "hazardous substance" within the meaning of CERCLA can escape liability pursuant to § 107(a)(3) on the grounds that the "hazardous substance" may have properties which, when commingled with certain other

Colgate-Palmolive, Inc.
Curators of the University of Missouri
International Harvester, Inc.
Mobay Chemical Corp.
Parmelee Pharmaceutical Co.
Sosland Companies
McDonnell Douglas Corporation
The Motions of the following third party generator defendants should be granted in part and denied in part:
Cooperative Farm Chemicals Ass'n.
Northwest Central Pipeline Corp.
W.R. Grace & Co.
There are no genuine issues of material fact as to the substance or the chemical composition of the substance involved nor as to whether the substance is hazardous within the meaning of CERCLA; therefore, summary judgment is appropriate as to CERCLA. There are, however, genuine issues of material fact as to whether the substance is a "solid waste" within the meaning of RCRA (despite the fact that, in the case of W.R. Grace & Co., third-party plaintiffs did not file suggestions in opposition). Therefore, summary judgment should be denied with respect to RCRA.

**30.** Indeed, the applicable definition of "treatment" *includes* neutralization.

hazardous substances, neutralize one or both substances.[31]

■ If BOC and KCP & L have generated "hazardous substances" within the meaning of CERCLA, they fall within the purview of Section 107(a)(3) which provides liability for:

"(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances ..."

However, BOC and KCP & L assert that they did not arrange for "disposal," but rather sold to CCC a treatment chemical in the normal course of business. The cases cited by BOC and KCP & L, the definition of "disposal" (§ 101(20) CERCLA incorporating the definition in § 1004 of the Solid Waste Disposal Act [42 U.S.C. § 6903]) and the express language of § 107(a)(3) belie the interpretation suggested by movants to the effect that a "sale" is distinguishable from a contract, agreement or other arrangement for disposal.

"Disposal" means:

"the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters."

The definition of "disposal" is not by its terms limited to transactions in which the site owner or operator is paid to effect disposal or in which the operator is paid, either a modest or substantial sum for the product being disposed. The Master has

no intention of redefining that which Congress has expressly determined to constitute disposal. Section 107(a)(3) uses the terminology "... any person who by contract, agreement or otherwise arranged for disposal ..." BOC and KCP & L do not allege that they did not contract with CCC for deposit or placement of the hazardous substance on the CCC site. They do argue that because the monetary consideration for the contract flowed to them rather than to CCC, they are not subject to liability under CERCLA.

The direction of flow of monetary consideration is not the test of liability under CERCLA. The several cases that have touched upon this issue are not supportive of movants' position. *See, United States v. A & F Materials Co., Inc.*, 582 F.Supp. 842 (S.D.Ill.1984); *New York v. General Electric Co.*, 592 F.Supp. 291 (N.D.N.Y. 1984); and *United States v. Westinghouse Electric Corp.*, 14 Env'tl L.Rep. 20483 (S.D.Ind., June 29, 1983).

In *United States v. A & F Materials Co., Inc., supra*, McDonnell-Douglas produced a spent caustic solution as a by-product of its manufacture of jet aircraft. McDonnell-Douglas sold the material to a waste site operator who used it to neutralize acidic oil on the site. Notwithstanding that the site operator paid McDonnell-Douglas for the caustic solution, the Court found that McDonnell-Douglas came within the broad language of § 107(a)(3). "The fact that this arrangement involved A & F promising to pay MDC seven cents a gallon is irrelevant." 582 F.Supp. at 845. The Court found the relevant inquiry to be *who decided* to place the waste into the hands of a facility that contains hazardous wastes. In that case, it was MDC. It is precisely that decision that CERCLA was intended to regulate. In this case, BOC and KCP & L decided to place the hazardous substance into the hands of a facility which contained hazardous wastes.

---

31. The Master does not now decide (and specifically reserves) the question of the effect, if any, that neutralization or other chemical processes resulting from the commingling of certain hazardous substances may have on the apportionment of response costs in Phase II. The Master also finds that any such determination would necessarily involve complex fact questions which are not appropriate for disposition on a motion for summary judgment.

In *New York v. General Electric Co., supra,* G.E. sold waste oil containing PCB's and dibenzofurans to an operator of a drag strip who applied the oil to the grounds for purposes of dust control. G.E. contended that Congress "never intended to make a supplier liable for the subsequent action of the purchaser in the ordinary course of a business other than waste disposal" and that G.E. had not arranged for disposal or treatment as used in § 107(a)(3) because it sold the oil to the purchaser. 592 F.Supp. at 297. The Court rejected G.E.'s arguments relying upon the legislative history of CERCLA which makes it clear that "persons cannot escape liability by 'contracting away' their responsibility or by alleging that the incident was caused by the act or omission of a third party." *Id.* "A generator's liability under CERCLA is not to be so facilely circumvented by its characterization of its arrangements as 'sales.'" *Id.*

BOC attempts to distinguish the holding in the *G.E.* and *A & F Materials* cases on the grounds that the oil and aluminum etch caustic solution at issue in those cases had already been used by defendants for an original purpose and became waste which had to be disposed of while the lime slurry they produce (albeit as a byproduct) is sold as a useful product for primary use. CERCLA makes no such distinction and applies uniformly to "hazardous substances," not just wastes. BOC further argues that the courts in those cases formulated a legal analysis which requires examination of the primary nature of the transaction from the defendant's viewpoint to determine whether the defendant was acting with the intent to dispose. BOC's argument is misguided to the extent that it asserts an "intent" requirement under CERCLA because CERCLA requires neither intent nor even negligence, but provides for strict liability.

In *United States v. Westinghouse Electric Corp., supra,* Monsanto sold PCB's to Westinghouse for use as a dielectric fluid in electrical equipment that it manufactured. Westinghouse later disposed of the equipment containing the PCB's. In a third party complaint, Westinghouse sought contribution or indemnification from Monsanto as the "generator" of the PCB's. The Court dismissed the complaint in part because Monsanto had not "arranged for disposal" but had simply sold a newly manufactured primary product to Westinghouse for use in one of its products. Monsanto had no dealings, direct or indirect, with the waste site owner or operator. It did not arrange for disposal; Westinghouse did. The *Westinghouse* case is distinguished by the Court in the *A & F Materials* case, *supra,* in part on the grounds that Monsanto did not arrange for the *disposal* of PCB's at a facility containing hazardous wastes. While "liability for releases under § 9607(a)(3) is not endless; it ends with that party who both owned the hazardous waste and made the crucial decision how it would be disposed of or treated ...." *United States v. A & F Materials Co., supra,* 582 F.Supp. at 845.

In this case, fly ash and slurry lime having been assumed to be hazardous substances within the meaning of CERCLA, and with testimony that BOC and KCP & L owned the hazardous substances and made the decision how it would be disposed of, the Court should deny the BOC and KCP & L motions for summary judgment.

## X. IN PERSONAM JURISDICTION

Third-party defendants Brookside Corporation ("Brookside"), Twigg Corporation ("Twigg"), Contractors United, Inc. ("Contractors") and the Sanitary District of Rockford ("SDR") have moved the Court for dismissal pursuant to Fed.R.Civ.P. 12(b) on the grounds that the defendants are not subject to service of process within the Western District of Missouri and that the District Court cannot obtain in personam jurisdiction against these non-resident third-party defendants. Each of the third party defendants is and was at all relevant times a foreign corporation (i.e., organized and existing in a state other than the forum state and not residing in the state in which the district court sits). Brookside,

Twigg and Contractors are Indiana corporations. SDR is an Illinois municipal corporation.

The Federal Rules of Civil Procedure provide for service of process beyond the territorial limits of the state where the district court sits only when authorized by a statute of the United States or by the federal rules. Fed.R.Civ.P. 4(e) and (f). Thus, unless Congress has expressly provided for service under CERCLA or RCRA or the non-resident third party defendants can be served under Missouri's long-arm statute (see Fed.R.Civ.P. 4(e) and R.S.Mo. § 506.500), the non-resident third-party defendants cannot be effectively served and the Court cannot exercise in personam jurisdiction over them. The third-party complaint does not allege a federal statutory basis for the claim of personal jurisdiction over non-resident third-party defendants. Third-party plaintiffs allege generally that "[e]ach third-party defendant may be found for service of process in the State of Missouri or by virtue of the matters alleged in this Third-Party Complaint is subject to service of process outside of Missouri under applicable law." Third-party plaintiffs, in their suggestions in opposition to the motions to dismiss, do not cite any federal statutory authority that would confer in personam jurisdiction. Therefore, for purposes of the motions to dismiss, the Court should decide only whether personal jurisdiction over the non-resident third-party defendants can be obtained by the District Court by operation of the Missouri long-arm statute (R.S.Mo. § 506.500).[32]

That statute provides:

506.500. Actions in which outstate service is authorized.—1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:

(1) The transaction of any business within this state;

(2) The making of any contract within this state;

(3) The commission of a tortious act within this state;

(4) The ownership, use, or possession of any real estate situated in this state;

(5) The contracting to insure any person, property or risk located within this state at the time of contracting.

2. Only causes of action arising from acts enumerated in this section may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.

In order to determine whether jurisdiction over a non-resident can be obtained under this statute, the Court must find that the cause of action that is the subject matter of the litigation arose from the doing of one of the enumerated acts within the state. This finding must necessarily be preceded by (1) an identification of the nature of the cause of action and (2) whether the act complained of fits within one of the types of acts enumerated. Following this analysis, the Court must then determine, if necessary, whether the exercise of personal jurisdiction over the defendant would violate the due process clause of the Fourteenth Amendment. *See, Commercial Design, Inc. v. Dean/Dale and Dean Architects,* 584 F.Supp. 890, 891 (E.D.Mo.1984).

To dispose of certain preliminary matters, the Missouri long-arm statute has been held to be constitutional, *State ex rel. Deere & Co. v. Pinnell,* 454 S.W.2d 889 (Mo. banc 1970), *State ex rel. Birdsboro Corp. v. Kimberlin,* 461 S.W.2d 292 (Mo. App.1970), *Fulton v. Southern Pacific Co.,* 320 F.Supp. 45 (W.D.Mo.1970), and has been interpreted to extend personal juris-

---

**32.** Because of the recommendation on the viability of obtaining jurisdiction under the Missouri long-arm statute, the Master does not find it necessary to now decide whether an independent basis for obtaining personal jurisdiction over non-residents derives directly from CERCLA and RCRA.

diction over non-residents "to that extent permissible under the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States" and to make effective the service of process upon such nonresidents. *Wooldridge v. Beech Aircraft Corp.*, 479 F.Supp. 1041, 1046 (W.D. Mo.1979); *see also, Breiner Equipment Co. v. Dynaquip, Inc.*, 539 F.Supp. 204 (E.D.Mo.1982).

Third-party defendants argue (and support their argument with voluminous documentary evidence and affidavits) that the Due Process Clause limits the reach of the Court in this instance because of the absence of the requisite minimum contacts between defendants and the State of Missouri. Before arriving at the constitutional question, however, the Court must undertake the analysis described above with respect to each of the defendants alleged acts.

Third-party plaintiffs have the burden of establishing that jurisdiction exists, and this burden may not be shifted to the party challenging the jurisdiction. While the facts must be viewed in the light most favorable to third-party plaintiffs, there must nonetheless be some evidence upon which a prima facie showing of jurisdiction may be found to exist. *See, Sun World Lines v. March Shipping Corp.*, 585 F.Supp. 580, 582 (E.D.Mo.1984). Plaintiffs need only make a prima facie showing of jurisdictional facts through submission of affidavits plus discovery materials. *See, Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).

The complained of acts of third-party defendants, presented in the light most favorable to third-party plaintiffs, can be summarized as follows:

### (i) *Brookside*

Brookside contracted with Jones Chemical Company ("Jones") for the transport and disposal of 715 gallons of its cyanide waste. Jones operated a waste disposal facility in Beech Grove, Indiana. Brookside apparently assumed that the waste would be disposed of initially, but not necessarily permanently, at that facility although there is no evidence that the contract actually specified a place of treatment and disposal. Jones accepted the waste and either transported it directly to the CCC site or transported it first to the Beech Grove, Indiana facility and then trans-shipped it to the CCC site for treatment and disposal. Thus, the cyanide generated by Brookside was ultimately treated and disposed at the CCC–Kansas City site. By motion for summary judgment, which is separately ruled upon herein, Brookside contends that it is not a responsible party under CERCLA because it did not "arrange" for disposal or treatment of the hazardous substance since it did not select the site nor even know where the waste was disposed of or treated. For purposes of the motion to dismiss, however, the Court is required to consider the facts in the light most favorable to third party plaintiffs and to give third-party plaintiffs the benefit of all reasonable inferences to be drawn from the underlying facts.

Third-party plaintiffs have tendered documents purporting to show that wastes delivered by Jones to the CCC site originated with Brookside. Brookside has submitted no evidence to show that its waste did not or could not have been disposed of at the CCC site, but has submitted affidavits to the effect that it had no knowledge of any transshipments to CCC–Kansas City and had not directly authorized such shipments.[33] Brookside contends that even if these factual allegations could be proven, they would not create the necessary contacts between Brookside and the State of Missouri to support the jurisdiction of the federal court under the Missouri long-arm statute.

### (ii) *Twigg and Contractors*

Twigg and Contractors contracted with Jones for the transport and disposal of

---

**33.** Generators can escape liability under CERCLA by relying on the acts or omissions of third parties, but third parties are narrowly defined.

Section 107(b)(3) CERCLA; and see discussion herein.

certain wastes. Twigg and Contractors assert that it was their understanding that the wastes were to be shipped to, treated and disposed at Jones' Beech Grove, Indiana facility, although there is no evidence of a contract between the parties actually specifying the place of treatment and ultimate disposal. Jones accepted the wastes from Twigg and Contractors and, it is alleged, either transported it directly to the CCC site or transported it first to the Beech Grove, Indiana site and then transshipped it to the CCC site. Thus, Twigg's waste (presumably nitric acid) and Contractors' waste (cyanide) were ultimately disposed at the CCC site in Kansas City.

Third-party plaintiffs have tendered documents purporting to show that wastes delivered by Jones to the CCC site originated with Twigg and Contractors. Twigg and Contractors deny that the documents suggest any relationship between the Twigg/Jones and Contractors/Jones transactions and the subsequent Jones/CCC transactions or that the waste involved in the first set of transactions are the wastes involved in the second set of transactions. However, Twigg and Contractors have submitted no evidence to show that their wastes did not or could not have been disposed of at the CCC–Kansas City site. Twigg and Contractors assert that even if these factual allegations could be proven, they would not create the necessary contacts between Twigg and Contractors and the State of Missouri because there was no reason for Twigg and Contractors to anticipate or foresee that any waste material they had arranged to be transported and disposed by Jones would ever be transported to or treated or disposed of in Missouri.

### (iii) SDR

It is not alleged that the SDR generated hazardous wastes nor that it directly transported hazardous wastes to the CCC–Kansas City site. Rather, SDR had a somewhat peculiar role in the transactions which ultimately resulted in hazardous wastes (cyanide) from plating and other heavy industries in the City of Rockford, Illinois being ultimately treated and disposed at the CCC–Kansas City site. SDR is a municipal sanitary district responsible for the treatment and disposal of wastes in the City of Rockford. In the early 1960's, dumping of cyanide into SDR's sewers impeded the operations of their treatment plant and cyanide was discharged into the Rock River resulting in several fish kills. Cyanide is a waste product of the plating industry. SDR sought to prevent future dumping and the resultant fish kills by promoting an arrangement whereby certain plating industries agreed to deposit their toxic wastes in a railroad tank car owned by CCC and to have CCC dispose of their wastes. SDR made the initial contact with CCC and set up a meeting between CCC and a large number of Rockford businesses producing cyanide wastes. As a result of the meeting, CCC arranged to place a 10,000 gallon railway tank car in Rockford for collection of cyanide concentrates. Following the meeting, CCC confirmed the arrangements including billing procedures, by letter, to the Chief Chemist of the SDR, who had chaired the meeting. SDR then communicated the arrangement, by letter, to the platers. SDR maintained contact with CCC by informing them when the tank car was filled and shipped. SDR's letter to the platers specified that the wastes would be shipped to the CCC–Kansas City site and that CCC would bill SDR for the transportation, treatment and disposal of the cyanide waste. (The cost would then be back-charged to each generator on a proportional basis.) Later, CCC billed the generators directly, but SDR continued to receive copies of invoices. SDR also continued to monitor the arrangement, as well as its success in lowering cyanide levels in its treatment plant, and made periodic progress reports. SDR contends that these activities do not amount to sufficient contact with the State of Missouri for SDR to be subject to jurisdiction pursuant to the Missouri long-arm statute.[34]

---

34. SDR has also moved to dismiss on the grounds that the Third Party Complaint fails to state a claim against SDR on which relief can be granted. The Third Party Complaint alleges

The third-party complaint alleging jurisdiction over Brookside, Twigg, Contractors and SDR is an action under CERCLA and RCRA for indemnification or for contribution if defendants (third-party plaintiffs) are adjudged liable to plaintiffs under any claim for relief under the government's First Amended Complaint, which seeks injunctive relief and reimbursement of expenses under Section 7003 of RCRA and Sections 106 and 107 of CERCLA to remedy a condition which may present an imminent and substantial endangerment to the public health and welfare or the environment arising from the presence, handling, storage, treatment, transportation, disposal, release or threatened release of hazardous wastes and/or hazardous substances. Initially the Court must characterize the nature of the cause of action alleged in the third party complaint, determine whether it falls within one of the enumerated acts listed in R.S.Mo. § 506.500, and then find that the specific course of action that is the subject matter of the litigation arose from the doing of the enumerated act in the state. Thereafter, the Court must decide if necessary, whether extension of the Missouri long-arm statute in such instance comports with the Due Process Clause of the Fourteenth Amendment. Interpretation of the reach of the state long-arm statute is a matter of state law (see cases cited, *infra* ).

It seems clear that the release of a hazardous substance creating an imminent danger to public health and welfare and to property and the environment is in the nature of a "tort." To give rise to liability in tort, there must be a duty and violation thereof and the violation must have proximately caused an injury, *Munger v. Equitable Life Assur. Soc. of U.S.*, 2 F.Supp. 914 (W.D.Mo.1933). To give rise to an action in "tort" the right violated must have been created and corresponding duty must have been imposed by law, *Donovan v. Kansas City*, 352 Mo. 430, 175 S.W.2d 874, *modified* 352 Mo. 430, 179 S.W.2d 108 (Mo.1944). *See also*, R.S.Mo. Ch. 537.

Missouri case law has held that the "cause of action" need not be characterized as a tort to come within R.S.Mo. § 506.-500(1)(3) so long as it arises from "the commission of a tortious act"; while § 506.500(1)(3) is limited to service upon one who has committed "tortious" conduct, and subsection (2) limits service to a "cause of action arising from" that conduct, it does not necessarily follow that the cause of action must sound in tort. *See, Fulton v. Chicago, Rock Island and Pacific R.R. Co.*, 481 F.2d 326 (8th Cir.1973); *State ex rel. Apco Oil Co. v. Turpin*, 490 S.W.2d

that third-party generator defendants "are persons as defined in RCRA and CERCLA, who by contract, agreement, or otherwise arranged for the disposal or treatment or arranged with a transporter for transport for disposal or treatment of solid or hazardous waste and substances or other materials owned or possessed by them at the CCC Kansas City site." SDR's Motion to Dismiss and Amended Motion to Dismiss are not supported by evidence negating each of the elements of the principal allegation set forth above. Evidence submitted by Third Party Plaintiffs places in dispute various issues of material fact relevant to the principal allegation. SDR's Reply, filed May 3, 1985 and therefore, out-of-time, seeks to establish an evidentiary basis for the Motion to Dismiss for failure to state a claim. However, the Master cannot now consider the Reply. (Moreover, Third Party Plaintiffs, possibly anticipating this tactic, expressly sought to reserve a right to respond if RSD amplified on its original Motion. The Master does not intend to allow an endless point-counterpoint. SDR had the burden, on its Motion to Dismiss, to eliminate all doubt as to the viability of Third Party Plaintiffs' claim. They have not done so and the Master therefore denies the Motion to Dismiss for failure to state a claim upon which relief can be granted. Among other facts in dispute is the question of whether SDR even "possessed" the hazardous substance within the meaning of CERCLA. If this factual issue were undisputed, the Master would then be compelled to interpret the language of Section 107(a)(3) of CERCLA, and, specifically, as to whether the clause "by any other party or entity" modifies the words "disposal or treatment" or rather allows liability even where the hazardous substance is not owned or possessed by the person arranging for disposal or treatment, or transportation for disposal or treatment. *See*, S. 1480 for alternate placement of this key modifying clause. The Master reserves ruling on this issue until it is properly presented and briefed.

400 (Mo.App.1973). Thus, even if the third-party complaint does not sound in tort, the third-party defendants' alleged conduct is tortious and the causes of action in the third-party complaint arise from such conduct. Furthermore, even if § 506.500(1)(3) were applicable only if the cause of action sued on sounded in tort, it would apply to the third-party complaint because its claims are derivative to those in the government's First Amended Complaint which do indeed sound significantly in tort. *See, United States v. Mottolo, supra; State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300 (N.D.Ohio, 1983); *see also, U.S. v. P/B Stco 213,* 569 F.Supp. 743 (S.D.Tex.1983) and *U.S. v. Barge Shamrock,* 635 F.2d 1108, 1112 (4th Cir.1980) (analogizing comparable provisions of the Federal Water Pollution Control Act to tort law).

If the causes of action of the third party complaint sound in tort, have third party defendants' actions satisfied the statutory requirement for "the commission of a tortious act within the state;" [R.S.Mo. § 506.500(3) ]? The "tortious act" phrase has been interpreted by both Missouri courts and federal courts. In two early products liability actions it was held that where the act of negligence was committed in the state where the product was manufactured, but damage did not result until after the product had been transferred to the state where the injury occurred, the state's long-arm statute was applicable. *See, State ex rel. Deere & Co. v. Pinnell,* 454 S.W.2d 889 (Mo. en banc. 1970); *Aftanase v. Economy Baler Co.,* 343 F.2d 187 (8th Cir.1965) (interpreting Minnesota's similar long-arm statute). Later this principle was extended to non-products liability actions by holding that Missouri case law construes the phrase "commission of a tortious act within the state" to include extraterritorial acts producing actionable consequences in Missouri. *See, Fulton v. Chicago, Rock Island & Pacific R.R. Co.,* 481 F.2d 326 (8th Cir.1973), citing *State ex rel. Deere & Co., supra* and *Missouri ex rel. Apco Oil Co. v. Turpin,* 490 S.W.2d 400 (Mo.App.1973); *see also, State ex rel.*

*Birdsboro Corp. v. Kimberlin,* 461 S.W.2d 292 (Mo.App.1970).

Thus, as in the classic example in the American Law Institute's Restatement (Second) of Conflicts of Law § 37(a) (1971): "... one who intentionally shoots a bullet into a state is as subject to the judicial jurisdiction of the state as to causes of action arising from the effects of the shot as if he had actually fired the bullet in the state." Other jurisdictions have interpreted long-arm statutes similar to Missouri's to include extraterritorial acts producing actionable consequences in the state and upheld the validity of such a construction against constitutional due process attacks. *See, Buckley v. New York Post Corp.,* 373 F.2d 175 (2d Cir.1967); *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961); *Ehlers v. U.S. Heating & Cooling Mfg. Corp.,* 267 Minn. 56, 124 N.W.2d 824 (1963). However, following *World-Wide Volkswagen Co. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), a question is raised as to whether the application of a long-arm statute to non-resident exterterritorial acts producing actional consequences in the forum state would retain its constitutionality even where there has been no deliberate conduct or intent by the non-resident defendant to move into, operate within, or subject himself to the jurisdiction of the forum state. *See, Pfeiffer v. Int'l Academy of Biomagnetic Medicine,* 521 F.Supp. 1331 (W.D.Mo.1981); *School District of Kansas City et al. v. State of Missouri et al.,* 460 F.Supp. 421 (W.D.Mo. 1978). In *Fulton v. Southern Pacific Co.,* 320 F.Supp. 45 (W.D.Mo.1970), the court found that the single act of negligent loading of freight cars in Minnesota was sufficient to support application of the Missouri long-arm statute against a non-resident defendant which resulted from a shifting of the load while the freight cars were in transit through Missouri, even where the freight cars were transferred following their loading in Minnesota to other railroad companies for ultimate trans-shipment to Texas.

■ A review of the Missouri cases suggests that the "minimum contacts" necessary to comport with due process can be met by a single act done or a single transaction consummated within the forum state if the cause of action arises from that act or transaction or by the conduct of business by a non-resident within the forum state even if the litigation does not arise from the business transacted. In the latter instance, courts have tried diligently to assess the nature and quantum of the contacts necessary. *See, State ex rel. Caine v. Richardson,* 600 S.W.2d 82, 84 (Mo.App. 1980); *M & D Enterprises v. Fournie,* 600 S.W.2d 64 (Mo.App.1980); *State ex rel. Newport v. Wiesman,* 627 S.W.2d 874 (Mo. banc. 1982). In the former instance, the courts, particularly in the case of tortious conduct resulting in injury to forum state residents, have often been satisfied that the resulting act itself meets the "minimum contact" standard if it was the result of deliberate action by the defendant to move into the state or to avail itself of the benefits of doing business in the state.

■ Although the reach of the state long-arm statute is a question of state law and federal courts are required to accept the interpretation given the statute by the state supreme court, the extent to which the reach of the long-arm statute is limited by due process is a question of federal law. *See, Scullin Steel Co. v. National Railway Utilization Corp.,* 676 F.2d 309 (8th Cir.1982). The Eighth Circuit has enunciated a five part test to determine whether the exercise of personal jurisdiction over a nonresident defendant who has committed one of the acts enumerated in the long-arm statute violates the Due Process Clause of the Fourteenth Amendment.

■ The five factors to be considered are: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts within the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its resident; and (5) the convenience of the parties. *See, Commercial Design v. Dean/Dale & Dean*

*Architects,* 584 F.Supp. 890, 892 (E.D.Mo. 1984). These factors, however, do not provide "a slide rule by which fundamental fairness can be ascertained with mathematical precision." *Toro Co. v. Ballas Liquidating Co.,* 572 F.2d 1267, 1270 (8th Cir. 1978). The first three factors are of primary importance and the last two are of secondary importance. *See, The Land-O-Nod Company v. Bassett Furniture Industries, Inc.,* 708 F.2d 1338 (8th Cir.1983). In *Toro* and *Land-O-Nod,* the court concluded that personal jurisdiction was lacking because of the absence of any connection between the cause of action and the activities of the defendants in the forum state.

The Eighth Circuit has explicitly rejected the argument that "jurisdictional significance should be attached to a foreign corporation's forum activities which were unrelated to the cause of action." *Breiner Equipment Co. v. Dynaquip, Inc.,* 539 F.Supp. 204, 206 (E.D.Mo.1982); *Toro Co. v. Ballas Liquidating Co., supra,* at 1270; *Aaron Ferer & Sons Co. v. American Compressed Steel Co.,* 564 F.2d 1206, 1211 (8th Cir.1977).

The central concern of the inquiry should always be the relationship among the defendant, the forum, and the litigation. Therefore, the question which must be answered is whether the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Breiner Equipment Co. v. Dynaquip, Inc.,* 539 F.Supp. 204, 205 (E.D.Mo.1982); *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Accord, World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291–294, 100 S.Ct. 559, 564–565, 62 L.Ed.2d 490 (1980).

Three recent U.S. Supreme Court cases, not cited in the briefs of any of the parties, shed considerable light on this subject. The first case, *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), involved the assertion of personal jurisdiction over a non-resident

defendant in New Hampshire although neither the plaintiff nor defendant were residents of New Hampshire and the bulk of the harm done to plaintiff occurred outside New Hampshire. The court found that since the defendant had continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine (citing *World-Wide Volkswagen, supra*). The defendant was held to have satisfied the "minimum contacts" standard.

The second case involved tortious injury to a plaintiff in the forum state as a result of activities undertaken by non-resident defendants in another state. *See, Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). "The fact that the actions causing the effects in California were performed outside the State did not prevent the State from asserting jurisdiction over a cause of action arising out of those effects." *Calder v. Jones, supra*, 104 S.Ct. at 1485–1486. The Supreme Court adopted the "effects" test employed by the California Court of Appeal. *Id.*, 104 S.Ct. at 1486, fn. 6 and 1487.

The tortious act component of R.S.Mo. § 506.500 has been interpreted to apply to extraterritorial acts that have consequences in the forum. *See, State ex rel. Deere & Co. v. Pinnell*, 454 S.W.2d 889 (Mo. banc. 1970); *State ex rel. Apco Oil Corp. v. Turpin*, 490 S.W.2d 400 (Mo.App. 1973). This interpretation is consistent with the Missouri court's broad interpretation of § 506.500 to extend jurisdiction of Missouri courts over non-resident defendants to the extent permissible under the due process clause. *State ex rel. Newport v. Wiesman*, 627 S.W.2d 874, 876 (Mo. banc. 1982). *Pfeiffer v. Int'l Academy of Biomagnetic Medicine*, 521 F.Supp. 1331 (W.D.Mo.1981).

In the third case, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) a wrongful death action was instituted in Texas against a Colombian corporation. The Court held that the Colombian corporation's contacts with Texas were insufficient to satisfy the requirements of the Due Process Clause of the Fourteenth Amendment and to allow a Texas court to assert in personam jurisdiction over the corporation. In this case, neither the negligent act nor the tortious consequence of the act occurred in Texas. The defendant had certain contacts with Texas, but these contacts were entirely unrelated to the cause of action. In denying jurisdiction, the Court's decision was consistent with the Eighth's Circuit's rulings that jurisdictional significance should not attach to a foreign corporation's forum activities which are unrelated to the cause of action. However, the Supreme Court has held that "general" jurisdiction can be asserted over a foreign defendant when there are sufficient contacts between the state and the foreign corporation. *See, Helicopteros, supra*, 104 S.Ct. at 1872 and especially fns. 8 and 9; *see also, Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

The Supreme Court's analysis in these cases is imprecise and, as in all such jurisdictional cases, the decisions are primarily dependent upon the application of vaguely stated principles to complex fact situations. The Court does, however, distinguish between "general" jurisdiction over a non-resident defendant (in suits *not* arising out of or related to the defendant's contacts with the forum) and "specific" jurisdiction over a non-resident defendant (in suits arising out of or related to the defendant's contacts with the forum). (Justice Brennan, in a dissenting opinion in the *Helicopteros* case, admonishes the majority for failing to go further by creating a distinction between controversies that "relate to" a defendant's contacts with a forum and those that "arise out of" such contacts. 104 S.Ct. at 1875–1879.) The Supreme Court has held that "general" jurisdiction requires "sufficient" minimum contacts between the non-resident defendant and the forum state to satisfy due process precisely *because* the cause of action does *not* arise out of or relate to the defendant's contacts with the forum; whereas, "specific" juris-

diction requires no contact between the non-resident defendant and the forum other than the occurrence of a result in the forum of an act (which may have been performed outside the forum) which gives rise to the cause of action, where such result in the forum state is purposeful, [*see, Commercial Design, Inc. v. Dean/Dale and Dean Architects, supra,* 584 F.Supp. at 892 and *Greycas v. Anderson,* 584 F.Supp. 894, 896 (E.D.Mo.1984) ], or part of a deliberate course of action (*see, Sun World Lines v. March Shipping Corp., supra,* 585 F.Supp. at 584), rather than mere untargeted negligence (see *Calder, supra,* 104 S.Ct. at 1487).

Applying these rules to the facts presented in this case is a difficult task and one that is made significantly more demanding by virtue of the fact that there are apparently no prior cases involving personal jurisdiction over a non-resident defendant pursuant to a state long-arm statute based upon a cause of action grounded on RCRA or CERCLA. Third party defendants rely principally on *World-Wide Volkswagen* and specifically the language that:

> the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there.

*World-Wide Volkswagen, supra,* 100 S.Ct. at 567.

CERCLA provides for liability for: any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by and other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances. 42 U.S.C. § 9607(a)(3); CERCLA § 107(a)(3). As has been discussed previously, there is no requirement that the generator select a particular site, nor is there any requirement that the generator deliberately or intentionally transport waste or arrange for waste to be transported to a facility containing hazardous substances or even that he know where the hazardous waste is being shipped. CERCLA is a strict liability statute. The only causation that is required to be shown to implicate a generator or other person who has arranged for the disposal or treatment of hazardous substances is: (1) that the hazardous substances were sent to the site; (2) that wastes of that type were present in the site at the time of the release; and (3) that there was a release or threatened release of *any* hazardous substance, resulting in a reimbursable response action. Thus, under CERCLA, a generator-defendant can reasonably anticipate being haled into court in any state in which hazardous substances, for which such generator-defendant has arranged for disposal or treatment or arranged with a transporter for disposal or treatment, are found at a facility containing such hazardous substances and at which there is a release of hazardous substances.

Given the facts alleged by third party plaintiffs, as supported by documentary evidence and sworn testimony, taken in the light most favorable to third-party plaintiffs indicating that defendants' wastes were sent to the site or that they arranged for hazardous wastes to be sent to the site, and given the nature of the cause of action asserted, the liability provisions of CERCLA, the relationship of third-party defendants' actions to the resultant harm in the forum state, and the breadth of the Missouri long-arm statute, the Master finds that third-party defendants' contacts with the State of Missouri are sufficient for the Court to obtain in personam jurisdiction under the Missouri long-arm statute consistent with the requisites of due process as enunciated by the United States Supreme Court. The "effects" test enunciated by the Supreme Court is met by the resultant "tortious act" of the release in Missouri. The requirement of deliberation, purposeful or intentional conduct to come

within or to harm a person or property in the State is negated by the uniform federal statutory scheme to impose liability on "any persons" as that term is used in Section 107(a)(3). The "foreseeability" requirement suggested by *World-Wide Volkswagen* is again satisfied by the uniform federal statutory scheme. A minimal contact with the forum state is sufficient to sustain an application of the long-arm statute compatible with due process if the relationship between the defendant, the forum and the litigation is such that maintenance of the suit will not offend traditional notions of fair play and substantial justice. Given the uniform federal statutory scheme and the express language and intent of RCRA and CERCLA, we do not find that the imposition of personal jurisdiction over a non-resident defendant whose hazardous substances are at a site with an actual or threatened release would violate due process.

## XI. MOTION OF FORD MOTOR COMPANY

■ Ford Motor Company ("Ford") arranged with CCC to purchase muriatic acid (the "acid") for use at its Kansas City Assembly Plant. On August 12, 1976, a CCC vehicle containing 2000 gallons of the acid pumped 500 gallons into Ford's demineralized water system. On August 13, 1976, an additional 500 gallons of the acid was pumped from the truck into the system.

Ford states that it has no knowledge of what became of the remaining 1000 gallons, although Ford was charged for 2000 gallons of the acid as well as $50 for the "disposal" of the unused acid. Ford further states that there is no evidence to suggest that Ford contracted or arranged for the disposal of any hazardous substance.

Third-party plaintiffs argue that transfer of ownership of the unused acid (waste) back to CCC at the time CCC picked up the truck containing the acid, does not absolve Ford from liability.

Ford's liability is determined by Section 107(a) and can presumably be decided by an analysis of Ford's possible ownership or possession of the acid. This is a question of fact which cannot be answered through those facts raised in Ford's Motion for Summary Judgment or the Suggestions of Third-Party Plaintiffs in Opposition to Motion of Third-Party Defendant Ford Motor Company for Summary Judgment. The evidence attached to Ford's Memorandum and Third-Party Plaintiffs Suggestions is not dispositive of the question who owned or possessed the remaining 1000 gallons of acid. Ford's Memorandum includes Purchase Notification, shipping forms, Invoice, and a Remittance Advice. Third-Party Plaintiffs' Suggestions include portions of depositions of Norman B. Hjersted, President of CCC.

The Purchase Notification is a copy that is difficult to read and illegible in parts. It does appear to be a type of an order form as the "Description of Supplies and Services" is set out as "... acid, truck rental and labor for [illegible word] of demineralized water system." It is not clear from the Purchase Notification how much acid was ordered. Ford might have ordered a specific number of gallons; Ford might have ordered all that was necessary for the system.

The three "shipping forms," so nominated because that is what they appear to be although the heading of the form was apparently cut off in the copying process, are dated August 11, 1976, August 12, 1976, and August 13, 1976. The August 11, 1976 form has as its Description "Emergency use of equipment and handling of 20 Be Muriatic Acid." The August 12, 1976 form has as its Description "Emergency use of equipment and handling of 2000 gallons 20 Be Muriatic Acid." Handwritten below this description is "500 pumped out/1500 still in T–1." The August 13, 1976 form has as its description "Emergency use of equipment and handing of 2)000 [sic] gallons 20 Be Muriatic Acid." As on the previous day's form, below this description is handwritten "500 pumped out/1000 still in T–1."

The Invoice is dated August 26, 1976, and contains descriptions of services for the three days discussed in the preceding paragraph. For each day, labor, time and trailer rental is noted. Below these notations is listed:

| | |
|---|---|
| Approximately 2000 gallons 20 | |
| Be Muriatic Acid 19,570 pounds | $782.80 |
| Freight charges, delivery of | |
| muriatic 4½ hrs. | $116.88 |
| Disposal of 1000 gallons Muriatic | $ 50.00. |

The Remittance Advice indicates that Ford paid CCC $1762.18 as the Invoice showed on September 27, 1976.

It is clear from the facts and evidence that:

1. The CCC truck, before any delivery to the Ford plant, contained 2000 gallons of acid.

2. A total of 1000 gallons was pumped into the demineralized water system of Ford's plant.

3. After 1000 gallons was pumped into the demineralized water system of Ford's Plant, 1000 gallons remained in the CCC truck.

4. Ford paid $782.80 for 2000 gallons of acid.

5. Ford paid $50.00 for disposal of 1000 gallons of acid.

6. The acid was procured from a vendor by CCC, and was not manufactured by CCC.

It is unclear from the facts and evidence that Ford owned or possessed the remaining 1000 gallons of acid. The strongest evidence that Ford owned those remaining 1000 gallons is that Ford was charged $782.80 for 2000 gallons on the Invoice. That would indicate that Ford purchased (owned) 2000 gallons. The arrangement between Ford and CCC is unclear. It is uncertain how many gallons of acid Ford ordered or what was to become of any unused acid. Ford may have purchased

2000 gallons, used the 1000 gallons and provided that CCC would "dispose," at its site, through resale or otherwise, of the remaining 1000 gallons. In his deposition, Hjersted states CCC might have purchased the acid from the vendor with the understanding that CCC would have to take and keep what it used (sold to Ford), or deal with some other way, or return the unused/unsold portion to the vendor.

The Invoice indicates that Ford was charged $50 for disposal. Hjersted's deposition indicates that the term "disposal" might have been used in a broad context, and does not specifically identify how the remaining 1000 gallons were disposed. There is no evidence presented to demonstrate that the acid was disposed of at the CCC site. The actual "disposal" of the acid must be determined to see if it occurred at the site, was resold, or was utilized in some other manner. The $50 charge for "disposal" should be examined to determine what it encompasses. Ford paid, according to the Invoice, $782.80 for 2000 gallons of acid and then the $50 for disposal. These charges do not relate, as 1000 gallons would have cost $391.40. The $50 "disposal" charge possibly is a handling charge for the 1000 unused gallons.

With material facts in question as to the ownership or possession [35] of the unused 1000 gallons and as to the arrangements between Ford and CCC, summary judgment cannot lie. If Ford is found to have purchased all 2000 gallons, used what was needed or wanted (1000 gallons), likely Ford owned the remaining 1000 gallons. If so, and if Ford arranged with CCC to dispose of or treat or transport the remaining 1000 gallons, Ford is likely liable.

## XII. MOTION OF THE WELLMAN DYNAMICS CORPORATION

Wellman Dynamics Corporation ("Wellman") was incorporated on October 19,

---

**35.** Although the parties assume that Ford must have owned or possessed the acid in order to be held liable, an argument can be made based upon the literal language of Section 107(a)(3), and its interpretation in the *NEPACCO* and *Mottolo* cases that a party who arranged for the disposal or treatment of a hazardous substance need not own or possess the substance to be potentially liable. See the further discussion on this point in footnote 34. This is all the more reason to deny summary judgment.

1982 in the State of Delaware. Wellman purchased the name and certain other assets and expressly assumed certain liabilities from New Wellman Dynamics, now Wellman Liquidating Corporation ("WLC") for $17,785,000 with a promissory note due. Wellman states that since its incorporation it has not shipped waste to the CCC site. The CCC site, under a closure plan submitted to the Missouri Department of Natural Resources, was to be completely closed on or before April 2, 1979. Testimony by a CCC employee indicates that by the end of July 1979 the closure of the site was 70% complete. Further, testimony by the owner and operator of the CCC site indicates that the closure was substantially completed by December 4, 1979. Wellman claims that the CCC site was closed to the receipt of all shipments of waste prior to its incorporation.

A "Remedial Investigation on the Conservation Chemical Company Site Kansas City, Missouri," conducted by consultants hired by third-party plaintiffs, states that CCC would terminate drum burial in December 1975, and was ordered not to accept wastes other than pickle liquor after January 1, 1976. The study showed that CCC was permitted to accept pickle liquor and fly ash during the closure period. Wellman claims that the spent chromic acid which third-party plaintiffs allege Wellman shipped to the CCC site would not have been disposed of or treated at that site.

WLC admits that it contracted with CCC between November 5, 1976 and October 1, 1982 to transport, dispose of, or treat substances owned by it and which were consigned to the CCC site. WLC has moved to intervene as a third-party defendant.

Wellman filed a Limited Response to its Suggestions of Third-Party Plaintiffs in Opposition to the Motion for Summary Judgment. The Limited Response addresses issues raised by Third-Party Plaintiffs that Wellman is a continuation of WLC and which Wellman claims are not contained in the Third-Party Complaint.

Assuming that stated facts to be true, Wellman could not be held liable under CERCLA because it did not dispose, transport or treat substances at the CCC site which had been closed prior to its incorporation. The possible liability of Wellman would result if Wellman was found to be a continuation of the predecessor corporation, WLC.

*Missouri v. Independent Petrochemical Corp.*, 22 E.R.C. 1167 (E.D.Mo. Jan. 8, 1985) held a corporation liable under CERCLA where the predecessor corporation arranged for disposal of waste at a site. Missouri sought clean-up costs for the site through allegations that Agribusiness was liable for the disposal of dioxin because its corporate predecessors arranged to have certain wastes removed from its property to a facility where it was reasonably foreseeable that material would have to be removed, and from which removal to an unsafe facility could have been prevented. The waste was subsequently deposited at another site from which release or threat of release continued. Agribusiness, in a motion to dismiss for failure to state a claim upon which relief may be granted, maintained that because Missouri did not allege that Agribusiness arranged for disposal at the site for which response costs were sought, Missouri has failed to state a claim.

The court rejected the argument of Agribusiness stating that "CERCLA imposes liability upon those who arranged for the disposal of hazardous substances which were released." 22 E.R.C. at 1168. Under the broad definition of "release," the court found that the hazardous waste originally disposed of at one site was released into the environment when it was transported to the subsequent site.

Here, the corporate predecessors, now WLC, arranged for the removal and disposal of the waste. There is no discussion in the opinion relating to the purchase agreement between Agribusiness and its corporate predecessors regarding assets, liabilities, continuation of operation, and so forth. WLC apparently continues to exist and further examination must be made to determine if Wellman is a continuation of

the business. Further examination must be made of the section of the purchase agreement between Wellman and WLC regarding absolving Wellman of any liability prior to its purchase with respect to the violation of federal statutes. *Independent Petrochemical Corporation* indicates that liability can be predicated upon the acts of corporate predecessors. However, the opinion is not developed sufficiently to specify what type of acts, or what the relationship was between the former and existing corporation.

In its Limited Response, Wellman claims that Third-Party Plaintiffs allege new facts; specifically, that Wellman is a mere continuation of WLC. It is arguable that this is not an allegation of "new" facts, but questions the relationship of Wellman to WLC. Wellman sets forth a review of the law related to conflicts and the sale of a corporation and the obligations of the purchaser. Still, it appears that a question of fact remains to be resolved on the nexus of Wellman to WLC.

Summary judgment cannot be granted because there remain genuine issues as to material facts relating to the relationship of Wellman to WLC. If Wellman is found to be a continuation of WLC, likely Wellman can be held liable under CERCLA. If Wellman is a new and separate corporation, likely Wellman cannot be held liable as it was incorporated on October 19, 1982, as counsel makes extremely clear, after the closure of the CCC site.

## XIII. LIABILITY OF KCP & L AS PAST OWNER OF CCC SITE AND AS AN OWNER OF A FACILITY

It is admitted that KCP & L is the past owner of the CCC site. Section 107(a)(2) of CERCLA provides for liability for "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." *Cadillac Fairview/California v. Dow Chemical Co.*, 24 Env'tl L.Rep. 20376 (C.D.Cal. March 5, 1984) holds that a past owner of land upon which hazardous wastes have been disposed who neither received nor disposed of the waste while it owned the land is not subject to liability under Section 107 of CERCLA.

Therefore, in order to find that a past owner is liable, it must be determined whether hazardous substances were disposed of on the site during the period of ownership of the past owner. In order to make this determination, the use of the property during such period of past ownership must be established. KCP & L asserts by affidavit based on knowledge and belief that the property, at the time of sale to CCC, was not used for any purpose by KCP & L and consisted of brush and timber land. Third-party plaintiffs assert, by way of their Complaint, that, upon information and belief, KCP & L's prior use of the property may have included placement and disposal of solid or hazardous waste materials.

The Master finds that there is a critical and material issue of fact that is unresolved in any definitive way by the evidence submitted and relied upon by KCP & L. The Trask Affidavit does not eliminate all doubt as to the past use of the property sold to CCC nor does it establish conclusively that the site was never used by KCP & L for disposal of hazardous substances. For that reason, the Master recommends that KCP & L's motion for summary judgment be denied.

KCP & L also argues that it cannot be held liable by virtue of its being the owner of adjacent land. The third-party plaintiffs, however, contend that KCP & L is liable under Section 107(a)(1), 42 U.S.C. § 9607(a)(1), as an "owner" of a "facility." The Master is unaware of any instances—and the parties do not cite any—where the owner of land adjacent to the property at issue has been held liable, or sought to be held liable. Nonetheless, the Master concludes that it is conceivable that, in the event that third-party plaintiffs incur response costs for the cleanup, that they could establish that KCP & L is (1) an "owner" of a "facility" (2) from which there was a release or threatened release

of a hazardous substance (3) which caused the incurrence of response costs by third-party plaintiffs consistent with the national contingency plan. If these elements can be established, it would appear that the statute does not discriminate merely because the "facility" was not the property on which the response costs were incurred. Obviously, such determination must await trial.

## APPENDIX A

Legend: NRU = Not ruled upon
D = Recommend Denial
A/D = Recommend Approval in part, denial in part

| Name of Party | Disposition of Motion | Location(s) in Report |
|---|---|---|
| Atlantic Richfield Co. | NRU | p. 178 n. 2 |
| AMF, Inc. | D | p. 233 n. 24; p. 237 n. 26 |
| American Saw & Tool Co. | D | p. 237 n. 26 |
| Armco, Inc. | NRU | p. 178 n. 1 |
| AT&T Technologies, Inc. | D | pp. 202–222 pp. 230–232 |
| BN Transport, Inc. | D | p. 237 n. 26; p. 238 n. 29 |
| BOC Group, Inc. | D | pp. 237–241 |
| Brookside Corp. (de minimus motion) | NRU | p. 178 n. 2 |
| Brookside Corp. (motion to dismiss) | D | pp. 241–250 |
| Brookside Corp. (summary judgment motion) | D | p. 233 n. 24 |
| Cabot Corp. | D | p. 233 n. 24; p. 237 n. 26; p. 238 n. 29 |
| Cessna Aircraft Co. | NRU | p. 178 n. 2 |
| Charles O. Larson Co. | NRU | p. 178 n. 2 |
| Chemcentral Corp. | D | p. 237 n. 26 |
| Colgate-Palmolive Co. | D | p. 191 n. 7; p. 211 n. 19; p. 238 n. 29 |
| Continental Steel Corp. | NRU | p. 178 n. 2 |
| Contractors United, Inc. | D | pp. 241–250 |
| Cooperative Farm Chemicals Ass'n | A/D | p. 237 n. 27; p. 238 n. 29 |
| Copolymer Rubber & Chemical Corp. | D | p. 233 n. 24; p. 237 n. 26 |
| Curators of the University of Missouri | D | p. 233 n. 23; p. 237 n. 26; p. 237 n. 27; p. 238 n. 29 |

| Name of Party | Disposition of Motion | Location(s) in Report |
|---|---|---|
| Daisy Manufacturing Co. | D | p. 237 n. 26 |
| DeSoto, Inc. | D | p. 237 n. 27 |
| Elco Industries, Inc. | NRU | p. 178 n. 2 |
| Fansteel, Inc. | D | p. 237 n. 26 |
| Faultless Caster Corp. | D | p. 233 n. 24; p. 237 n. 27 |
| F.L. Carswell Manufacturing Co./CMC Production Galvanizers, Inc. | NRU | p. 178 n. 2 |
| Ford Motor Co. | D | pp. 250–251 |
| Frantz Manufacturing Co. | NRU | p. 178 n. 2 |
| Gates Rubber Co. | D | p. 233 n. 23; p. 237 n. 26 |
| Georgetown Steel Corp. | NRU | p. 178 n. 2 |
| Hjersted, Norman B. | NRU | p. 178 n. 2 |
| Internat'l Business Machines Corp. | D | pp. 202–222 |
| Internat'l Harvester Co. | D | p. 233 n. 23; p. 234 n. 25; p. 238 n. 29 |
| Jones Chemicals, Inc. | NRU | p. 178 n. 2 |
| Kansas City Power & Light Co. | A/D | p. 189 n. 17; pp. 230–232; p. 237 n. 26; pp. 237–241; pp. 253–254 |
| Kaw Transport Co. | NRU | p. 178 n. 1 |
| Kiowa Corp. | NRU | p. 178 n. 2 |
| Luzier, Inc. | D | p. 233 n. 23; p. 237 n. 26 |
| McCord–Winn, Inc. | D | p. 233 n. 23 |
| McDonnell Douglas Corp. | D | p. 237 n. 27; p. 238 n. 29 |
| McGraw Edison Co. | NRU | p. 178 n. 2 |
| Metal Plating Corp. | NRU | p. 178 n. 2 |
| Metals Protection Plating Co. | NRU | p. 178 n. 2 |
| Mobay Chemical Corp. | D | p. 237 n. 27; p. 238 n. 29 |
| Monroe Auto Equipment Co. | NRU | p. 178 n. 2 |
| Mueller Co. | NRU | p. 178 n. 2 |
| Nat'l Metal Processing, Inc. | D | p. 233 n. 24 |
| NL Industries, Inc. | NRU | p. 178 n. 1 |
| Northrop Worldwide Aircraft Services, Inc. | D | p. 237 n. 26 |

| Name of Party | Disposition of Motion | Location(s) in Report |
|---|---|---|
| Northwest Central Pipeline Corp. | A/D | p. 198 n. 17; p. 233 n. 23; p. 238 n. 29 |
| Owens-Corning Fiberglas Corp. | NRU | p. 178 n. 2 |
| Parmelee Pharmaceutical Co. | D | p. 237 n. 26; p. 238 n. 29 |
| Peterson Manufacturing Co. | NRU | p. 178 n. 1 |
| Pfizer, Inc. | NRU | p. 178 n. 2 |
| Philip A. Hunt Chemical Corp. | NRU | p. 178 n. 2 |
| Puritan Equipment, Inc. | D | p. 233 n. 24 |
| Regency Electronics, Inc. | D | p. 237 n. 26 |
| Rochester Corp. | NRU | p. 178 n. 2 |
| Rockwell Internat'l Corp. | NRU | p. 178 n. 2 |
| Russell, Burdsall & Ward Corp. | D | p. 237 n. 26 |
| Sanitary District of Rockford | D | pp. 241–250 |
| Schwinn Bicycle Co. | D | p. 198 n. 17; p. 234 n. 25; pp. 234–235 |
| Sheldahl, Inc. | D | p. 233 n. 24; p. 234 n. 25 |
| Sosland Companies, Inc. | D | p. 237 n. 27; p. 238 n. 29 |
| Sundstrand Corp. | NRU | p. 178 n. 2 |
| Third-party plaintiffs (Armco, AT&T, FMC and IBM) | A/D | pp. 222–230 |
| Thorpe Manufacturing Co. | NRU | p. 178 n. 2 |
| Trane Co. | D | p. 237 n. 26 |
| Trans World Airlines, Inc. | NRU | p. 178 n. 1 |
| Twigg Corp. | D | p. 233 n. 24; pp. 241–250 |
| United States of America (Department of Energy) | D | p. 237 n. 26 |
| United States of America (motion re: liability) | A/D | pp. 181–202 |
| United States of America (motion #1) | A/D | pp. 202–222 |
| United States of America (motion #2) | A/D | pp. 202–222 |
| USM Corp. | D | p. 191 n. 7; p. 211 n. 19 |
| Von Durpin, Inc. | D | p. 233 n. 24; p. 237 n. 26 |
| Wellman Dynamics Corp. | D | pp. 251–253 |
| Woodward Governor Co. | NRU | p. 178 n. 2 |

| Name of Party | Disposition of Motion | Location(s) in Report |
|---|---|---|
| W.R. Grace & Co. | A/D | p. 233 n. 23; p. 238 n. 29 |
| Zenith Electronics, Inc. (two motions) | NRU | p. 178 n. 2 |
| Zero Corp. | D | p. 234 n. 25; p. 237 n. 26 |

---

## APPENDIX B
### SPECIAL MASTER'S RECOMMENDATION CONCERNING THIRD–PARTY GENERATORS' "DE MINIMIS" MOTIONS

Many of the third-party defendant generators have argued that the principle of *de minimis non curat lex* provides a basis for their dismissal from this litigation. The Special Master has not attempted to determine the exact number of such defendants (hereinafter the "de minimis generators") who have raised this issue either through motions to dismiss, motions for summary judgment or as an affirmative defense in the answers to the third-party complaint. Attached hereto as Exhibit A is a list of the generators who have raised the issue by motion to this date.* A hearing was held on October 10, 1984, at which the application of the principle was forcefully and articulately advocated by spokespersons for the de minimis generators. One of the spokespersons estimated that the application of the *de minimis* principle would result in the dismissal of approximately 175 parties to this litigation.

The Special Master is concerned that for many of the de minimis generators, the costs of litigation could exceed their ultimate liability, if any. Nevertheless, for reasons more fully explained below, the Special Master is constrained to suggest to the Court that the principle of *de minimis non curat lex* should not be applied in this CERCLA litigation.

### Background

The principle of *de minimis non curat lex*, which has its origin in the English common law, stands for the proposition that "the law does not concern itself about trifles." Put simply, the basis for its proposed application in this case is the contention that fifty waste generators contributed approximately 98.15% of the waste shipped to the CCC–KC site, thus leaving approximately 175 generator defendants who have collectively contributed only 1.85% of the waste.** Those generators in this latter group argue that the amounts of waste that they shipped to the CCC–KC site are *de minimis* and that, as a result, the Court should dismiss them from the litigation.

A variation on this theme was proposed by the Ford Motor Company and joined by several other de minimis generators. Ford Motor Company suggested that de minimis third party generators be dismissed upon payment of a per capita "fair share" contribution (initially proposed as $7,400.00) for investigative and remedial actions at the CCC–KC site. *See,* Memorandum In Support of Motion For Order to Show Cause Why "De Minimis" Defendants Should Not

---

* *Ed. note:* Exhibit A was not designated for publication.

** These figures are based upon the waste generation list which was prepared on the basis of partial shipping records from CCC. The accuracy of the list is hotly contested by some of the parties. The Special Master accepts these figures only for purposes of argument.

Be Dismissed, at 3. At oral argument, spokespersons for other de minimis generators suggested that the Ford proposal would be more attractive if the contribution were based upon the volume of waste shipped to the site as opposed to equal per capita shares paid by all de minimis generators.

## Discussion

The first issue which must be addressed is the claim which is made by some de minimis generators that the doctrine is a "jurisdictional" defense. The Special Master is uncertain whether the parties' contention is that the application of the doctrine is jurisdictional in the sense that it strips the Court of jurisdiction over either the party or the subject matter. To the extent that such an argument may be proferred, the Special Master would suggest that it is in error. Indeed, for purposes of the motions, the de minimis generators themselves assumed that they are liable; their argument was that the Court should utilize its discretionary powers to dismiss them as a matter of equity. Thus, under such assumed facts, the Court does not lack jurisdiction; rather, the parties are asking the Court to elect not to exercise its jurisdiction based upon the equities of the case.

Having determined that the Court has jurisdiction, the threshold issue is not whether the principle of *de minimis non curat lex* should be applied in this case, but whether it *can* be applied. In opposing the de minimis motions, the plaintiff United States suggests that the third-party complaint against the de minimis generators is based upon CERCLA and that the *de minimis* doctrine is inapplicable to claims raised under federal statutes. The de minimis generators, on the other hand, have suggested that the third-party complaint is not a CERCLA action but is purely one for contribution. The Special Master concludes that both suggestions are wrong.

The latter suggestion of the de minimis generators that the third-party complaint is not a CERCLA action is belied by the pleading itself. While the third-party plaintiffs might also be entitled to common law contribution, it is clear that they are seeking contributions *under the statute* based upon the allegation that "(e)ach of the third-party plaintiffs has incurred and, if adjudged to be liable to plaintiff herein, will continue to incur necessary costs of response consistent with the national contingency plan in regard to the CCC Kansas City site." Third-Party Complaint, ¶ 8. Claims by private parties for response costs incurred are authorized under § 107(a)(4)(b) of CERCLA. *See, City of Philadelphia v. Stepan Chemical Company*, 544 F.Supp. 1135, 1143 (E.D.Pa.1982). Some courts have limited private party recovery of response costs under § 107 to cases where the government has initiated an action for site cleanup. *See, Wickland Oil Terminals v. ASARCO, Inc.*, 14 Env't. L.Rep. 20494 (N.D.Cal. May 4, 1984). However, such a limitation would not preclude the third-party plaintiffs' recovery of response costs in this case because the government did initiate the litigation.

As several of the de minimis generators have noted, however, the *de minimis* principle has been recognized and used repeatedly by federal courts in actions arising under federal statutes and involving trifling injuries or inconsequential violations of the statute. The federal courts have invoked the doctrine under the federal Fair Labor and Standards Act, *Lindow v. United States*, 738 F.2d 1057 (1984), the Mineral Leasing Act, *Conway v. Watt*, 717 F.2d 512 (10th Cir.1983), the Truth in Lending Act, *Bates v. Provident Consumer Discount Co.*, 493 F.Supp. 605 (E.D.Pa. 1979), *aff'd*, 631 F.2d 725 (3d Cir.1980), the Hatch Act, *Palmer v. United States Civil Service Comm'n*, 191 F.Supp. 495 (S.D.Ill. 1961), the Federal Food, Drug and Cosmetic Act, *United States v. Capital City Foods, Inc.*, 345 F.Supp. 277 (D.N.D.1972), the Lanham Trademark Act, *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352 (S.D.N.Y.1976), and other cases involving constitutional torts, *Am-*

*mons v. Baldwin,* 705 F.2d 1445 (5th Cir. 1983), and copyright infringement, *Rexnord, Inc. v. Modern Handling Systems, Inc.,* 379 F.Supp. 1190 (D.Del.1974). The Eighth Circuit Court of Appeals has recognized and applied the principle in antitrust cases. *See, John Wright & Associates, Inc. v. Ullrich,* 328 F.2d 474 (8th Cir.1964). In doing so, the Eighth Circuit stated that the "overall impact [of the contested bidding practice] during this period upon antitrust laws would be so inconsequential that the doctrine of *de minimis non curat lex* precludes its consideration." 328 F.2d at 479. Thus, it is clear that the principle may potentially be applicable, even if the cause of action is a statutory claim based upon CERCLA.

Since the claim is, at least partially, based upon CERCLA, the key question is whether the application of *de minimis non curat lex* would be consistent with Congressional intent. The parties have been unable to demonstrate that the principle, or any similar concept, was considered during the legislative process. The Special Master's independent research into the legislative history of CERCLA leads to the same conclusion. The Special Master has discovered, however, that one Superfund proposal limited liability to those parties whose contributions were a "significant factor" in a release. *See,* Gulick, "Superfund: Conscripting Industry Support for Environmental Cleanup," 9 *Ecology L.Q.* 524, 542 (1981), citing S. 1480, 96th Cong., 2d Sess. § 4(f)(1) (1980), reprinted in *The Environmental Emergency Response Act: Hearing Before the Senate Committee on Finance on S. 1480,* 96th Cong., 2d Sess. 5 (1980). While not conclusive, the omission of such language from the approved bill lends support to the Special Master's conclusion that the language of the act itself, particularly when considered in light of the standard and scope of liability imposed thereunder, precludes application of *de minimis non curat lex.*

As counsel for both the plaintiff and the third-party plaintiffs have aptly pointed out, § 107(a) provides that *"(n)otwithstanding any other provision or rule of law, and subject only to the defenses set forth* in subsection (b) of this section ... [responsible parties] ... shall be liable ..." (Emphasis added.) The defenses permitted are quite limited: (1) an act of God; (2) an act of war; (3) an act or omission of a third party with whom the responsible party has no employment, agency or contractual relationship, provided the responsible party exercised due care and took appropriate precautions; or (4) any combination of the three enumerated defenses. Thus, the principle of *de minimis non curat lex* is not a defense. The principle is a "provision or rule of law," but liability is imposed *notwithstanding* any other provision or rule of law. Thus, it has been held that the liability imposed under § 107(a) is "absolute," subject only to the listed defenses. *United States v. Reilly Tar & Chemical Corporation,* 546 F.Supp. 1100, 1118 (D.Minn.1982). Therefore, the explicit statutory language would appear to prevent a court from applying *de minimis non curat lex* in CERCLA cases.

Certainly, courts may look beyond the literal language of a statute and may disregard it where it can be clearly demonstrated that literal application would contravene legislative intent. However, the equitable thrust of the de minimis generators' argument that the statutory language should be disregarded—that it is *unfair* to impose the burdens of litigation on parties who have contributed a "trifling" amount of hazardous waste to the subject site—has no basis in the legislative history of CERCLA. Indeed, the standard and scope of liability imposed under the Act, as well as the nature and goals of the legislation generally, repudiate the fairness argument presented by the de minimis generators.

This Court has previously discussed the Congressional goals underlying CERCLA, chief among those being the spreading of the costs, and the assurance that the responsible parties bear the costs, of cleaning up hazardous waste sites. *See* Order, February 3, 1984, at 5 (hereinafter, "February

3 Order"). At that time, the Court held that liability under CERCLA is strict and that the strict liability standard furthers the objectives of Congress. *Id.* The federal courts throughout the country have uniformly reached the same conclusion. *See, United States v. Argent Corp.,* 14 Env't.L. Rep. 20497 (D.N.M. May 4, 1984); *United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823 (W.D.Mo. 1984) (hereinafter, *NEPACCO* ); *United States v. Price,* 577 F.Supp. 1103 (D.N.J. 1983) (hereinafter, *Price* ); *United States v. Chem-Dyne Corp.,* 572 F.Supp. 802 (S.D. Ohio 1983) (hereinafter, *Chem-Dyne* ); *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135 (E.D.Pa.1982). Quoting from the slip opinion in the *Price* decision, the Court noted that "(t)hough strict liability *may impose harsh results on certain defendants,* it is the most equitable solution in view of the alternative—forcing those who bear no responsibility for causing the damage, the taxpayers, to shoulder the full cost of the clean up." February 3, Order, at 5–6 (emphasis added).

The "fairness" argument has arisen not just in the context of the *standard* of liability under CERCLA, but also in the context of the *scope* of liability. The February 3 Order adopted the position of the *Chem-Dyne* court that Congress determined that joint and several liability should not be mandated in CERCLA but that the scope of liability should be determined on a case-by-case basis. February 3 Order, at 6–7; *see also, NEPACCO, supra,* 579 F.Supp. at 844–845; *United States v. A & F Materials Co., Inc.,* 578 F.Supp. 1249, 1255–1256 (S.D.Ill.1984) (hereinafter, *A & F Materials* ). This conclusion recognizes that joint and several liability—perhaps even more so than the strict liability standard—can lead to harsh results under certain circumstances. Thus, in the *A & F Materials* case, the court observed as follows:

> ... After reviewing the legislative history, the Court concludes a rigid application of the Restatement approach to joint and several liability is inappropriate. Under the Restatement approach, any defendant who could not prove its contribution would be jointly and severally liable. This result must be avoided because both Houses of Congress were concerned about the issue of fairness, and joint and several liability is extremely harsh and unfair if it is imposed on a defendant who contributed only a small amount of waste to a site. The Senate expressed its sensitivity to the fairness issue by rejecting a mandatory legislative standard in lieu of allowing the courts to impose joint and several liability on a case by case basis.

> Moreover, the House expressed its sensitivity to the fairness issue by passing a bill which contained a moderate approach to joint and several liability. On September 23, 1980, the House passed the Gore Amendment which softened the modern common law approach to joint and several liability, particularly when applied to a defendant who contributed a relatively small percentage to the waste site. 126 Cong.Rec. at H9461. The House was concerned that in many cases a small contributor would not be able to prove his contribution, and thus, would face joint and several liability for the whole injury. Under the Gore Amendment, a court had the *power* to impose joint and several liability whenever a defendant could not prove his contribution to an injury, however, a court could still apportion damages in this situation....

> The court finds that the moderate approach to joint and several liability set out above is both persuasive and consistent with the intent of Congress. First, the Senate's failure to adopt the Gore Amendment cannot be interpreted as a rejection of its approach. Indeed, when Senator Randolph was discussing the significance of the deletion of the terms joint and several from the Senate version, he stated "the changes do not reflect a rejection of the standards in the earlier bill." 126 Cong.Rec. at S14964. Thus, the only thing the Senate rejected was [a] mandatory legislative standard imposing joint and several liability. Second, a number of representatives

thought the final compromise bill emplicitly incorporated the essence of the House's moderate approach to liability. 126 Cong.Rec. at H11,796 and H11,801 (Remarks of Representatives Mikulski, Gore and Brown). Perhaps these representatives predicted that courts would be sensitive to the inherent unfairness of imposing joint and several liability on minor contributors. Finally, the moderate approach promotes fairness because it does not indiscriminately impose joint and several liability. Rather, it makes [a] rational distinction based on such factors as the amount and toxicity of a particular defendant's contribution to a waste site.

(578 F.Supp. at 1256–1257) (emphasis supplied by court; footnote omitted). Similar analysis led the court in *United States v. Wade*, 577 F.Supp. 1326, 1340–1341 (E.D. Pa.1983) (hereinafter, *Wade*) to reject generators' hypothetical fear of draconian liability for the contribution of a single copper penny. Clearly, these courts do not perceive Congressional intent as either imposing draconian joint and several liability on small generators or to allow a party to escape liability altogether based solely upon the small amount of waste that party generated.

Another practical barrier to acceptance of the de minimis generators' argument is the fact that it proposes a purely volumetric method of determining whether the waste contributed by a party is "trifling." As the *Chem-Dyne* court stated: "... the volume of waste of a particular generator is not an accurate predictor of the risk associated with the waste because the toxicity or migratory potential of a particular hazardous substance generally varies independently with the volume of the waste." 572 F.Supp. at 811. Thus, the 250-drum measuring stick to establish "de minimis" proposed by some of the de minimis generators could hardly be considered "trifling" if the 250 drums contained 2, 3, 7, 8—tetrachlorodibenzo—p—dioxin (dioxin). Indeed, the *NEPACCO* case involved a waste site which contained a *total* of approximately 85 drums of waste. For this reason, the Gore Amendment discussed in the *A & F Materials* case requires consideration of toxicity and other factors for purposes of apportioning damages. *See, A & F Materials, supra*, 578 F.Supp. at 1256. Not insignificantly, the United States Environmental Protection Agency's draft policy for analyzing proposed settlement agreements under CERCLA also requires consideration of other factors in addition to the volume of waste contributed.

The Special Master acknowledges that the *de minimis* doctrine has been applied in a state court hazardous waste case, *Environmental Protection Department v. Ventron Corp.*, 94 N.J. 473, 468 A.2d 150 (1981). The de minimis generators urge that this Court should follow the lead of the New Jersey court. However, the *Ventron* decision is devoid of any probing analysis concerning the *de minimis* principle or the jurisprudential basis for its application in that case. The court's discussion on this point consists of the following sentence: "We share the trial judge's view that any increment from the Wolf's property of the mercury pollution in Berry's Creek during their ownership and prior to the installation of the containment system was de minimis and therefore, not a substantial factor in proximately causing the total dangerous and toxic condition." 440 A.2d at 463.

Clearly, the *Ventron* court's consideration of the *de minimis* principle did not involve its application as a bar to liability based purely upon the small amount of waste contributed. Rather, the court applied *de minimis* in the context of causation of the harm following trial. In the case at bar, the Court is hardly in a position to speculate as to the nature of the harm at the CCC site, if any, let alone to determine those parties causally contributing to that harm. Moreover, one federal court in a CERCLA case has considered a *de minimis* -type argument for purposes of causation and rejected it. In *United States v. South Carolina Recycling and Disposal, Inc.*, 14 Env't.L.Rep. 20272 (D.S.C. Feb. 23, 1984), the generator defendants advocated the adoption of a "fin-

gerprinting" causation standard: "Generator defendants would nonetheless have this court require plaintiff to prove that hazardous substances traceable to each generator were released at the Bluff Road site or that their specific substances were more than a *de minimis* factor in a release or a threatened release." 14 Env't.L.Rep. at 20274. Relying upon the *Wade* decision, where a similar argument had been raised, the court rejected the argument.

### Recommendation

In summary, the Special Master concludes that the express statutory language in § 107(a) of CERCLA, as well as the legislative history concerning the standard and scope of liability to be imposed, preclude the application of *de minimis non curat lex* in CERCLA cases as being inconsistent with Congressional intent. All motions to dismiss and motions for summary judgment premised upon the application of that principle should therefore be denied.

The Special Master is sympathetic, however, with the plight of those generators who may truly be de minimis in terms of ultimate responsibility. For such parties, the cost of defense of the litigation might easily exceed their apportioned liability for response costs. The Special Master would strongly urge the parties to give serious consideration to the nature of the waste contributed in small amounts by various generators in an attempt to reach settlement with those parties and achieve their dismissal upon contribution of an agreed upon sum for cleanup costs. Due to the existence of cross-claims, of course, dismissal must be predicated upon unanimous consent of the parties. However, in light of the fact that a number of third-party defendant generators have been voluntarily dismissed by the third-party plaintiffs without objection by other third-party defendants, the Special Master would hope that such cooperation could extend to those parties whose liability will be relatively insignificant and that the united front presented for purposes of these motions is not illusory.

Alternatively, those generators who are convinced that their responsibility is *de minimis* could stipulate to liability and thus be spared the expense of litigating Phase One of the trial. Such parties should then be allowed to re-enter the litigation in Phase Two, if there is one, for purposes of contesting or participating in the apportionment of the response costs. Similarly, parties should consider offers of judgment under Fed.R.Civ.P., Rule 68, as a potential source of relief from unnecessary taxable litigation costs.